Louisiana Pacific Corporation and Louisiana-Pacific Canada Ltd.,

    Plaintiffs,

v.

Akzo Nobel Coatings, Inc., Akzo Nobel Coatings, Ltd, and John Does 1-10,

    Defendants.

Court File No. 1:12-cv-625

**Affidavit of Shawn M. Raiter in Support of Louisiana Pacific's Memoranda in Opposition to Akzo Nobel Coatings, Ltd.'s Motions to Dismiss**

# EXHIBIT JJ

Not Reported in F.Supp.2d, 2008 WL 78748 (D.Del.)
(Cite as: 2008 WL 78748 (D.Del.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
ENERGY TRANSPORTATION GROUP, INC.,
Plaintiff,
v.
WILLIAM DEMANT HOLDING A/S et al., Defendants.

No. C.A. 05-422 GMS.
Jan. 4, 2008.

Edmond D. Johnson, Pepper Hamilton LLP, Thomas Henry Kovach, Parkowski, Guerke & Swayze, P.A., Wilmington, DE, Maya M. Eckstein, Brian M. Buroker, Christopher C. Campbell, Thomas J. Scott, Pro Hac Vice for Plaintiff.

Mary B. Graham, James Walter Parrett, Jr., Donald E. Reid, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE, John M. Romary, Brian K. Shelton, Carl J. Pellegrini, David Cushing, William Mandir, Pro Hac Vice, for Defendants.

*MEMORANDUM*
GREGORY M. SLEET, Chief District Judge.
**I. INTRODUCTION**
*1 On June 23, 2005, Energy Transportation Group, Inc. ("ETG") filed this patent infringement action against the above-captioned defendants. Presently before the court is William Demant Holding A/S' ("WDH A/S") renewed motion to dismiss for lack of personal jurisdiction. For the following reasons, the court will deny the motion.

**II. BACKGROUND**
WDH A/S is a Danish corporation with its principal place of business in Smrum, Denmark. WDH A/S is the parent company of forty-five subsidiaries located throughout the world, including the following defendants who manufacture the allegedly infringing products: Oticon A/S, a Danish

corporation; WDH, Inc., a Minnesota corporation, with its principal place of business in New Jersey; Oticon Inc., a California corporation, with its principal place of business in Somerset, New Jersey; Bernafon, LLC, a limited liability company organized under the laws of New Jersey; and Bernafon AG, a Swiss Atiengesellschaft. (D.I. 88, at 1.) WDH A/S is a holding company that does not manufacture, sell, advertise, offer to sell, trade, or import any goods or services in the United States or anywhere in the world. (*Id.* at 3.) It maintains its own financial statements and corporate records separate from the financial statements and corporate records of its subsidiaries. (*Id.* at 4.) WDH A/S is not registered to do business in Delaware and has never contracted to supply goods or services in Delaware. (*Id.*) It has not appointed an agent to accept service on its behalf in Delaware or anywhere in the United States. (*Id.*) It does not maintain any offices or other facilities in Delaware or the United States. (*Id.*) It neither owns nor leases any real property in Delaware or the United States. (*Id.*) It does not maintain any bank accounts in Delaware and has never contracted to supply services or things in Delaware or the United States. (*Id.*)

ETG, a Delaware corporation with its principal place of business in New York, New York, is the assignee and owner of U.S. Patent Nos. 4,731,850 (the "'850 patent") and 4,879,749 (the "'749 patent") (collectively, the "patents-in-suit"). The '850 patent relates to a programmable digital hearing aid system, while the '749 patent relates to a host controller for the programmable digital hearing aid system. ETG alleges that WDH A/S has induced infringement of one or more claims of the patents-in-suit. (D.I. 89, at 8.)

On October 31, 2005, WDH A/S filed a motion to dismiss for lack of personal jurisdiction (D.I.87). ETG responded by opposing the motion or, in the alternative, requesting jurisdictional discovery. On November 30, 2006, the court held a scheduling conference, during which it orally denied WDH A/

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 78748 (D.Del.)

(Cite as: 2008 WL 78748 (D.Del.))

S' motion to dismiss and granted ETG's request for jurisdictional discovery. On December 4, 2006, the court issued an Order (D.I.135) reiterating its denial of WDH A/S' motion, outlining the scope of ETG's jurisdictional discovery, and limiting the scope of ETG's claim against WDH A/S to inducement of infringement. On August 20, 2007, WDH A/S filed a renewed motion to dismiss for lack of personal jurisdiction (D.I.353).

## III. STANDARD OF REVIEW

**\*2** WDH A/S moves to dismiss the complaint for lack of personal jurisdiction. "Rule 12(b)(2) of the Federal Rules of Civil Procedure requires a court to dismiss a case when the court lacks personal jurisdiction over the defendant[ ]." *E.I. DuPont de Nemours & Co. v. Rhodia Fiber & Resin Intermediates,* 197 F.R.D. 112, 119 (D.Del.2000). In determining whether personal jurisdiction exists, courts engage in a two step analysis. First, the court must decide whether jurisdiction is authorized by the long-arm statute of the state in which the court sits. *Transportes Aeros de Angola v. Ronair, Inc.,* 544 F.Supp. 864-65 (D.Del.1982). If jurisdiction is proper per the long-arm statute, the court must then determine whether exercising jurisdiction comports with the requirements of the Due Process Clause of the Fourteenth Amendment. *Id.* (noting, however, the "intent of the legislature to exercise jurisdiction over non-residents whenever feasible"); *Compaq Computer Corp. v. Packard Bell Elec., Inc.,* 948 F.Supp. 338, 342 (D.Del.1996) (citation omitted).

In determining the jurisdictional question, the court must accept as true the allegations in the complaint. *Altech Indus., Inc. v. Al Tech Specialty Steel Corp.,* 542 F.Supp. 53, 55 (D.Del.1982). However, ETG, the plaintiff, bears the burden of alleging facts sufficient to make a *prima facie* showing of personal jurisdiction over WDH A/S. *ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.,* 147 F.Supp.2d 268, 270-71 (D.Del.2001). To meet this burden, ETG must adduce facts which " 'establish with reasonable particularity' " that jurisdiction over WDH A/S exists. *Id.* (quoting *Joint Stock*

*Soc'y v. Heublein, Inc.,* 936 F.Supp. 177, 193 (D.Del.1996)).

## IV. DISCUSSION

### A. Delaware's Long-Arm Statute

The first step in the court's analysis is to determine whether any of the provisions of Delaware's long-arm statute, Del.Code Ann. tit. 10 § 3104, warrant the exercise of jurisdiction over WDH A/S. WDH A/S contends that the court has no basis to assert jurisdiction, while ETG maintains that the WDH A/S' conduct satisfies the requirements of subsections (c)(1) and (c)(3) of the long-arm statute, under a stream of commerce theory. In other words, ETG's principle argument is that the court may exercise jurisdiction over WDH A/S, because WDH A/S has induced infringement by its distributors and co-defendants Oticon A/S, Oticon, Inc., Bernafon AG, and Bernafon, LLC.

Under subsection (c)(1), the court may exercise jurisdiction over a nonresident or agent of a nonresident who "transacts any business or performs any character of work or service in the State." DEL. CODE ANN. tit. 10 § 3104(c)(1). Subsection (c)(3) gives the court the authority to exercise jurisdiction over a nonresident or agent of a nonresident who "causes tortious injury in the State by an act or omission in this State." DEL.CODE ANN. tit. 10 § 3104(c)(3). Delaware courts construe the long-arm statute broadly to confer jurisdiction to the maximum extent possible so as to "provide residents a means of redress against those not subject to personal service within the state." *Boone v. Oy Partek Ab,* 724 A.2d 1150, 1156-57 (Del.Super.1997). The Delaware Supreme Court has interpreted subsections (c)(1) and (c)(3) as specific jurisdiction provisions that require a "nexus" between the plaintiff's cause of action and the conduct of the defendant that is used as a basis for jurisdiction. *See LaNuova D & B, S.p.A. v. Bowe Co.,* 513 A.2d 764, 768 (Del.1986). In order to meet the requirements of subsections (c)(1) and (c)(3), WDH A/S' actions must be directed at residents of Delaware and the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 78748 (D.Del.)
(Cite as: 2008 WL 78748 (D.Del.))

protection of Delaware laws. *Thorn EMI N. Am. Inc. v. Micron Tech., Inc.,* 821 F.Supp. 272, 274 (D.Del.1993).

*\*3* ETG asserts that the court should exercise jurisdiction under § 3104(c)(1) and/or (c)(3), because WDH A/S actively induced sales of infringing products in the United States and Delaware, via well-established distribution channels that it owned and controlled. ETG relies on *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558 (Fed.Cir.1994) for the proposition that a foreign company's actions in inducing infringement, here WDH A/S, give rise to personal jurisdiction in any United States forum where the infringing products are sold. ETG argues that WDH A/S and its subsidiaries "collaborate in many areas" and "to a wide extent also share resources and technologies." D.I. 387, at 7 (quoting WDH Holding Annual Report 2006, D.I. 388, Ex. 36 at DEM012313). Put differently, ETG argues that WDH A/S acted in consort with its subsidiaries to develop the allegedly infringing hearing aid products, then induced its subsidiaries to manufacture, sell, and distribute the infringing products in the United States and Delaware. ETG argues that these acts by WDH A/S caused the allegedly infringing products to be injected into the stream of commerce for sale in Delaware.

For support, ETG cites to a number of WDH A/S documents, including annual reports, press releases or announcements, and licensing agreements, as well as the company's website "www.demant.com." The website states that "The William Demant Holding Group develops, manufactures and sells products and equipment designed to aid the hearing and communication of individuals." D.I. 89-2, Ex. A-4; *see id.* Ex. A-6 ("In 2000, the William Demant Holding Group acquired four major companies that have strengthened the distribution of hearing aids manufactured by both Oticon and Bernafon."). The annual reports of WDH A/S from 1999-2006 discuss profits and costs for the entire group of companies owned by it. Additionally, several of the annual reports describe the "shared functions" of the "Group," which include "co-ordinat[ing] and handl[ing] a substantial part of ... operational activities, such as purchasing, logistics, production facilities, IT infrastructure, quality management systems, service and technical support as well as finance and administration." (D.I. 388, at DEM012013, DEM012047, DEM012084, DEM012126, DEM012170.) Further, the Group sells its products direct to end users and to OEM customers through a number of distribution companies in selected countries. (*Id.* at DEM012013, DEM012047, DEM012084, DEM012126, DEM012170.) An announcement or press release from Niels Jacobsen ("Jacobsen"), President and CEO of WDH A/S, to the Copenhagen Stock Exchange, dated November 22, 2000, states that "William Demant Holding A/S has just concluded a joint venture and an OEM-agreement with a group of independent American hearing aid dispensers...." (*Id.* Ex. A-1 at 1.) The press release further states, "[b]y virtue of the recently concluded exclusive OEM-agreement, the clinics will in [the] future mainly sell OEM-products from the William Demant companies under the AVADA brand ." (*Id.*) Finally, the release states that "[t]he cooperation with the AVADA Group will strengthen the position of William Demant Holding A/S on the North American market...." (*Id.* at 2.)

*\*4* A license and development agreement between Widex A/S and William Demant Holding A/S further supports ETG's position. The agreement, dated March 22, 2002, specifically lists WDH A/S as a party and discusses a collaboration between WDH A/S and Widex with respect to a production method for hearing aid shells and an ear scanner. The agreement states that "WDH has *developed* a model (3 times real size) ear scanner (the "Ear Scanner"), and applied for certain patents in relation to the Ear Scanner and has afterwards initiated a full-scale feasibility study in order to develop functional test models." (D.I. 388, Ex. 23 at DEM012958) (emphasis added). The scope of the agreement indicates that Widex and WDH A/S will

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 78748 (D.Del.)
(Cite as: 2008 WL 78748 (D.Del.))

jointly continue development of the Ear Scanner. ( *Id.* at DEM012959, DEM012962.) The agreement is signed by Jacobsen on behalf of WDH A/S.

WDH A/S disagrees with ETG's assertion, arguing that it is merely a Danish holding company that did not know of the asserted patents before the suit was filed and did not undertake any affirmative acts to cause the accused products to enter the United States. As previously mentioned, WDH A/S contends that it does not manufacture, sell, advertise, offer to sell, trade, or import any goods or services in the United States or anywhere in the world. The crux of WDH A/S' argument is that, as a holding company, it had nothing to do with the accused products, it had no knowledge of the patents-in-suit, and it did not purposefully induce infringement in the United States, let alone purposefully direct activities to Delaware residents. Thus, according to WDH A/S, subjecting it to jurisdiction in Delaware is beyond the reach of the Delaware long-arm statute, and would violate due process.

The court is not persuaded by WDH A/S' argument. After having reviewed the record, the court finds that the evidence produced by ETG illustrates that WDH A/S is not merely just a passive holding company. The situation in the present case is analogous to that in *Beverly Hills Fan,* where the Federal Circuit found that jurisdiction was proper over foreign defendants when the plaintiff alleged that the defendants purposefully shipped the accused product into the forum through an established distribution channel. 21 F.3d at 1565. Quoting *World-Wide Volkswagen v. Woodson,* 444 U.S. 286, 297 (1980), the Federal Circuit highlighted: " '[I]f the sale of a product of a manufacturer or distributor ... is not simply an isolated occurrence, but arises from the efforts of the [defendants] to serve, directly or indirectly, the market for its product ..., it is not unreasonable to subject it to suit.' " *Beverly Hills Fan,* 21 F.3 d at 1565. The court then concluded that the plaintiff had stated all of the necessary ingredients for an exercise of jurisdiction: "defendants, acting in consort, placed the accused

[product] in the stream of commerce, they knew the likely destination of the products, and their conduct and connections with the forum state were such that they should reasonably have anticipated being brought into court there." *Id.* at 1566. In the present case, when viewed in light of the allegations, assertions in the affidavits, and evidence provided in ETG's appendix, the court concludes that ETG has stated the necessary ingredients for an exercise of jurisdiction over WDH A/S: WDH A/S acted in consort with its subsidiaries to place the accused products in the stream of commerce; it knew that the accused products foreseeably would be sold in the United States and Delaware; [FN1] and WDH A/S' conduct and connections with the forum state were such that it should reasonably have anticipated being brought to court here. *See Oakley, Inc. v. JOFA AB,* 287 F.Supp.2d 1111, 1117 (finding the exercise of jurisdiction consonant with due process: "the fact situation is more compelling here than in *Beverly Hills Fan Co.* given the peculiar relationship between the [Defendant seeking dismissal] and the other Defendants, which are its subsidiaries").

> FN1. Oticon's website directs customers to three providers of hearing aids located in Wilmington, Delaware. http://hcl.oticonusa.com/(S(xhila545oy02kgqusfqwspft))/viewMap.aspx (last visited Dec. 27, 2007); http://hcl.oticonusa.com/(S(xhila545oy02kgqusfqwspft))/form.aspx (last visited Dec. 27, 2007) ("The hearing care professionals that are listed within the U.S. Hearing Center Locator represent an overview of currently active Oticon distributors trained in fitting Oticon products.")

**B. Due Process**
*\*5* Having found that the exercise of jurisdiction is proper per Delaware's long-arm statute, the court must determine whether jurisdiction comports with the requirements of constitutional due process. To satisfy the due process prong of the jurisdictional analysis, the court must find the existence of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 78748 (D.Del.)
**(Cite as: 2008 WL 78748 (D.Del.))**

"minimum contacts" between the defendant and the forum state, "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (citation omitted). Specifically, ETG must show that WDH A/S "purposefully avail [ed] itself of the privilege of conducting activities within the forum State." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253 (1958)); *see also Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 108-09 (1987). Due process, therefore, requires the court to consider whether it would be unreasonable for the court to assert jurisdiction under all the facts and circumstances.

As the *Beverly Hills Fan* court noted, "[i]n general, these cases are limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." 21 F.3d at 1568. The court concludes that this is not one of those rare cases. Delaware's interest in the dispute is significant. Delaware has an interest in discouraging injuries that occur within the state, which extends to patent infringement actions such as the one here. *Id.* Additionally, the burden on WDH A/S of litigating in Delaware is not significant enough to outweigh Delaware's interest in the dispute. While WDH A/S will have to travel to the United States to defend itself, " 'progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome.' " *Id.* at 1569 (citing *World-Wide Volkswagen,* 444 U.S. at 294). Moreover, because many of the defendants are subsidiaries of WDH A/S, the burden of document and witness production will be minimal to WDH A/S. *See* D.I. 88, at 2, 16-17 ("[A]s a manufacturer, seller, and/or designer, these defendants [the subsidiaries] can provide any potentially relevant documents or witnesses in this action."). Given the foregoing, the court concludes that it is not unreason-

able to assert jurisdiction over WDH A/S. Accordingly, the court will deny WDH A/S' motion.

### ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. WDH A/S' Renewed Motion to Dismiss for Lack of Personal Jurisdiction (D.I.353) is DENIED.

D.Del.,2008.
Energy Transp. Group, Inc. v. William Demant Holding A/S
Not Reported in F.Supp.2d, 2008 WL 78748 (D.Del.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**H**
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**
NOT FOR PUBLICATION

United States District Court,
D. New Jersey.
SCHINDLER ELEVATOR CORP., Plaintiff,
v.
OTIS ELEVATOR CO., Defendant.
, Otis Elevator Co., Counterclaim Plaintiff,
v.
Schindler Elevator Corp. and Schindler Aufzüge
AG, Counterclaim Defendants.

Civil Action No. 09-cv-0560 (DMC).
March 16, 2010.

Jeffrey James Brosemer, Brosemer Kolefas & Associates, Hazlet, NJ, Pierre R. Yanney, Stroock & Stroock & Lavan LLP, New York, NY, for Plaintiff/Counterclaim Defendants.

Donald A. Robinson, Keith J. Miller, Leda Dunn Wettre, Robinson, Wettre & Miller LLC, Newark, NJ, for Defendant/Counterclaim Plaintiff.

**OPINION**
DENNIS M. CAVANAUGH, District Judge.
*1 This matter comes before the Court upon motions by Schindler Aufüge ("Aufüge" or "Counterclaim Defendant"). In this matter, Otis Elevator Company ("Otis" or "Counterclaim Plaintiff") asserts a counterclaim for indirect infringement of United States Patent No. 6,739,433 (the "'433 Patent") against Aufüge. Aufüge, pursuant to FED. R. CIV. P. 12(b)(2) and/or 12(b)(6), moves to dismiss Otis' counterclaim. No oral argument was heard pursuant to FED. R. CIV. P. 78.

For the reasons stated below, Aufüge's motions

are **denied.**

**I. *BACKGROUND*** FN1

> FN1. The facts in the Background section are taken from the parties' moving papers.

**A. PROCEDURAL HISTORY**
On December 23, 2008, Schindler Elevator Corporation ("Schindler N.J.") filed the present action seeking a declaration that the '433 Patent is invalid. The '433 Patent covers flat belts for use in lifting elevator cars. The patent teaches the use of flat belts instead of round ropes for tension members, as using ropes has a number of drawbacks.

Otis filed its answer and a counterclaim on January 22, 2009, alleging that Schindler N.J. infringed the '433 Patent. Otis amended its complaint to assert infringement against Schindler Aufzüge AG ("Aufzüge"). In its counterclaim, Otis alleges that Schindler N.J. and Aufzüge directly and indirectly infringed the '433 Patent. On June 26, 2009, Aufzüge moved to dismiss Otis' claims pursuant to FED. R. CIV. P. 12(b)(2) and/or 12(b) (6).

**B. FACTS**
Aufzüge is an entity formed under the laws of Switzerland, having a principal place of business in Ebikon, Switzerland. *See* Aufzüge's Brief in Support of its Motion to Dismiss ("Aufzüge Br."), at 2. Aufzüge is a wholly-owned subsidiary of Schindler Holding AG. *Id.* Schindler N.J. is a Delaware corporation with its principal place of business in Morristown, New Jersey. *Id.* Schindler N.J. is a subsidiary of Schindler Enterprises Inc., a Delaware corporation, which is a wholly-owned subsidiary of Schindler Holding AG. *Id.* The companies, then, are indirectly affiliated in that they both are subsidiaries of Schindler Holding AG. *Id.* at 1-2.

Although the companies are affiliated, Aufzüge and Schindler N .J. are separate entities that maintain independent financial records. *Id.* Neither company owes or controls the stock of the other. *Id.* at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

3. Aufzüge does not realize any profits or losses based on Schindler N.J.'s revenues or expenditures. *Id.* Aufzüge is not involved in creating or approving Schindler N.J.'s budgets, and has no control over Schindler N.J.'s resources. *Id.*

Schindler N.J. maintains its own research and development ("R & D") department. *Id.* Aufzüge is, however, involved in selecting Schindler N.J.'s director of R & D-this fact notwithstanding, Aufzüge asserts that it is not involved in the approval of Schindler N.J. projects.

Aufzüge is a Swiss company doing business in Switzerland. *Id.* Aufzüge does not maintain any offices or facilities in the State of New Jersey. *Id.* Aufzüge is not licensed to do business in New Jersey, and has not designated an agent for service of process. *Id.* Aufzüge does not own or have any rights to any real or personal property in New Jersey. *Id.* Aufzüge does not maintain a bank account or telephone listing in New Jersey. *Id.* Aufzüge does not advertise or solicit business in New Jersey. *Id.*

*2 Aufzüge developed the Gates LL MV 90-07 Tension Member ("the Gates Tension Member") in Switzerland. *Id.* In 2003, Schindler N.J. began investigating alternate suspension systems for the North American market. *Id.* at 4. Schindler N.J. imported Gates Tension Members into the U.S. from Schindler, S.A., located in Zaragoza, Spain and Schindler Elettronica, S.A., located in Locarno, Switzerland. *Id.* Aufzüge has not provided Schindler N.J. with any Gates Tension Members or any other belt with similar steel configurations, and has not imported any Gates Tension Members, or any similar steel wire configurations, into the U.S. *Id.* Schindler N.J. has installed an elevator system designed for the European market having a prefabricated alternate suspension system at a Pennsylvania facility, and has installed Gates Tension Members at its New Jersey facility. *Id.* Aufzüge did not direct or manage either installation. *Id.* Aufzüge and Schindler N.J. share general information through telephone calls and visits. *Id.* Aufzüge, however,

asserts that personnel have not visited Schindler N.J. specifically in connection with the Gates Tension Member or any other belt with similar steel wire configurations. *Id.* Although Aufzüge is involved in selecting Schindler N.J.'s director of R & D, Aufzüge asserts that it is not involved in the approval of Schindler N.J. projects.

Otis' characterization of Aufzüge's role in Schindler N.J.'s activities is substantially different. Otis, relying on the testimony of Schindler N.J. personnel, asserts that Aufzüge's influence is more pervasive than as portrayed by Aufzüge. For example, Otis suggests that the two companies' personnel work together extensively, as evidenced by the inter-company workshops and meetings. *See* Otis' Brief in Opposition to Aufzüge's Motion to Dismiss ("Otis Br."), at 7-8. As described by a Schindler N.J. employee, "Schindler Aufzüge is an entity in Switzerland providing guidance, and there is a direct flow of information and a feedback process between [Schindler NJ] and Aufzüge." *Id.* at 17. Otis suggests that this "guidance" was such that Schindler N.J. required the "agreement" of various Aufzüge engineers before making product decisions, so as to "ensure that globally [Schindler is] working within certain boundaries, if you will, or certain norms, standards, that have to be met." *Id.* Moreover, it is not uncommon for Aufzüge employees to work at the Schindler N.J. facilities for extended periods of time. *Id.* at 13. [FN2] Contact between the two companies does not appear to be limited to isolated occurrences. A Schindler N.J. employee, for example, described the visitations by Aufzüge employees by stating that "[t]here are a number of people that are floating in and out." *Id.* at 7. In short, Otis' description of the Aufzüge/ Schindler N.J. relationship suggests that Aufzüge plays a significant role in Schindler N.J. activities, particularly with respect to R & D.

> FN2. More detail regarding the exchange of employees between the two companies is provided below. *See* Section II.B.3, *infra.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1032651 (D.N.J.)
(Cite as: 2010 WL 1032651 (D.N.J.))

## II. *SCHINDLER AUFZÜGE'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) FOR LACK OF PERSONAL JURISDICTION*

**\*3** Aufzüge moves to dismiss Otis' counter-claims, asserting that the Court lacks personal jurisdiction over Aufüge.

### A. APPLICABLE LAW

"Federal Circuit law governs personal jurisdiction issues where the jurisdictional issue is 'intimately involved with the substance of patent law." *Avocent Huntsville Corp. v. Aten Int'l Co.,* 552 F.3d 1324, 1328 (Fed.Cir.2008), *cert. denied,* --- U.S. ----, 129 S.Ct. 2796, 174 L.Ed.2d 292 (2009).

A Plaintiff has the burden of demonstrating that assertion of jurisdiction over a defendant is proper. *Elecs. for Imaging, Inc. v. Coyle,* 340 F.3d 1344, 1351 (Fed.Cir.2003) ("[W]here the district court's disposition as to the personal jurisdictional question is based on affidavits and other written materials in the absence of an evidentiary hearing, a plaintiff need only to make a prima facie showing that defendants are subject to personal jurisdiction."); *Elcheikhali v. C.C.A.,* 2010 U.S. Dist. LEXIS 1054, at \*6 (D.N.J. Jan. 6, 2010) ("Once a defendant has raised a jurisdictional defense, the plaintiff has the burden of demonstrating by a preponderance of the evidence that the defendant has purposefully directed its activities toward the residents of the forum state, or otherwise purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."). Once Otis has made a "threshold showing in support of jurisdiction," it is "entitled to have [its] allegations viewed as true and have disputed facts construed in [its] favor." *Metcalfe v. Renaissance Marine, Inc.,* 566 F.3d 324, 331 (3d Cir.2009); *Miller Yacht Sales, Inc. v. Smith,* 384 F.3d 93, 97 (3d Cir.2004) (stating that when considering a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, a court "must accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff.").

To determine whether personal jurisdiction exists over a foreign defendant, the Court of Appeals for the Federal Circuit has established a two-tier inquiry: (1) "whether a forum state's long-arm statute permits service of process"; and (2) "whether the assertion of personal jurisdiction would violate due process." *Inamed Corp. V. Kuzmak,* 249 F.3d 1356, 1359 (Fed.Cir.2001); *see also Colida v. LG Elecs., Inc.,* 2003 U.S. Dist. LEXIS 26818, at \*6 (D.N.J. Apr. 28, 2003). As "New Jersey's long-arm statute 'permits the exercise of personal jurisdiction to the fullest limits of due process,' " the traditional two-part inquiry of the long-arm statute and due process "collapses into one-whether due process considerations permit the exercise of jurisdiction." *Campbell Pet Co. v. Miale,* 542 F.3d 879, 884 (Fed.Cir.2008); *IMO Indus., Inc. v. Kiekert AG,* 155 F.3d 254, 259 (3d Cir.1998).

To demonstrate that considerations of due process permit the exercise of jurisdiction, a defendant must have certain "minimum contacts" with the forum, such that the assertion of personal jurisdiction over the defendant comports with "traditional notion of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). There are two ways that sufficient contacts for asserting personal jurisdiction can be established: "general jurisdiction" and "specific jurisdiction"; the focus, here, is on the latter.[FN3]

> FN3. Schindler asserts that neither can be established. Otis responds that the requirements for specific personal jurisdiction have be met. Otis Br., at 4.

**\*4** The Federal Circuit has established a three-factor test for specific jurisdiction, instructing courts to consider whether "(1) the defendant purposefully directed its activities at residents of the forum, (2) the claim arises out of or relates to the defendant's activities with the forum, and (3) assertion of personal jurisdiction is reasonable and fair."

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Synthes v. GMReis,* 563 F.3d 1285, 1297 (Fed.Cir.2009). Specific jurisdiction may be asserted, "even if the contacts are isolated and sporadic, so long as the cause of action arises out of or relates to those contacts." *Id.* (citing *Silent Drive, Inc. v. Strong Indus., Inc.,* 326 F.3d 1194, 1200 (Fed.Cir.2003). Indeed, a "substantial connection" with a forum arising out of a "single act can support jurisdiction." *Burger King,* 471 U.S. at 475 n. 18 (citing *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)).

## B. ANALYSIS

The Court will consider each of the three factors of the Federal Circuit's specific jurisdiction test in turn.

### 1. *Did Aufzüge purposefully direct its activities at residents of the forum?*

Aufzüge argues that personal jurisdiction cannot be established because it has not purposefully directed it activities at residents of New Jersey. Aufzüge asserts that it has not promoted or marketed any product or services to residents of New Jersey; nor did it sell, or contract to sell, the product in question (i.e., the Gated Tension Member or any similar product) in New Jersey. It has no distributor in New Jersey, and derives no revenue from sales in New Jersey. Aufzüge asserts that the only connection it has with New Jersey is that it selected Schindler N.J.'s director of research and development.

Otis responds that Aufzüge did direct its activities at the forum state. Specifically, it asserts that Aufzüge: (1) had its employees visit Schindler N.J. facilities in New Jersey, (2) provided product specifications for the infringing product to its New Jersey affiliate, (3) provided assistance, guidance and personnel to its New Jersey affiliate for product development, including the development of elevator belts. This Court agrees with Otis.

First, with respect to Aufzüge employees visiting Schindler N.J. facilities, the Court finds such contacts a significant indication that Aufzüge dir-

ects its activities at the forum state. Previously, the Federal Circuit has held that a Defendant purposefully directed its activities at a forum state where it made telephone calls to the forum state, and hired local counsel and sent two representative to the forum state. *Elecs. for Imaging,* 340 F.3d at 1351; *see Grand Entm't Group v. Star Media Sales, Inc.,* 988 F.2d 476, 482-3 (3d Cir.1993) (determining that the foreign defendants "deliberately and purposefully directed significant activities" toward the forum by directing "at least twelve communications to the forum" and by engaging in "negotiations for an agreement that would have created rights and obligations among citizens of the forum and contemplated significant ties with the forum"); *Salem Steel North Am., LLC v. Shanghai Shangshang Stainless Steel Pipe Co.,* 2009 U.S. Dist. LEXIS 49228, at *11, 2009 WL 1652395 (D.N.J. June 10, 2009) (finding jurisdiction proper where the foreign company sold inputs "to New Jersey-based Salem ... [and corresponded via] e-mail and fax communications to their corporate offices in New Jersey, and by sending its president and international sales manager to New Jersey to discuss pipe quality issues.). In these cases, the Courts found electronic and in-person communications between the parties to be significant in demonstrating that a foreign entity directed its activities at the forum state.[FN4]

> FN4. *See also Shanks v. Westland Equip. & Parts Co.,* 668 F.2d 1165, 1167 (10th Cir.1982) (finding personal jurisdiction over entity having almost no direct contacts with the forum state in part because it worked in concert with another corporation that was owned by the same family that had considerable contacts with the state); *Cardica, Inc. v. Integrated Vascular Interventional Techs., L.C.,* 2008 U.S. Dist. LEXIS 72325, at *11, 2008 WL 753893 (N.D.Cal. Mar. 18, 2008) ("IVIT's actions in sending two representatives to California to demonstrate the technology underlying the '268 patent, in combination with the solicitation of investment in the related

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

technology in California, as well as IVIT's entering into contracts with various consultants in California, are sufficient to confer personal jurisdiction under the Federal Circuit's 'minimum contacts' jurisprudence."); *Oakley, Inc. v. Jofa AB,* 287 F.Supp.2d 1111, 1116 (C.D.Cal.2003) (holding that plaintiff made a "a prima facie showing that personal jurisdiction exists" where the foreign parent company, although contending it was merely a holding company, actually "acted in consort with [domestic] Defendants to place the accused visor in the stream of commerce, ... [and] knew that the accused visor was being sold in California.").

**\*5** It appears that there were extensive communications between Aufzüge and Schindler N.J. For instance, there were consistent correspondence between the companies, and multiple meetings every year from 2004-2008. *See id.* at 7-9. During this time, Schindler N.J. began investigating the feasibility of alternate suspension systems for the North American market. *Id.* at 7. Accordingly, the meetings between the companies included several workshops and "viewed testings of Gates Tension Members at Schindler [NJ] facilities." *Id.* at 3.

Second, as to Aufzüge's provision of product specifications to Schindler N.J., the Court finds that this factor only minimally weighs in favor of finding that it purposefully directed its activities at New Jersey. The specifications were available via an internal company database, which was physically located in Switzerland. The fact that an individual in New Jersey access documents on an Aufzüge database does not alone demonstrate that Aufzüge purposefully directed its activities to New Jersey. *See Trintec Indus. v. Pedre Promotional Prods.,* 395 F.3d 1275, 1281 (Fed.Cir.2005). Nonetheless, the existence of the database can be relevant in a personal jurisdiction analysis insofar as it further illustrates the degree of coordination between Aufzüge and Schindler N.J.

Third, this Court finds Aufzüge's assistance and guidance to Schindler N.J. to be significant in determining whether the company has engaged in significant activities in New Jersey. In *Elecs. For Imaging,* the Federal Circuit found that where "two representatives of defendants visited EFI's facility in California for the purpose of demonstrating the technology underlying what later issued as the '746 patent," the defendants were properly subjected to personal jurisdiction. *See* 340 F.3d at 1351. Similarly, in *Energy Transp. Group, Inc. v. William Demant Holding A/S,* the Court observed that where a foreign parent company "and its subsidiaries collaborate in many areas and to a wide extent also share resources and technologies" the foreign company is subject to jurisdiction in the federal district court. 2008 U.S. Dist. LEXIS 845, at \*8, 2008 WL 78748 (D.Del. Jan. 4, 2008). There, the Court explained that despite the fact that the companies maintained separate books and production facilities, the foreign company "acted in consort with its subsidiaries to develop the allegedly infringing hearing aid products." [FN5]

> FN5. The *Energy Transp. Group* Court explained that the parent company, was
>
> > a holding company that does not manufacture, sell, advertise, offer to sell, trade, or import any goods or services in the United States or anywhere in the world. It maintains its own financial statements and corporate records separate from the financial statements and corporate records of its subsidiaries. [The parent company] is not registered to do business in Delaware and has never contracted to supply goods or services in Delaware. It has not appointed an agent to accept service on its behalf in Delaware or anywhere in the United States. It does not maintain any offices or other facilities in Delaware or the United States. It neither owns nor leases any real property in Delaware or the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

United States. It does not maintain any bank accounts in Delaware and has never contracted to supply services or things in Delaware or the United States.

2008 U.S. Dist. LEXIS 845, at *2-3, 2008 WL 78748. Nonetheless, the Court found that the parent company was properly subject to jurisdiction in Delaware, because it "acted in consort with its subsidiaries to place the accused products in the stream of commerce." *Id.* at 13. Here, it appears that Aufzüge acted in consort with its New Jersey affiliate in product development.

Here, Aufzüge sent a number of employees to Schindler N.J. during the period in which the Gates Tension Member was being developed. *See* Otis Br., at 14. In recent years, as many as twelve employees have been sent from Aufzüge to Schindler N.J. *See id.* at 13. These employees have held positions such as director of research and development (a multi-year position), as well as various engineering positions within the R & D department. *See id.* at 13-14. Several engineers were transferred to New Jersey for extended periods of time, in some cases exceeding a year. *See id.* When transferred to Schindler N.J., Aufzüge personnel are considered to be on extended business trips, and are paid by Aufzüge. *Id.* at 13. This Court finds this to be a strong indication of the degree of coordination between the two companies.

*6 The role that these employees had specifically with respect to development of the accused product, i.e., the Gate Tension Member, is not entirely clear on this record. One employee, Daniel Fischer, however, was involved in "the development of [an] elevator system employing the Gates Tension Member." [FN6] In any case, it is clear that several Aufzüge employees were involved in developing elevator belts for the U.S. market. *See id.* at 12. All of these employees remained on Aufzüge's payroll while working at Schindler N.J.

FN6. Schindler listed Mr. Fischer in response to the following interrogatory: "Describe in detail the development of the Gates Tension Member and the development of any elevator system employing the Gates Tension Member, including in your answer an identification of all persons and entities involved in the development process and a description of their role." In post-briefing letters to this Court, the parties dispute the relevance of Schindler's interrogatory answer. *See* docket entry nos. 77, 83. Otis contends that the interrogatory response indicates that Mr. Fischer was involved in developing belts/tension members, such as the infringing Gates Tension Member. Schindler, in contrast, responds that Mr. Fischer only worked on machines that utilized such belts. Whichever parties' reading is adopted, it appears that Mr. Fischer's work was, at the very least, "related to" the development of tension members-the way that the belts interact with the machines that utilize them would seem to this Court to be necessarily relevant to the belt development process.

Moreover, technical specifications for Aufzüge products-such as the Gates Tension Member-were available through a internal company database which could be accessed by both Schindler N.J. and Aufzüge employees. Admittedly, the mere existence of a foreign database does not demonstrate "purposefully" directing activity to New Jersey, but the shared company database further illustrates the degree of coordination between the companies. As Schindler N.J. employee Dean Chow indicated, there are substantial lines of communication through which Aufzüge provides guidance to its New Jersey affiliate. *Id.* at 16.

Considering the various contacts between Schindler N.J. and Aufzüge, the Court finds that Aufzüge purposefully directed its activities toward New Jersey.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1032651 (D.N.J.)
**(Cite as: 2010 WL 1032651 (D.N.J.))**

*2. Does the claim arise out of or relate to the defendant's activities with the forum?*

As discussed above, Aufzüge's activities within New Jersey were "related to" the underlying conduct that gives rise to Otis' patent infringement claim. While many of the communications and employee transfers may have been unrelated to the development of the Gates Tension Member, this Court is satisfied that the extensive contact between Aufzüge and Schindler N.J. was, at least in part, "related to" the development of elevator belts.

*3. Is assertion of personal jurisdiction reasonable and fair under these circumstances?*

Having determine that the first two prongs of the test are satisfied, this Court must consider "whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472-73, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 320, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

Under this factor, to demonstrate that jurisdiction is improper, a defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 477. This factor is applied sparingly; as the Federal Circuit has explained, the "third Burger King factor ... [only defeats] otherwise constitutional personal jurisdiction [in] the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." *Campbell,* 542 F.3d at 885. This assessment requires a weighing of the following five factors: "(1) the burden on the defendant, (2) the interests of the forum state, (3) the plaintiff's interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies." *Elecs. for Imaging, Inc. v. Coyle,* 340 F.3d at 1351-52. Under this prong,

the burden is on the defendant to make a compelling case that jurisdiction in not reasonable. *Campbell,* 542 F.3d at 885.

*7 First, there is little burden on Aufzüge to travel to the United States. Aufzüge has consistently sent representatives to New Jersey for short trips as well as extended employment placements. This fact weighs against finding a burden on Aufzüge. *See Synthes v. GMReis,* 563 F.3d 1285, 1299 (noting that defending a law suit in the United States was not unduly burdensome, as company representatives traveled to the United States to promote the company's product line over the last five years).

Aufzüge also asserts that if it is "forced to remain in this case, it may be subject to unnecessary and intrusive 'fishing expedition' type of discovery." Aufzüge Br., at 16. Any of Aufzüge's concerns regarding the scope of discovery, however, can be properly addressed through this Court's oversight of discovery. *See, e.g., Professional Recovery Services, Inc. v. General Electric Capital Corp.,* 2009 U.S. Dist. LEXIS 3889, at *12-13, 2009 WL 137326 (D.N .J. Jan. 15, 2009).

Also as to the first factor, Aufzüge asserts that it is burdened because it would face a threat of "criminal prosecution under Swiss law if forced to provide discovery." Aufzüge Br., at 16. Although Aufzüge does not point to the specific Swiss criminal laws under which it could face prosecution, presumably it is referring to Articles 271 and 273 of the penal code, as these are the provisions it previously invoked in response to Otis' effort to depose a Swiss corporate defendant. *See Schindler Elevator Corp. v. Otis Elevator Co.,* 657 F.Supp.2d 525, 531 (D.N.J.2009). There, Aufzüge argued that the two laws presented an obstacle to it being deposed. *Id.* at 531-33. Magistrate Judge Falk, however, determined that although "there are Swiss penal statutes that, at first blush, appear to pose an obstacle to a non-Convention deposition ... upon close examination, the Court is not persuaded that the Swiss laws prevent the deposition sought in this case, or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1032651 (D.N.J.)
(Cite as: 2010 WL 1032651 (D.N.J.))

that they apply at all." *Id.* at 531.[FN7] Accordingly, this Court does not find that litigation of this case would unduly burden Aufzüge.

> FN7. To the extent that Aufzüge believes that these laws, or any others, would present some other barrier to discovery, it has not presented them to this Court.

Second, Aufzüge has not demonstrated that New Jersey's interest in this case is insignificant. Aufzüge states that it has little presence in New Jersey, and that its activities have little or no impact on the State's residents. This Court disagrees. New Jersey, like all states, has an interest in enforcing intellectual property laws. *See Synthes,* 563 F.3d at 1299 ("The United States has a substantial interest in enforcing the federal patent laws") (internal citations omitted); *Rudolph v. Yari Film Group Releasing,* 2007 U.S. Dist. LEXIS 21646, at *14, 2007 WL 928472 (D.N.J. Mar. 27, 2007) ("[T]he State of New Jersey has a strong interest in protecting Rudolph's (a New Jersey citizen) copyright from infringement"); *Energy Transportation Group,* 2008 U.S. Dist. LEXIS 845, at *15, 2008 WL 78748 ("Delaware has an interest in discouraging injuries that occur within the state, which extends to patent infringement actions such as the one here."). Further, "New Jersey has an interest in protecting its residents and corporations [such as Otis] from the injuries inflicted by out-of-state and foreign actors, and in preventing breaches of contract from affecting its economy and commercial operations." *Metex Mfg. Corp. v. Ian Manson,* 2006 U.S. Dist. LEXIS 54891, at *16 (D.N.J. Aug. 4, 2006); *see Synergy, Inc. v. Manama Textile Mills, W.L.L.,* 2008 U.S. Dist. LEXIS 12791, at *47 (D.N.J.2008).

*8 Third, Otis has a strong interest in maintaining Aufzüge in the current litigation. As a key player in research and development of the allegedly infringing product, Aufzüge presence may be critical to discovery. Otis asserts that the infringing product is a copy of an Otis product, the "Coated Steel Belt." As Aufzüge plays a key role in product development, its actions are important to this litiga-

tion. For example, in the underlying patent validity litigation, Schindler contends that Otis' patent is invalid as "obvious." Otis intends to respond that its product is not obvious, and will likely demonstrate that Aufzüge actions are relevant to the obviousness determinate (e.g., that Aufzüge copied Otis' design).[FN8] Accordingly, Otis has an interest in maintaining Aufzüge in the current litigation.

> FN8. *See, e.g., Vandenberg v. Dairy Equipment Co.,* 740 F.2d 1560, 1567 (Fed.Cir.1984) ("[C]opying of an invention may constitute evidence that the invention is not an obvious one.")

Finally, under the fourth and fifth factors, the Court must consider the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies. To the extent that these fators are applicable, they weigh in favor of maintaining this action for the same reasons discussed above with respect to the third factor.

This Court finds that "accept[ing] all of the plaintiff's allegations as true and constru[ing] disputed facts in favor of the plaintiff," *Miller Yacht Sales, Inc. v. Smith,* 384 F.3d 93, 97 (3d Cir.2004), Otis has demonstrated that: (1) Aufzüge purposefully directed its activities at New Jersey, (2) such activities are related the claim asserted by Otis, and (3) assertion of personal jurisdiction is reasonable and fair. *See Synthes v. GMReis,* 563 F.3d 1285, 1297 (Fed.Cir.2009). Accordingly, specific jurisdiction may be asserted here.

### III. *SCHINDLER AUFZÜGE'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM PURSUANT TO FED. R. CIV. P. 12(b)(6)*

Otis asserts a counterclaim against Aufzüge for actively inducing direct infringement of its patent by Schindler N.J. Pursuant to 35 U.S.C. § 271(b), "whoever actively induces infringement of a patent shall be liable as an infringer." Aufzüge moves to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

dismiss the counterclaim for failure to state a claim. Aufzüge asserts that (1) Otis has not adequately plead its claim for induced infringement, and (2) Otis cannot be liable for any indirect infringement that may have occurred prior to May 26, 2009, because it did not receive notice until such time.

## A. APPLICABLE LAW

In deciding a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Trump Hotels & Casino Resorts, Inc., v. Mirage Resorts Inc.,* 140 F.3d 478, 483 (3d Cir.1998). If, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears beyond doubt that no relief could be granted "under any set of facts which could prove consistent with the allegations," a court shall dismiss a complaint for failure to state a claim. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). In *Bell Atlantic Corp. v. Twombly* the Supreme Court clarified the Rule 12(b)(6) standard. 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Specifically, the Court "retired" the language contained in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief." *Twombly,* at 1968 (citing *Conley,* 355 U.S. at 45-46). Instead, the Supreme Court instructed that "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965. Ultimately, the question is whether the claimant can prove a set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Semerenko v. Cendant Corp.,* 223 F.3d 165, 173 (3d Cir.2000).

## B. ANALYSIS

1. *Failure to State a Claim*

*9 Aufzüge first asserts that Otis failed to adequately plead its claim of inducement to infringe the '433 Patent.

Otis, in its First Amended Complaint, alleged that Aufzüge has "manufactured, offered for sale, sold, and/or used certain elevator belt products, including the Gates LL MV 90-07 Tension Member" in Europe, "assisted, directed, and managed" "Schindler NJ's research and development related to the Gates Tension Member," and "actively induced Schindler NJ to use the infringing Gates Tension Member" in the United States." Otis Br. at 26. Otis, then, alleges that Aufzüge was aware of the '433 Patent, and that it has intentionally contributed to Schindler N.J.'s direct infringement thereof. These allegations are sufficient to state a claim at this stage of the proceedings. *See, e.g., Grice Eng'G v. Jg Innovations,* 2010 U.S. Dist. LEXIS 20314, at *29, 2010 WL 768971 (March 4, 2010) (finding that a claim for inducing infringement to be adequately plead where plaintiff asserted that defendant was "aware of plaintiff's patent rights ... and acted willfully to infringe plaintiff's patent"); *Takeda Chemical Industries, Ltd. v. Watson Pharmaceuticals, Inc.,* 329 F.Supp.2d 394, 401 (S.D.N.Y.2004) (allegations that "Watson has taken and will take acts to induce infringement" of specified patents is "sufficient to state a claim"); *Wyeth v. Lupin, Ltd.,* 505 F.Supp.2d 303, 308 (D.Md.2007) (allegations of aiding and abetting infringement sufficient to "satisf[y] the notice pleading requirements"). Accordingly, Aufzüge's motion to dismiss under FED. R. CIV. P. 12(b)(6), must be denied.

2. *Liability and Notice of Patent Rights*

Aufzüge also asserts that Otis has failed to state a claim for induced infringement because "a party cannot be liable for inducement of infringement when actual notice of the alleged infringement has not yet been given."

Pursuant to 35 U.S.C. § 271(b), "whoever actively induces infringement of a patent shall be liable as an infringer." Inducement requires a showing of " 'specific intent to encourage another's in-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1032651 (D.N.J.)
**(Cite as: 2010 WL 1032651 (D.N.J.))**

fringement.' " *Broadcom Corp. v. Qualcomm Inc.,* 543 F.3d 683, 699 (Fed.Cir.2008) (quoting *DSU Med. Corp. v. JMS Co.,* 471 F.3d 1293, 1306 (Fed.Cir.2006) (en banc)). Under that rule, a plaintiff must show that the alleged infringer knew or should have known that his actions would induce actual infringements. *See DSU Med. Corp.,* 471 F.3d at 1304 ("The requirement that the alleged infringer knew or should have known his actions would induce actual infringement necessarily includes the requirement that he or she knew of the patent.").

Aufzüge states that it did not receive notice of the '433 Patent until after it committed the conduct that forms the basis of Otis' alleged infringement claim. Thus, Aufzüge reasons, it cannot be liable for such conduct, and accordingly, Otis' claim for induced infringement must fail. The Court does not agree.

**\*10** Otis' failure to provide notice is not fatal to its induced infringement claim. As the Federal Circuit has explained, "[t]he failure to mark a product under § 287(a) or to provide the requisite **notice** does not prohibit a patentee from bringing an infringement suit to obtain an injunction or damages occurring after the complaint was served. *Prasco, LLC v. Medicis Pharm. Corp.,* 537 F.3d 1329, 1340 (Fed.Cir.2008). Here, Otis seeks injunctive relief with respect to a course of conduct between Aufzüge and Schindler N.J. At this stage, taking the facts as alleged by Otis, there appear to be sufficient allegations to suggest that Schindler N.J. and Aufzüge's coordination was substantial. There is no indication that such cooperation ceased after the date of the official notice of Otis' patent, May 26, 2009 (i.e., the date of service). Accordingly, Otis may still proceed on it induced infringement claim, as it seeks injunctive relief against Aufzüge with respect to its continued involvement (e.g., product development) in Schindler N.J. activities.

**IV. CONCLUSION**

For the reasons stated, Aufzüge's motions to dismiss Otis' counterclaims pursuant to

Fed.R.Civ.P. 12(b)(2) and 12(b)(6) are denied.

D.N.J.,2010.
Schindler Elevator Corp. v. Otis Elevator Co.
Not Reported in F.Supp.2d, 2010 WL 1032651 (D.N.J.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3756947 (M.D.N.C.)
**(Cite as: 2009 WL 3756947 (M.D.N.C.))**

c
Only the Westlaw citation is currently available.

United States District Court,
M.D. North Carolina.
FATBOY USA, LLC, Plaintiff,
v.
Pieter SCHAT, Schat Import Agencies, Inc., and
Sitting Bull, GMBH, Defendants.

No. 1:07CV965.
Nov. 6, 2009.

Stanley Franklin Hammer, Wyatt Early Harris &
Wheeler, L.L.P., High Point, NC, for Plaintiff.

John Brooks Reitzel, Jr., J. Brooks Reitzel, Jr., At-
torney at Law, High Point, NC, Jeffrey S. Souther-
land, Tuggle Duggins & Meschan, P.A., Greens-
boro, NC, for Defendants.

Stanley Franklin Hammer, Wyatt Early Harris &
Wheeler, L.L.P., High Point, NC, for Plaintiff.

John Brooks Reitzel, Jr., J. Brooks Reitzel, Jr., At-
torney at Law, High Point, NC, Jeffrey S. Souther-
land, Tuggle Duggins & Meschan, P.A., Greens-
boro, NC, for Defendants.

## MEMORANDUM OPINION AND RECOM-
## MENDATION

WALLACE W. DIXON, United States Magistrate
Judge.

*1 This matter comes before the court on De-
fendant Sitting Bull, GmbH's motion to dismiss for
lack of personal jurisdiction (docket no. 14) pursu-
ant to Rule 12(b)(2) of the Federal Rules of Civil
Procedure.[FN1] Plaintiff has responded in opposi-
tion to Defendant's motion (docket no. 29), and the
motion is thus ripe for disposition. The parties have
not consented to the jurisdiction of a magistrate
judge; therefore, the court must deal with Defend-
ant's motion by way of recommendation. For the
following reasons, it will be recommended that the
court deny Defendant's motion to dismiss.

> FN1. Defendant's original motion also
> sought to dismiss for lack of proper service
> pursuant to Rule 12(b)(5). That issue,
> however, has been resolved by stipulation
> (docket no. 25).

**PROCEDURAL POSTURE**

On December 21, 2007, Plaintiff, Fatboy USA,
LLC filed this action against Defendants Pieter
Schat, Schat Import Agencies, Inc., and Sitting
Bull, GmbH asserting claims for unfair and decept-
ive trade practices pursuant to N.C. GEN. STAT. §
75-1.1, violation of the North Carolina Trade
Secrets Protection Act, N.C. GEN. STAT. § 66-152
, tortious interference with contract, and violation
of the Federal Computer Fraud and Abuse Act, 18
U.S.C. § 1030. (Compl.¶ 1.) Defendants Pieter
Schat and Schat Import Agencies timely answered
the complaint (docket no. 7). Defendant Sitting
Bull, however, failed to respond. As a result,
Plaintiff moved for entry of default against Defend-
ant Sitting Bull (docket no. 11), and on February
25, 2008, the court granted Plaintiff's motion for
entry of default against Defendant Sitting Bull
(docket no. 12). The entry of default was sub-
sequently vacated pursuant to a stipulation among
the parties. (*See* docket no. 25.)

On April 3, 2008, Defendant Sitting Bull filed
a motion to dismiss pursuant to Rules 12(b)(2) and
(5) of the Federal Rules of Civil Procedure, con-
tending that service of process was inadequate and
that the court lacked personal jurisdiction over Sit-
ting Bull (docket no. 14). After entertaining several
motions regarding jurisdictional discovery, the
court entered a stipulation and order dismissing De-
fendant Sitting Bull's motion to dismiss based on
inadequate service (docket no. 25). This recom-
mendation and opinion addresses Defendant Sitting
Bull's remaining motion to dismiss based on lack of
personal jurisdiction.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3756947 (M.D.N.C.)
**(Cite as: 2009 WL 3756947 (M.D.N.C.))**

## FACTS

The following facts are taken in the light most favorable to Plaintiff on Defendant's motion to dismiss for lack of personal jurisdiction. Plaintiff Fatboy USA, LLC (hereinafter "Fatboy" or "Plaintiff") is a limited liability company registered to conduct business in North Carolina with its principal place of business in Coppell, Texas. (Compl.¶ 5.) Defendant Pieter Schat is a citizen and resident of Toronto, Ontario, Canada and regularly conducts business in North Carolina. (*Id.* ¶ 6.) Defendant Schat Import Agencies, Inc. (hereinafter "Schat Import") is a corporation organized under the laws of Ontario, Canada that maintains and conducts business from a distribution facility in High Point, North Carolina. (*Id.* ¶ 7.) Defendant Sitting Bull, GmbH (hereinafter "Sitting Bull" or "Defendant") is a German corporation that distributes its products through Bull Designs, a North Carolina limited liability company based in High Point, North Carolina. (*Id.* ¶ 8.)

### A. *Formation of the Relationships between the Parties*

*2 Plaintiff Fatboy is a designer and manufacturer of designer beanbags and related products. (*Id.* ¶ 9.) As part of its business operations, Fatboy maintains a computer list of more than 400 customers, as well as confidential pricing information regarding its customers and suppliers. (*Id.* ¶ 11.) Fatboy contends that such information is confidential and, as such, is a trade secret. (*Id.* ¶¶ 11-14.) Defendants Pieter Schat and Schat Import distributed Fatboy's products from their High Point, North Carolina facility from May 2005 to June 2007. (*Id.* ¶ 15.) In June 2007, Fatboy terminated its relationship with Pieter Schat and Schat Imports and moved its operations to Texas. (*Id.* ¶ 10.)

Bull Designs currently operates out of a warehouse in High Point, North Carolina owned by Schat Import. (Chiriac Dep. at 32.) It does not, however, pay Schat Import any rent for its use of the warehouse. (*Id.* at 33.) The warehouse is the same warehouse where Schat Import conducted dis-

tribution activities related to Fatboy's products. (Schat Dep. at 9.) Bull Designs' sole activity since its inception is marketing and distributing Sitting Bull's products. (Flöetotto Dep. at 11.)

### B. *Nature of the Distribution Agreement between Sitting Bull and Bull Designs*

In July 2007, Bull Designs entered into an agreement with Sitting Bull to act as Sitting Bull's exclusive distributor in the United States, Mexico, and Canada.[FN2] (*Id.* at 20.) The distribution agreement between Bull Designs and Sitting Bull arose out of a meeting in April 2007 between Bull Designs' principals, Pieter Schat and Cornell Chiriac, and Sitting Bull's principals, Elmar and Frederik Flöetotto. (*Id.* at 13.) According to Frederik Floëtotto, Pieter Schat's knowledge of the American furniture market was the "most important reason" for the selection of Bull Designs as the distributor. (*Id.* at 25.) The nature of the agreement between Bull Designs and Sitting Bull involves extensive ongoing collaboration between the two entities. The agreement obligates Bull Designs to distribute, partially manufacture, and promote Sitting Bull brand products. This action arises from Bull Designs' contractual obligation to expand Sitting Bull's customer base.

> FN2. When Defendant Sitting Bull executed the distribution agreement, its name was Brands GmbH. After signing the distribution agreement with Bull Designs, Brands GmbH changed its name to Sitting Bull, GmbH.

Pursuant to the distribution agreement, Bull Designs is responsible for distribution of all of Sitting Bull's products in North America. (*Id.* at 24.) Product components are shipped from Germany to Bull Designs' address in High Point, North Carolina, where Bull Designs is responsible for completion of manufacture. (*Id.* at 32-34.) Thus, in essence, Sitting Bull relies on Bull Designs to set quality control standards over its finished product.

The terms of the distribution agreement oblig-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3756947 (M.D.N.C.)
**(Cite as: 2009 WL 3756947 (M.D.N.C.))**

ate Bull Designs to actively market Sitting Bull products in North America, grow its market, and increase brand recognition. (Distribution Agreement, Pl .'s Ex. D, ¶¶ 2, 6.1, and 8.1.) To further those ends, Bull Designs is licensed to use Sitting Bull's trademark on all of its promotional material. (Floëtotto Dep. at 47.) Moreover, in the past, Bull Designs has distributed promotional material printed in Germany by Sitting Bull at trade shows in North Carolina. (Chiriac Dep. at 88-89.) Bull Designs also maintains a website, approved by Sitting Bull, to promote Sitting Bull products. (*See* Floëtotto Dep. at 40.) Sitting Bull explicitly authorized Bull Designs to use www.SittingBullUSA.com as the website's domain name. (*Id.*) In addition, the Sitting Bull trademark that was licensed to Bull Designs as part of the distribution agreement appears on almost every page of the website. (*Id.* at 59.) Furthermore, the company history that appears on the website describes the history of Sitting Bull in Germany, not Bull Designs in North Carolina. ( *Id.*) The contact page of the website, however, includes a North Carolina phone number and Bull Designs' address in High Point, North Carolina. (*Id.* ) In general, Bull Designs' promotional activities, explicitly endorsed by Sitting Bull, intentionally create an impression that Bull Designs, located in High Point, North Carolina, is the U.S. counterpart of the Sitting Bull company based in Germany.

*3 In addition to Bull Designs' contractual obligation to aggressively market Sitting Bull's products, the distribution agreement also imposes strict reporting requirements on Bull Designs. (*See* Distribution Agreement ¶¶ 6.1 & 6.2.) The agreement requires Bull Designs to send a yearly memorandum containing a list of the businesses served during the preceding year, as well as an update every six months listing the fifty best customers and detailing the customers' commercial importance. (*Id.*)

Fatboy contends that around the time it terminated its relationship with Pieter Schat and Schat Import, Pieter Schat improperly accessed Fatboy's computer, acquired Fatboy's customer and pricing information, and disclosed the information to Sitting Bull. (Compl.¶¶ 15-20.) Furthermore, Fatboy contends that Schat subsequently used the information to market Sitting Bull products pursuant to Bull Designs' contract with Sitting Bull. *Id.* The following discussion is limited to Defendant Sitting Bull's jurisdictional challenge.

## DISCUSSION

When a court's exercise of personal jurisdiction is challenged pursuant to a Rule 12(b)(2) motion, the plaintiff must prove the existence of a ground for jurisdiction by a preponderance of the evidence. *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir.1989). If jurisdiction turns on disputed facts, the court may conduct an evidentiary hearing, or postpone ruling on the motion pending receipt of evidence relating to jurisdiction at trial. *Id.* If the court, as here, considers the jurisdictional challenge based solely on motion papers, supporting legal memoranda, and pleadings, the plaintiff need only make a prima facie showing of a sufficient jurisdictional basis. *Id.* When considering a jurisdictional challenge based on the record, the court must construe allegations contained in the pleadings in the light most favorable to the plaintiff, assume credibility, and the most favorable inferences stemming from the evidence must be drawn in favor of the existence of jurisdiction. *Id.*

To determine whether personal jurisdiction is proper, the court must engage in a two-part inquiry. *Mylan Labs., Inc. v. Akzo, N.V .,* 2 F.3d 56, 60 (4th Cir.1993). First, the court must determine whether the state's long-arm statute authorizes the exercise of jurisdiction under the circumstances. *Id.* Second, if the court finds such authorization, it must consider whether the exercise of jurisdiction is consistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Id.* Courts have construed North Carolina's long-arm statute "to extend jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause." *Christian Sci. Bd. of Dirs. of the*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*First Church of Christ v. Nolan,* 259 F.3d 209, 215 (4th Cir.2001) (citing *Century Data Sys., Inc. v. McDonald,* 109 N.C.App. 425, 427, 428 S.E.2d 190, 191 (1993)). Thus, the two inquiries collapse into one. *Ellicott Mach. Corp. v. John Holland Party Ltd.,* 995 F.2d 474, 477 (4th Cir.1993).

*\*4* To decide whether the exercise of personal jurisdiction over Sitting Bull comports with due process, therefore, the court must consider whether the defendant has "minimum contacts" with the forum state "such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe v. Wash.,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). When examining the sufficiency of a non-resident defendant's contacts, "[t]he touchstone of the minimum contacts analysis remains that an out-of-state person have engaged in some activity purposefully directed toward the forum state." *Lesnick v. Hollingsworth & Vose Co.,* 35 F.3d 939, 945 (4th Cir.1994). In short, jurisdiction is proper when a relationship exists between the defendant and the forum "such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

Personal jurisdiction may be exercised either specifically or generally. *Slaughter v. Life Connection of Ohio,* 907 F.Supp. 929, 933 (M.D.N.C.1995). Specific jurisdiction is established where the forum state asserts personal jurisdiction over a defendant in a suit "arising out of or related to" that defendant's contacts with the state. *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). By contrast, exercise of general jurisdiction requires the defendant to have "continuous and systematic" contacts with the forum state. *Helicopteros Nacionales de Colombia,* 466 U.S. at 414 n. 8. The contacts required for specific jurisdiction are not as extensive as those required for general jurisdiction. *See First Am. First, Inc. v. Nat'l. Ass'n of Bank Women,* 802 F.2d 1511,

1516 (4th Cir.1986).

The gravamen of Fatboy's complaint is that Pieter Schat misappropriated its trade secrets for the benefit and at the behest of Sitting Bull. *(See* Compl. ¶¶ 1-22.) Fatboy contends that these trade secrets are being used to aid Bull Designs in performing a central purpose of the distribution agreement-namely, marketing Sitting Bull's products and expanding its customer base. *(See id.* ¶¶ 20-21.) In short, Fatboy contends that the distribution agreement between Sitting Bull and Bull Designs was the means by which Fatboy's trade secrets could be exploited by both Sitting Bull and Pieter Schat. *(See id.)* Thus, Sitting Bull's contacts with North Carolina are related to Fatboy's claims. Here, because Plaintiff's cause of action arises out of and is related to Sitting Bull's contacts with North Carolina, an analysis based on specific jurisdiction is proper.

Defendant Sitting Bull claims that because it does not directly conduct business out of North Carolina, has no employees within the state, its representatives have not traveled to the state, and it does not own any property within the state, it lacks sufficient contacts with North Carolina to support the court's exercise of jurisdiction.[FN3] (Def.'s Br. in Supp. of Mot. to Dismiss at 10.) Sitting Bull does concede that it has a contractual relationship with Bull Designs, a North Carolina company. (Floëtotto Decl. ¶ 7.) It contends, however, that the single contract is inadequate to meet the "purposeful availment" standard. (Def.'s Br. in Supp. of Mot. to Dismiss at 10.)

> FN3. Defendant also points to a forum selection clause in the distribution agreement designating Germany as the forum in the event of a dispute between the parties. Since, however, Plaintiff was not a party to this agreement, the court does not consider this factor in its personal jurisdiction analysis.

*\*5* Nevertheless, even a single contract may

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3756947 (M.D.N.C.)
(Cite as: 2009 WL 3756947 (M.D.N.C.))

give rise to jurisdiction when it amounts to purposeful activity directed toward the forum state. *See McGee v. Int'l Life,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). Moreover, "marketing [a] product through a distributor who has agreed to serve as the sales agent in the forum [s]tate" indicates purposeful activity directed toward the forum state. *Lesnick,* 35 F.3d at 945 (citing *Asahi-Metal Indus. Co. v. Superior Court of Cal.,* 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)). In assessing whether the court may assert specific jurisdiction over Sitting Bull, the court must examine the extent to which Sitting Bull purposefully directed its activities towards North Carolina, and whether the claims arise out of Sitting Bull's activities purposefully directed at North Carolina. *See Lesnick,* 35 F.3d at 945-46 . As part of this analysis, courts have considered various factors, such as who initiated the contact between the parties; whether the contract was to be performed in the forum state; and whether the agreement between the parties contemplated a single transaction or an ongoing relationship. The court will begin its analysis by addressing the circumstances that culminated in the execution of the distribution agreement.

The Fourth Circuit has given great weight to the question of who initiated the contact between the parties. If the defendant initiated the contact, then the courts are more likely to assert personal jurisdiction over the defendant. *See Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners,* 229 F.3d 448, 451 (4th Cir.2000) (finding no personal jurisdiction where the plaintiffs initiated the contractual relationship); *see also CBP Res., Inc. v. Ingredient Res. Co.,* 954 F.Supp. 1106, 1109 (M.D.N.C.1996) (asserting personal jurisdiction where the defendant initiated the contact with the plaintiff, where the defendant entered into an exclusive distributorship agreement with the plaintiff, and where the defendant was responsible for shipping the products out of the forum). The parties do not dispute the facts surrounding the meeting in April 2007 that resulted in the distribution agreement between Sitting Bull and Bull Designs. Pursuant to a pre-existing relationship between Elmar Flöetotto and Pieter Schat, Bull Designs' principal, Pieter Schat, and Sitting Bull's principals, Elmar and Frederik Flöetotto, discussed the possibility of marketing Sitting Bull's products in the United States. (Flöetotto Dep. at 13.) Because the initial contact between Sitting Bull and Bull Designs arose out of a pre-existing relationship between Pieter Schat and Elmar Flöetotto, it cannot be said that Sitting Bull initiated the instant relationship. Thus, this factor appears to be in equipoise in the personal jurisdiction analysis.

Another factor courts consider in the personal jurisdiction analysis is whether the parties contemplated that the contract would be performed in the forum state. Where performance under a contract was intended to be performed outside of the forum in question, courts have been reluctant to assert personal jurisdiction over non-resident defendants. *See, e.g., Diamond Healthcare of Ohio, Inc.,* 229 F.3d at 452 (finding no personal jurisdiction over the defendant where the contract called for performance mainly outside of the forum). Here, the plain language of the distribution agreement does not mandate performance in North Carolina. (*See generally* Distribution Agreement.) The circumstances surrounding the distribution agreement, however, suggest that the parties contemplated that it would be performed largely within North Carolina. Bull Designs operates out of a warehouse in High Point, North Carolina, a city of well-known significance to the American furniture market. (*See* Chiriac Dep. at 32.) Indeed, Sitting Bull's principal, Frederik Flöetotto, stated that one of the reasons for choosing Bull Designs to distribute Sitting Bull's products was Pieter Schat's knowledge of the American furniture market. (Flöetotto Dep. at 25.) To be sure Sitting Bull was aware that Bull Designs would capitalize on its presence in High Point, and that much of its promotional activity would be performed there. Furthermore, during their depositions, Defendants acknowledged that Sitting Bull was specifically aware of, and, in fact, endorsed Bull Designs' promotional activities at a trade show

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

in North Carolina.[FN4] (Chiriac Dep. at 81.) The fact that the circumstances surrounding the distribution agreement suggest that the parties contemplated that the agreement would be performed in North Carolina, and that the agreement was, indeed, performed in North Carolina weighs in favor of asserting jurisdiction over Sitting Bull.

> FN4. Representatives from Bull Designs attended a furniture trade show in High Point, North Carolina, where they passed out brochures printed by Sitting Bull in Germany. (Chiriac Dep. at 89.) Furthermore, for purposes of brand recognition, and with Sitting Bull's permission, they called themselves Sitting Bull USA and used the Sitting Bull trademark. (*Id.* at 100.)

**\*6** Another factor to be considered in the personal jurisdiction analysis is whether the agreement between the parties contemplated a single transaction or an ongoing relationship. The finding of an ongoing relationship, as opposed to a single transaction, weighs towards assertion of personal jurisdiction. *See, e.g., Chung v. NANA Dev. Corp.,* 783 F.2d 1124, 1127-28 (4th Cir.1986) (distinguishing between a single transaction in the forum state and a "substantial and continuing relationship") (citing *Burger King v. Rudzewicz,* 471 U.S. 462, 487, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)); *CBP Res., Inc.,* 954 F.Supp. at 1109 (finding sufficient contacts where the defendant entered into a five-year agreement with the North Carolina plaintiff). Here, the plain language of the distribution agreement expressly contemplates an ongoing relationship. (Distribution Agreement ¶ 15.) The terms of the distribution agreement mandate a three and one-half year relationship that automatically renews at the end of each additional year. (*Id.*) Furthermore, the distribution agreement requires close collaboration between Bull Designs and Sitting Bull with respect to Bull Designs' promotional duties. (*See generally* Distribution Agreement.) Thus, it is fair to say that the distribution agreement represents a "substantial and continuing" relationship between the parties rather than a single transaction. Therefore, this factor weighs in favor of asserting personal jurisdiction over Sitting Bull.

Moreover, the court notes that other factors weigh in favor of finding personal jurisdiction, starting with Sitting Bull's reason for entering into the distribution agreement with Bull Designs. As noted, Sitting Bull sought to benefit from Pieter Schat's knowledge of the American furniture market, and when they executed the distribution agreement, Sitting Bull's principals surely were aware that Schat's knowledge stemmed from his operation of a distribution facility in High Point, North Carolina. (*See* Flöetotto Dep. at 25.) In addition, Sitting Bull went to great lengths to forge a very visible relationship with Bull Designs. When Sitting Bull signed the distribution agreement with Bull Designs, Sitting Bull was called Brands GmbH. After signing the distribution agreement, however, Sitting Bull changed its name to Sitting Bull, GmbH. (*Id.* at 9.) Furthermore, to increase brand recognition, Sitting Bull licensed Bull Designs to use its exclusive trademark on all of Bull Designs' promotional materials. (*Id.* at 47.) Moreover, Bull Designs actually had a hand in manufacturing Sitting Bull's finished product. (*Id.* at 32-34.) It appears that Sitting Bull combined forces with Bull Designs to manufacture, distribute, and promote its products. *See Cree, Inc. v. Bridgelux, Inc.,* No. 1:06cv761, 2007 WL 3010532, at \*5 (M.D.N.C. July 5, 2007) (noting that a defendant has made "intentional contact with the state" when "the defendant has a hand in the distribution" of its product).

**\*7** Indeed, Sitting Bull cannot claim that its contacts with North Carolina are "random, isolated, or fortuitous," *see Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), nor can it claim that they are the product of "unilateral activity" on the part of Bull Designs, *see Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). Rather,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 3756947 (M.D.N.C.)
(Cite as: 2009 WL 3756947 (M.D.N.C.))

it appears that Sitting Bull made a concerted effort to reap the benefits of associating itself with a company conducting business in North Carolina. *Cf. B.E.E. Int'l v. Hawes,* 267 F.Supp.2d 477, 483 (M.D.N.C.2003) (finding no personal jurisdiction over the plaintiff where commonality between the plaintiff and defendant was the "unilateral activity" of the plaintiff). After carefully considering all of the above factors, the court concludes that Sitting Bull has sufficient minimum contacts with North Carolina for this court to assert jurisdiction over Sitting Bull.

Even though Sitting Bull has sufficient contacts with North Carolina to support jurisdiction, such exercise must also be consistent with "traditional notions of fair play and substantial justice." *Int'l Shoe,* 326 U.S. at 316. In making this determination, courts consider the burden on the defendant, the interests of the forum state, the efficient resolution of controversies, and the shared interests of the several states in furthering substantive social policies. *Lesnick,* 35 F.3d at 945-46. Fatboy's claims primarily involve unfair business practices allegedly conducted within North Carolina. Although traveling to the United States to defend this lawsuit imposes some burden on Sitting Bull, "progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome." *World-Wide Volkswagen Corp.,* 444 U.S. at 294. Furthermore, North Carolina has a substantial interest in discouraging unfair business practices within its borders. Moreover, North Carolina is the only forum where Fatboy may bring suit against all Defendants in one action. Requiring Fatboy to travel to Germany to bring suit against Sitting Bull while also maintaining a suit against the other named Defendants in North Carolina would be highly burdensome and inefficient. Therefore, the court finds that the exercise of jurisdiction in this case would comport with all the requirements of due process and that such exercise of personal jurisdiction is also consistent with the requirements of "fair play and substantial justice."

**CONCLUSION**

For the reasons stated herein, it is **RECOMMENDED** that the district court **DENY** Defendant Sitting Bull, GmbH's motion to dismiss for lack of personal jurisdiction (docket no. 14).

M.D.N.C.,2009.
Fatboy USA, LLC v. Schat
Not Reported in F.Supp.2d, 2009 WL 3756947 (M.D.N.C.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2042900 (M.D.N.C.)
(Cite as: 2006 WL 2042900 (M.D.N.C.))

c
Only the Westlaw citation is currently available.

United States District Court,
M.D. North Carolina.
STATIC CONTROL COMPONENTS, INC.,
Plaintiff,
v.
INTERSOLUTION VENTURES LTD.; David Abraham; Summit Laser Products, Inc.; National Data Center, Inc., d/b/a Graphic Technologies Corp.; Summit Technologies, L.L.C., A.I. Business Services, Inc.; and Lake James Associates, Inc., d/b/a Chips Incorporated, Defendants.
and
Static Control Components, Inc., Plaintiff,
v.
Steven Miller; Robert Rauber; Platinum Wrench Auto Repair, Inc., d/b/a Platinum Manufacturing and Platinum Manufacturing International, Inc., Defendants.

No. 1:05CV00401.
July 17, 2006.

Jennifer Heisinger, Joseph C. Smith, Jr., Bartlit Beck Herman Palenchar & Scott, Denver, CO, Shayna S. Cook, Bartlit Beck Herman Palenchar & Scott, Chicago, IL, William L. London, III, Steven Ryan Quinley, Static Control Components, Inc., Sanford, NC, for Plaintiff.

Andrew C. Greenberg, Suzette M. Marteny, Carlton Fields, PA, Tampa, FL, William Sam Byassee, Maupin Taylor, PA, Research Triangle Park, NC, Brian R. Gilchrist, Jeffrey S. Boyles, Allen Dyer Doppelt Milbrath & Gilchrist, P.A., Orlando, FL, Ashley Lee Hogewood, III, Kennedy Covington Lobdell & Hickman, LLP, Raleigh, NC, for Defendants.

ORDER
FRANK W. BULLOCK, J.
*1 On May 24, 2006, in accordance with 28 U.S.C. § 636(b), the Recommendation of the United States Magistrate Judge was filed and served on the parties in this action and a copy was given to the court.

Within the time limitation set forth in the statute, the parties objected to the Recommendation.

The court has appropriately reviewed the portions of the Magistrate Judge's report to which objections were made and has made a de novo determination which is in accord with the Magistrate Judge's report. The court hereby adopts the Magistrate Judge's Recommendation.

IT IS THEREFORE ORDERED that Defendants' motions to dismiss for lack of personal jurisdiction and improper venue pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3) [Docket Nos. 39, 47] be DENIED and that Defendants' alternate motions to transfer venue to the Middle District of Florida pursuant to 28 U.S.C. § 1404(a) [Docket Nos. 39, 47] be GRANTED. The Clerk is DIRECTED to effect the transfer forthwith.

RECOMMENDATION BY UNITED STATES
MAGISTRATE JUDGE
WALLACE W. DIXON, Magistrate J.
Plaintiff Static Control Components, Inc. ("Static Control") brought suit in this court on May 18, 2004, against Defendants David Abraham and Intersolution Ventures Ltd. ("ISV") (collectively, "Abraham d/b/a ISV") for copyright infringement of its software code. Static Control instituted a second action in this court on May 4, 2005, alleging identical copyright violations and other various related claims against Defendants Steven Miller, Robert Rauber, Platinum Wrench Auto Repair, Inc. d/b/a Platinum Manufacturing ("Platinum Wrench"), and Platinum International, Inc. ("Platinum International"). On January 6, 2006, following a status conference and hearing, this court found that both cases contained common questions

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2042900 (M.D.N.C.)
(Cite as: 2006 WL 2042900 (M.D.N.C.))

of law and fact and ordered *sua sponte* that they be consolidated pursuant to Rule 42(a) of the Federal Rules of Civil Procedure.

Plaintiff Static Control filed a consolidated, second amended complaint on January 27, 2006. [Docket No. 38]. Defendant Rauber and Defendants Abraham d/b/a ISV, Miller, Platinum Wrench, and Platinum International filed separate motions to dismiss for lack of personal jurisdiction and improper venue pursuant to Rules 12(b)(2) and 12(b)(3) of the Federal Rules of Civil Procedure, or in the alternative, to transfer venue pursuant to 28 U.S.C. § 1404 [Docket Nos. 39, 47]; and to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) [Docket Nos. 40, 45]. Abraham d/b/a ISV also filed an independent motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). [Docket No. 43].

The parties have fully briefed their positions and the motions are ready for a ruling. Because there has been no consent, the court must deal with these motions by way of recommended disposition. For the reasons set forth below, the court will recommend that Defendants' motions to dismiss for lack of personal jurisdiction and improper venue be denied and that their motions to transfer venue to the Middle District of Florida be granted. The remaining motions to dismiss will not be addressed because of the recommended change of venue.

I. FACTS

*2 The facts as alleged by Static Control in its consolidated, second amended complaint are as follows. Static Control is a North Carolina corporation that develops, markets, and sells various devices and components used to repair and recycle printer toner cartridges. (Second Am. Compl. ¶ 12). Beginning in early 2002, Static Control developed integrated circuit chips ("Static Chips") to use in remanufactured toner cartridges that are compatible with the Lexmark T520/522 and T620/622 families of laser printers. (Second Am. Compl. ¶ 29). Static Chips incorporate original, proprietary, and copyrighted software code developed by Static Control

("Static Code") that allows printers to interpolate and exchange information with laser printer toner cartridges. (Second Am. Compl. ¶ 30). Static Chips contained a computer program, the Static Code, that Static Control's software engineers had written to control the chip's function and to provide for future functions (such as reuse) that were not initially provided. (Second Am. Compl. ¶ 37).

Static Control began selling Static Chips in April 2002 and uses derivative variations of the Static Code in chips it manufacturers for Lexmark branded printers and other related brands. (Second Am. Compl. ¶ 31). Static Control introduced the Static Chip for use on remanufactured Lexmark toner cartridges in September 2002 and had no competitors. (Second Am. Compl. ¶ 36). Static Control has registered its copyright in the Static Code with the United States Copyright Office and has obtained certificates of registration. (Second Am. Compl. ¶ 32). Static Chips are sold with labels bearing Static Control's registered trademarks and copyrighted documentation; the copyrighted instructions contained a clear and apparent notice of copyright. (Second Am. Compl. ¶ 33).

Steven Miller, a Florida resident, is the president of Platinum Wrench, a Florida corporation, and the sole director of Platinum International, also a Florida corporation. (Second Am. Compl. ¶¶ 13, 16-17). Robert Rauber, a Florida resident, is the president of Lake James Associates, Inc. d/b/a Chips, Inc. ("Chips, Inc.") and a former officer of Platinum Wrench and employee Platinum International. (Second Am. Compl. ¶ 14). David Abraham is a former Platinum Wrench employee and the current president of ISV, a Florida sole proprietorship. (Second Am. Compl. ¶¶ 2, 15, 50).

Platinum Wrench was originally operated strictly as an automotive repair garage and prior to September 2002 neither Miller nor Rauber had experience in writing software code for chips, in manufacturing chips for electronic components, or in the remanufactured toner cartridge industry. (Second Am. Compl. ¶ 34). Miller decided to enter

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2042900 (M.D.N.C.)
(Cite as: 2006 WL 2042900 (M.D.N.C.))

the business of manufacturing and selling chips for use in remanufactured toner cartridges in late 2002 and Rauber agreed to assist in this venture. (Second Am. Compl. ¶ 35). Miller, because of his lack of relevant industry experience and unwillingness to spend the time and money necessary to develop an original product, decided to steal Static Control's code and sell it as his own. (Id.). In December 2002, Miller faxed Platinum Wrench's business information to Static Control's North Carolina headquarters to set up a business account and obtain Lexmark 520 and 620 compatible chips from Static Control for the purpose stealing the software code and manufacturing counterfeit chips. (Second Am. Compl. ¶ 38). Platinum Wrench, through Miller and Rauber, purchased Lexmark compatible chips from Static Control through 2004. (Second Am. Compl. ¶ 39).

*3 Miller and Rauber first paid an individual named Steve Lamothe to extract code from Static Chips. (Second Am. Compl. ¶ 40). While Lamothe was able to successfully extract the code, he refused to give the information to Miller and Rauber. (Id.). Rather, Lamothe apparently used the extracted Static Code to unlawfully aid an individual named Sam Patel in manufacturing and selling chips that utilized the Static Code. (Second Am. Compl. ¶ 75).

Miller and Rauber next approached Jason and David Olmsted and detailed their plan for extracting and copying Static Control's code. (Second Am. Compl. ¶ 41). Rauber instructed David Olmsted to use the internet to find the contact information for a particular Russian computer scientist studying in England with the technical ability to extract the Static Code from Static Chips. (Second Am. Compl. ¶ 42). Miller and Rauber then directed Jason Olmsted, then a Platinum Wrench employee, to send the Static Chips to the Russian computer scientist. (Id.).

The Russian computer scientist successfully extracted all software code contained on the Static Chip, including the Static Code, and sent the in-

formation back to Jason Olmsted. (Second Am. Compl. ¶ 43). Miller then instructed Rauber and the Olmsteds to manufacture chips containing the Static Control code through Platinum Wrench. (Second Am. Compl. ¶¶ 43-45, 63). Miller instructed Rauber to supervise the chip manufacturing process and ordered David Olmsted to make the chips appear to be Static Control chips by scanning the Static Control label into the computer, copying Static Control's instructions verbatim, and packaging the counterfeit chips and counterfeit labels using packaging materials identical to Static Control's. (Second Am. Compl. ¶¶ 43, 63, 68). From approximately March 2003 through July 2003, Miller, Rauber, and Platinum Wrench sold chips containing a duplicate copy of Static Control's code, instructions, labels, and packaging through ISV ("Version 1 ISV Chips"), and Rauber personally delivered the chips to a Federal Express drop-off for shipping to ISV customers. (Second Am. Compl. ¶¶ 24, 44-45, 63, 68).

In May 2003, Miller attempted to intimidate Sam Patel, the recipient of the Static Code extracted by Steve Lamothe, into discontinuing the sale of his competing chips. (Second Am. Compl. ¶¶ 76, 113). Miller forged letters to several individuals in Illinois named Sam Patel with the assistance of Jason Olmsted by scanning a copy of Static Control's letterhead. (Second Am. Com pl. ¶¶ 76-77, 114). In the letters, Miller misrepresented himself as Static Control attorney William London and threatened legal action if Patel's company did not cease and desist its chip sales. (Second Am. Compl. ¶¶ 76, 113). To enhance the credibility of the forged letters, Miller even traveled from Florida to Sanford, North Carolina, where Static Control is located, and posted registered copies of the letter for delivery by the United States Postal Service. (Second Am. Compl. ¶¶ 77, 115).

*4 In the summer or fall of 2003, Jason Olmsted helped Miller and Rauber contact Herman Schnell, a software engineer in Fort Lauderdale, Florida. (Second Am. Compl. ¶ 64). Schnell modi-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2042900 (M.D.N.C.)
**(Cite as: 2006 WL 2042900 (M.D.N.C.))**

fied Static Control's code and created derivative works from that code for use on a variety of Lexmark printer engine families. (*Id.*). Rauber, at Miller's direction, placed the derivative works on chips for sale to the customers through ISV under the ISV brand name ("Version 2 ISV Chips"). (*Id.*).

Miller incorporated Platinum International in August 2003 and Rauber, at Miller's direction, then began manufacturing chips that contained code copied or derived from Static Control's code through that new entity. (Second Am. Compl. ¶ 46). The infringing chips manufactured by Platinum International were sold and transported through interstate and foreign commerce on at least 100 occasions from August 2003 until September 2004. (Second Am. Compl. ¶ 62). Rauber, Miller, Platinum Wrench, and Platinum International manufactured the chips knowing and intending that they would be delivered to customers in North Carolina, the United States, and worldwide by ISV. (Second Am. Compl. ¶¶ 46, 61-62, 65). Between July 2003 and August 2004, at least eight interstate phone calls were placed from North Carolina phone numbers to a New York state answering service utilized by the Defendants; seven of the calls were placed to "David Abraham," one call was placed to "Robert," at least two calls specifically sought chip pricing, and one referred to a previous call with "David Abraham." (Second Am. Compl. ¶ 25).

In order to shield himself, his business entities, and Rauber from legal liability, Miller obtained effective legal control of his former Platinum Wrench employee, David Abraham. (Second Am. Compl. ¶¶ 2, 49, 51). On or about February 28, 2003, Miller became Abraham's attorney-in-fact through a durable power of attorney for financial matters, which, among other things, authorizes Miller to open, close, and draw on personal and commercial bank accounts; deal in securities, promissory notes, and bills of exchange; retain tax professionals; open and answer mail in Abraham's name; and to file suit and defend suits brought against Abraham. (Second Am. Compl. ¶¶ 13, 51-52). Abraham was a self-described homeless person with no documented assets at the time he executed the power of attorney and was subsequently incarcerated from March 2003 until early 2004. (Second Am. Compl. ¶ 53).

On or about the same date that the power of attorney was executed, Miller organized ISV as a sole proprietorship and designated Abraham as the president. (Second Am. Compl. ¶¶ 54-56). Despite Abraham's title, Miller actually dominated and controlled all aspects of ISV; Abraham lacked significant understanding of computer chip technology and had no actual control of either the operations or finances of ISV. (Second Am. Compl. ¶ 57). At all times relevant to this case, Rauber participated with Miller in conducting the affairs of Abraham d/b/a ISV. (Second Am. Compl. ¶ 14). In fact, Miller and Rauber assumed Abraham's identity in their interactions with ISV customers; Rauber became the phone persona of Abraham and Miller used the name "David Abraham Junior" or "Junior." (Second Am. Compl. ¶¶ 2, 79). They were, however, forced to continue operating the chip manufacturing process through the Platinum entities because the electronic component vendors wanted to meet David Abraham face-to-face before conducting business with ISV. (Second Am. Compl. ¶¶ 66-67). ISV customers were repeatedly assured by Miller and Rauber that their chips were independently developed and did not resemble the Static Control code in any way; they maintained that the code on ISV chips was written by Jason Olmsted. (Second Am. Compl. ¶ 111). Further, Miller and Rauber made false advertising claims that ISV maintained a state-of-the-art manufacturing facility with "research and development departments." (Second Am. Compl. ¶¶ 110, 112).

*5 Miller opened and utilized multiple secret bank accounts under Abraham's name and other assumed identities to conceal and disguise the nature, location, source, ownership, and control of the illegal chip sale proceeds. (Second Am. Compl. ¶¶ 2, 81). The banks where accounts were opened included Bank of America, Mercantile Bank, and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2042900 (M.D.N.C.)
**(Cite as: 2006 WL 2042900 (M.D.N.C.))**

SunTrust Bank. (Second Am. Compl. ¶ 81). Miller used transfers among the various bank accounts to withdraw as much as $1,000 cash per day from each account by debit card, intending to avoid transaction reporting requirements and scrutiny from bank investigators. (*Id.*).

After Static Control filed suit against Abraham and ISV in May 2004, Miller directed Rauber to use proceeds from their venture to purchase an established shell corporation. (Second Am. Compl. ¶¶ 3, 83). Rauber purchased Chips, Inc. in June 2004 and he and Miller intended to make both Abraham and ISV disappear. (Second Am. Compl. ¶¶ 83, 85). Miller and Rauber began transferring ISV's operations to the newly acquired entity and decided to "kill off" the David Abraham identity by telling customers that Abraham was suffering from pancreatic cancer. (Second Am. Compl. ¶¶ 3, 85).

## II. CLAIMS

Static Control raises the following six claims for relief in its consolidated, second amended complaint: (1) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), against Miller, Rauber, Platinum Wrench, and Platinum International based on the predicate acts of copyright infringement, trafficking in counterfeit goods and materials, mail fraud, wire fraud, and money laundering; (2) violation of RICO § 1962(a) against Rauber based on the same predicate acts; (3) violation of the federal Copyright Act, 17 U.S.C. § 501 *et seq.*, against Miller, Rauber, Platinum Wrench, Platinum International, and Abraham d/b/a ISV; (4) violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. GEN.STAT. § 75-1.1, against Miller, Rauber, and Abraham; (5) violation of the Lanham Act (Trademark Infringement), 15 U.S.C. § 1114 *et seq.*, against Miller, Rauber, Platinum Wrench, and Abraham d/b/a ISV; and (6) violation of the Lanham Act (False Destination of Origin), 15 U.S.C. § 1125(a), against Miller, Rauber, Platinum Wrench, and Abraham d/b/a ISV.

## III. DISCUSSION

### A. Personal Jurisdiction

Static Control claims three independent bases for this court to exercise personal jurisdiction over Defendants: (1) the North Carolina long-arm statute, N.C. GEN.STAT. § 1-75.4; (2) the RICO statute, 18 U.S.C. § 1965(b); and (3) conspiracy theory jurisdiction. Defendant Rauber and Defendants Miller, Platinum Wrench, Platinum International, and Abraham d/b/a ISV contest Static Control's assertions and separately move to dismiss this action for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). When such a motion is made, the plaintiff must prove the existence of a ground for jurisdiction by a preponderance of the evidence. *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir.1989). If the court, as here, considers the jurisdictional challenge based solely on motion papers, supporting legal memoranda, and pleadings, the plaintiff need only make a prima facie showing of a sufficient jurisdictional basis. *Id.* When considering a jurisdictional challenge based on the record, the court must construe allegations contained in the pleadings in the light most favorable to the plaintiff, assume credibility, and the most favorable inferences stemming from the evidence must be drawn in favor of the existence of jurisdiction. *Id.* The Fourth Circuit has held, however, that "[a]lthough it is true that the plaintiff opposing a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction is entitled to have all reasonable inferences from the parties' proof drawn in his favor, district courts are not required ... to look solely to the plaintiff's proof in drawing those inferences." *Mylan Labs., Inc. v. Akzo, N.V.,* 2 F.3d 56, 62 (4th Cir.1993).

**\*6** Static Control first claims that this court has personal jurisdiction based on the North Carolina long-arm statute. Whether personal jurisdiction is proper involves a two-part inquiry. First, the court must determine whether the state long-arm statute provides a statutory basis for the assertion of personal jurisdiction. *Id.* Second, the court must determine whether the exercise of personal jurisdic-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2042900 (M.D.N.C.)
**(Cite as: 2006 WL 2042900 (M.D.N.C.))**

tion is consistent with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Id.* Because North Carolina's long-arm statute has been interpreted to extend to the full extent permitted by the Constitution, however, the inquiry collapses into a one-step due process analysis. *Christian Science Bd. of Dirs. of the First Church of Christ v. Nolan,* 259 F.3d 209, 215 (4th Cir.2001) (citing *Century Data Sys., Inc. v. McDonald,* 109 N.C.App. 425, 427, 428 S.E.2d 190, 191 (1993)); *DP Envtl. Servs., Inc. v. Bertlesen,* 834 F.Supp. 162, 164 (M.D.N.C.1993) ("Since North Carolina's legislature intended to make available to the North Carolina courts the full jurisdictional powers permissible under federal due process, the normal two-step inquiry merges into one.").

For a state to exercise personal jurisdiction over a non-resident defendant, due process requires that the defendant have certain minimum contacts with the forum state such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Lesnick v. Hollingsworth & Vose Co.,* 35 F.3d 939, 945 (4th Cir.1994). When examining the sufficiency of a non-resident defendant's contacts, "[t]he touchstone of the minimum contacts analysis remains that an out-of-state person have engaged in some activity purposefully directed toward the forum state." *Id.* In short, jurisdiction is proper when a relationship exists between the defendant and the forum "such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

There are two types of personal jurisdiction: specific and general. *Slaughter v. Life Connection of Ohio,* 907 F.Supp. 929, 933 (M.D.N.C.1995). Specific jurisdiction is established where the forum state asserts personal jurisdiction over a defendant in a suit "arising out of or related to" the defendant's contacts with that state. *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404

(1984)). For specific jurisdiction to be found, due process requires that the defendant purposely direct its activities at the forum. *Fed. Ins. Co. v. Lake Shore, Inc.,* 886 F.2d 654, 660 (4th Cir.1989). On the other hand, if the issues before the court did not arise in the forum state, general jurisdiction can be found only when a defendant had sufficient "continuous and systematic contacts" with the forum state. *Helicopteros,* 466 U.S. at 414. Thus, general jurisdiction requires "a more demanding standard than is necessary for establishing specific jurisdiction." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,* 293 F.3d 707, 712 (4th Cir.2002). With these principles in mind, the court turns to the issue of whether the Defendants have sufficient contacts with North Carolina such that maintenance of this case in North Carolina comports with due process.

*7 Static Control does not assert, and the alleged facts do not support a finding, that the Defendants' contacts with North Carolina in this case are sufficiently "continuous and systematic" to subject them to *general* jurisdiction. The court must, therefore, determine whether Defendants' contacts with North Carolina are sufficient to subject them to *specific* jurisdiction. To establish specific jurisdiction, Static Control must show: (1) the extent to which the Defendants "purposefully availed" themselves of the privileges of conducting activities in North Carolina; (2) whether its claims arise out of those activities directed at North Carolina; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable. *Id.* After construing all relevant pleadings in the light most favorable to Static Control, assuming credibility, and drawing the most favorable inferences in favor of jurisdiction, this court finds a sufficient basis for personal jurisdiction in North Carolina.

The "purposeful availment" requirement ensures that defendants "will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts or of the 'unilateral activity of another party or a third person,'" *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2174, 85 L.Ed.2d 528 (1985) (internal citations omitted). It requires conduct by defendants in relation to the forum state "such that [they] should reasonably anticipate being haled into court there." *World-Wide Volkswagen,* 444 U.S. at 297. The alleged conduct by the Defendants in this case was anything but random, fortuitous, or attenuated; they initiated contact with Static Control, opened a business account, and maintained an ongoing business relationship for nearly two years, acquiring Lexmark compatible chips for the sole purpose of stealing the code and manufacturing competing, counterfeit chips.

The Fourth Circuit has held that such actions targeting a domestic company constitute sufficient grounds to support personal jurisdiction. In *Vishay Intertechnology, Inc. v. Delta Int'l Corp.,* 696 F.2d 1062, 1064 (4th Cir.1982), a California defendant sought to obtain a domestic price quote from a North Carolina plaintiff under false pretenses to use to underbid the plaintiff on a Korean contract. The defendant challenged personal jurisdiction based on the low number of contacts it had with North Carolina, which at most amounted to three letters and five telephone calls. *Id.* at 1068. The court deemed "[s]uch a quantitative analysis" to be inappropriate and found personal jurisdiction on the grounds that defendant "intended both to inflict foreseeable injury upon [the North Carolina plaintiff] such that [defendant] could reasonably expect answering to [plaintiff] in North Carolina on claims arising out of those contacts, and to avail itself of the benefits and protections of North Carolina's laws." *Id.* at 1068.

Like the defendant in *Vishay,* each Defendant in this case was directly involved in the intentional tortious activity directed at Static Control and should have reasonably expected to be haled into a North Carolina court to answer for those actions. Miller and Rauber had direct involvement with North Carolina in the repeated procurement of Static Control chips over an approximate two year period. They also manufactured duplicate chips, in-

structions, labels, and packaging through Platinum Wrench, manufactured derivative chips through Platinum International, and sold the counterfeit chips through Abraham d/b/a ISV. The foreseeable harm inflicted upon Static Control included loss of revenue, tarnished reputation, and diminished goodwill.

*8 While the Defendants' activities targeting Static Control's business alone are sufficient to show purposeful availment, there are other significant factors present in this case that reinforce such a finding: (1) telephone calls made from North Carolina to Miller and Rauber via a New York state answering service concerning their chips; (2) multiple ISV invoices for orders of the infringing chips placed by North Carolina customers; and (3) Miller traveling to North Carolina to mail forged letters to intimidate a competing business. While all Defendants deny a significant number of factual allegations made in the complaint, this court must view all allegations as presumptively credible and view them in the light most favorable to Static Control. Miller, Abraham d/b/a ISV, Platinum Wrench, and Platinum International have not presented sufficient arguments/evidence to rebut Static Control's allegations favoring jurisdiction. Rauber argues that he was merely a salaried employee of Platinum Wrench with no significant personal interest in the company's operations and that he never worked for, had responsibilities with, or spoke to customers of ISV. Such assertions, however, are belied by the record. Rauber is listed as the vice president of Platinum Wrench in a Static Control account application form and as a director of Platinum Wrench in a signed form submitted to the Florida Department of State. Further, while Rauber is not officially listed as an officer or employee of ISV, it is alleged that he was the organization's de facto president by assuming the telephone persona of Abraham while conducting ISV business. Accordingly, Defendants have purposefully availed themselves of the privileges of conducting activities in North Carolina.

In addition to the purposeful availment require-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2042900 (M.D.N.C.)
(Cite as: 2006 WL 2042900 (M.D.N.C.))

ment, due process requires a sufficient nexus between defendants' contacts with the forum state and the nature of the claims asserted. *Helicopteros,* 466 U.S. at 415-16; *ALS Scan,* 293 F.3d at 712. Specifically, the plaintiff's causes of action must "arise out of" or "relate to" the defendant's contacts with the forum state. *Helicopteros,* 466 U.S. at 414 n. 8. In determining whether a claim is sufficiently related to forum-related activities, circuits have applied different tests. *Yates v. Motivation Indus. Equip. Ltd.,* 38 F. App'x 174, 178 n. 6 (4th Cir.2002). The Sixth Circuit takes a more liberal view and "does not require that the cause of action formally 'arise from' defendant's contacts with the forum; rather, [it] requires only 'that the cause of action, of whatever type, have a substantial connection with the defendant's in-state activities." ' *Bird v. Parsons,* 289 F.3d 865, 875 (6th Cir.2002) (citing *Third Nat'l Bank in Nashville v. WEDGE Group. Inc.,* 882 F.2d 1087, 1091 (6th Cir.1989)). The Ninth Circuit, on the other hand, utilizes a more restrictive "but for" test and "considers whether [a plaintiff's] claims would have arisen but for [the defendant's] contacts with [the forum state]." *Doe v. Unocal Corp.,* 248 F.3d 915, 924 (9th Cir.2001).

*9 In this case, there is a sufficient connection between the claims and contacts under either test to support personal jurisdiction. Even under the more demanding "but for" analysis, jurisdiction would be appropriate because each claim would not have arisen absent the following actions by Defendants targeting Static Control's North Carolina business: (1) initiating contact and establishing an ongoing business relationship with Static Control; (2) repeatedly purchasing Static Chips; (3) copying the Static Code; (4) manufacturing counterfeit chips; (5) copying Static Control's instructions, labels, and packaging; and (6) marketing, distributing, selling, and shipping the counterfeit chips and supporting information to customers in North Carolina.

Finally, the court must determine whether the exercise of personal jurisdiction would be constitutionally reasonable. In making this determination, the court must consider the burden on the Defendants, the interests of the forum state, the Plaintiff's interest in obtaining relief, the efficient resolution of controversies, and the shared interests of the several states in furthering substantive social policies. *Lesnick,* 35 F.3d at 945-46. While litigating this case in North Carolina would certainly present an inconvenience to Defendants, the burden is not constitutionally unreasonable. By targeting a North Carolina corporation and conducting business in the state, Defendants "reasonably could have assumed ... that [they] would be sued there." *ePlus Tech., Inc. v. Aboud,* 313 F.3d 166, 177 (4th Cir.2002) (finding jurisdiction reasonable over a Canadian defendant whose Virginia contacts were limited to the submission of false information on credit applications to two Virginia companies). Furthermore, North Carolina has a strong interest in providing effective means of redress for its residents. *Burger King,* 471 U.S. at 474; *First Am. First, Inc. v. Nat'l Ass'n of Bank Women,* 802 F.2d 1511, 1517 (4th Cir.1986). "North Carolina and this District have strong interests in protecting the corporate entities that are contributing to the economic well-being of the area. This is especially true when those economic interests are threatened by conduct purposefully directed at a North Carolina corporation." *Richmar Dev., Inc. v. Midland Doherty Servs., Ltd.,* 717 F.Supp. 1107, 1120 (W.D.N.C.1989). As such, the exercise of personal jurisdiction in this case "does not offend 'traditional notions of fair play and substantial justice." ' *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)).

Because of the Defendants' purposeful availment of the privilege of conducting activities in North Carolina, the relation between the claims and the contacts, and the reasonableness of asserting jurisdiction, exercising personal jurisdiction over Defendants is proper in this case. The court will, therefore, forego analysis under Static Control's alternate bases of personal jurisdiction and discuss Defendants' venue claims.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

## B. Venue

**\*10** Static Control asserts that venue is proper in this district based on the following statutory provisions: (1) the general venue statute, 28 U.S.C. § 1391; (2) the copyright infringement venue statute, 28 U.S.C. § 1400(a); and (3) the RICO venue statute, 18 U.S.C. § 1965(a), (b). Defendant Rauber and Defendants Miller, Platinum Wrench, Platinum International, and Abraham d/b/a ISV separately move to dismiss this action for improper venue, or in the alternative, to transfer venue to the United Stats District Court for the Middle District of Florida.

### 1. *Motion to dismiss for improper venue*

When an objection to venue has been raised under Federal Rule of Civil Procedure 12(b)(3), the burden lies with the plaintiff to establish that venue is proper in the judicial district in which the plaintiff has brought the action. *Plant Genetic Sys., N.V. v. Ciba Seeds,* 933 F.Supp. 519, 526 (M.D.N.C.1996). First, corporate defendants are deemed to reside in any judicial district in which they are subject to personal jurisdiction at the time the action is commenced. 28 U.S.C. § 1391(c). Because, as discussed above, Platinum Wrench and Platinum International are subject to personal jurisdiction in North Carolina, they are considered residents of this district for venue purposes. Second, in cases where jurisdiction is not based solely on diversity of citizenship, venue is proper in both "(1) a judicial district where any defendant resides, if all defendants reside in the same State, [and] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred...." *Id.* § 1391(b). Because all Defendants are Florida residents, venue is unquestionably proper in the Middle District of Florida. To determine whether venue is also proper in this district, the court must determine if a substantial part of the events or omissions giving rise to Static Control's claims occurred in the Middle District of North Carolina.

Each Defendant in this case was involved in one or more activities in North Carolina that gave rise to Static Control's claims in this case. These activities, as discussed above in the personal jurisdiction context, include: (1) initiating contact and establishing an ongoing business relationship with Static Control; (2) repeatedly purchasing chips from Static Control; (3) copying Static Control's code; (4) manufacturing counterfeit chips; (5) copying Static Control's instructions, labels, and packaging; and (6) marketing, distributing, selling, and shipping the counterfeit chips and supporting information to customers in North Carolina. Not only are the actions that precipitated Static Control's claims considered, but also the harm that resulted from those actions. *See Ciena Corp. v. Jarrard,* 203 F.3d 312, 318 (4th Cir.2000); *Sadighi v. Daghighfekr,* 36 F.Supp.2d 267, 276 (D.S.C.1999). Static Control experienced resulting harm in North Carolina to its sales revenues, reputation, and goodwill. The affirmative actions taken by Defendants in/ with North Carolina coupled with the resulting harm experienced by Static Control in North Carolina justify venue in this district.

### 2. *Motion to transfer venue*

**\*11** Defendants alternatively move to transfer this action to the Middle District of Florida pursuant to 28 U.S.C. § 1404(a). When considering whether a transfer is appropriate under § 1404(a), district courts take the following factors into consideration: (1) the plaintiff's initial choice of forum; (2) relative ease of access to sources of proof; (3) availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing and unwilling witnesses; (4) possibility of a view of the premises, if appropriate; (5) enforceability of a judgment, if one is obtained; (6) relative advantage and obstacles to a fair trial; (7) other practical problems that make a trial easy, expeditious, and inexpensive; (8) administrative difficulties of court congestion; (9) local interest in having localized controversies settled at home; (10) appropriateness in having a trial of a diversity case in a forum that is at home with the state law that must govern the action; and (11) avoidance of un-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2042900 (M.D.N.C.)
**(Cite as: 2006 WL 2042900 (M.D.N.C.))**

necessary problems with conflicts of laws. *Brown v. Flowers,* 297 F.Supp.2d 846, 850 (M.D.N.C.2003). Unless the balancing of these factors weighs strongly in favor of the defendant, the plaintiff's choice of forum generally should not be disturbed. *Id.* (citing *Collins v. Straight, Inc.,* 748 F.2d 916, 921 (4th Cir.1984)). A court also should not transfer venue where doing so would only shift the inconvenience to another party. *Id.* (citing *Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.,* 841 F.Supp. 719, 721 (M.D.N.C.1993) ).

While venue and the exercise of personal jurisdiction are both proper in either this district or the Middle District of Florida, the court finds that the above-listed discretionary factors weigh strongly in favor of Defendants' motions to transfer. Despite the considerable deference afforded Static Control's initial choice of forum, the unavailability of compulsory process in this district for several key witnesses and the resulting obstacle to a fair trial tips the scales in favor of transfer. Each claim raised by Static Control relies heavily upon the testimony of non-party Florida residents who are beyond the subpoena power of this court.

Throughout the discovery process in the initial copyright infringement suit against Abraham and ISV, Static Control learned more and more detailed information that ultimately led to the second action being filed against Miller, Rauber, and the Platinum entities. Not only did the information learned implicate additional parties in the copyright infringement, it also formed the basis for the additional claims raised in this consolidated action. Florida residents Jason and David Olmsted provide the foundation for Static Control's RICO, UDTPA, and Lanham Act claims; they are allegedly complicit in and/or witnesses to both the acts of mail/wire fraud that underlie the RICO and UDTPA claims and the counterfeiting of Static Control's instructions, packaging, and labels that forms the basis for the trademark and false designation claims. (Second Am. Compl. ¶¶ 76, 114; Docket No. 48, Sealed App. S-

1, S-2). The Olmsteds, along with Steve Lamothe and Herman Schnell, are also important witnesses to Static Control's copyright infringement claim. (Second Am. Com pl. ¶¶ 40-41, 64).

**\*12** Considering the gravity of Static Control's claims, the potential for serious liability, and the critical nature of the non-party testimony in this case, it is of paramount importance that the jurors be able to assess the credibility of those key witnesses firsthand by personally observing their demeanor on the stand. The use of written deposition transcripts or videotaped depositions are an inadequate substitute in this case. Not only is live testimony easier for jurors to follow and comprehend, reliance on depositions would preclude counsel from both formulating more probing questions after a considered review of the depositions and altering the scope of questioning based on unexpected developments at trial. *See, e.g., United Rentals, Inc. v. Pruett,* 296 F.Supp.2d 220, 229 (D.Conn.2003). Therefore, to promote the interest of justice and remove a substantial obstacle to a fair trial, this court finds that venue should be transferred to the Middle District of Florida.[FN1]

> FN1. This action essentially reverted back to square one upon the consolidation of case nos. 1:04CV00443 and 1:05CV00401 and the transfer of venue will not substantially postpone its ultimate resolution. Furthermore, Florida's Deceptive and Unfair Trade Practices Act is analogous to the North Carolina UDTPA and mitigates Static Control's interest in having a forum that is home to the state law in question. *See* FLA. STAT. § 501.204(1) ("Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.").

IV. CONCLUSION

IT IS THEREFORE RECOMMENDED that Defendants' motions to dismiss for lack of personal jurisdiction and improper venue pursuant to Federal

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2042900 (M.D.N.C.)
**(Cite as: 2006 WL 2042900 (M.D.N.C.))**

Rules of Civil Procedure 12(b)(2) and 12(b)(3) [Docket Nos. 39, 47] be DENIED.

IT IS FURTHER RECOMMENDED that Defendants' alternate motions to transfer venue to the Middle District of Florida pursuant to 28 U.S.C. § 1404(a) [Docket Nos. 39, 47] be GRANTED.[FN2]

> FN2. Because this court recommends a transfer of venue, Defendants' motions to dismiss a portion of the asserted claims for failure to state a claim [Docket Nos. 40, 45] and for lack of subject matter jurisdiction [Docket No. 43] will not be addressed.

M.D.N.C.,2006.
Static Control Components, Inc. v. Intersolution Ventures Ltd.
Not Reported in F.Supp.2d, 2006 WL 2042900 (M.D.N.C.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 170506 (E.D.Va.)
**(Cite as: 2008 WL 170506 (E.D.Va.))**

C
Only the Westlaw citation is currently available.

United States District Court, E.D. Virginia,
Norfolk Division.
EAGLE PAPER INTERNATIONAL, INC.,
Plaintiff,
v.
EXPOLINK, LTD., et al., Defendant.

Civil Action No. 2:07cv160.
Jan. 17, 2008.

Alan Dale Albert, Ray Webb King, Leclair Ryan PC, Norfolk, VA, for Plaintiff.

James E. Kane, Karen S. Elliott, Gregory Kaplan PLC, Richmond, VA, for Defendant.

### *ORDER*

RAYMOND A. JACKSON, District Judge.

This matter comes before the Court upon Defendants' Motion To Dismiss pursuant to Rule 12(b) 6 and 12(b)2 of the Federal Rules of Civil Procedure.

This matter was referred to a United States Magistrate Judge for report and recommendation on October 12, 2007, pursuant to the provisions of 28 U.S.C. Section 636(b)(1)(B) and (C), Rule 72(b) of the Federal Rules of Civil Procedure, and the Rules of the United States District Court for the Eastern District of Virginia. On November 26, 2007, the Magistrate Judge filed his report recommending that Defendants' Motion To Dismiss be *GRANTED.* By copy of the report, the parties were advised of their right to file written objections to the findings and recommendations made by the Magistrate Judge. The Court has received no objections to the report and the time for filing same has expired. After careful review of the Magistrate Judge's Report and Recommendation, the Court does hereby accept the findings and recommendations set forth in the report of the United States Magistrate Judge

filed November 26, 2007. It is, therefore, *ORDERED* that Defendants' Motion To Dismiss for a lack of personal jurisdiction is *GRANTED* and Defendants' motion to dismiss for a failure to state a claim is *DENIED.*

The Clerk of the Court is *DIRECTED* to send a copy of this Final Order to counsel of record.

*IT IS SO ORDERED.*

### *REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE*

TOMMY E. MILLER, United States Magistrate Judge.

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia, by order of reference entered October 12, 2007.

This case was referred for a report and recommendation on a motion to dismiss filed by Defendants Expolink, Ltd., ("Expolink"), Michael Mamlin ("Mamlin"), and Arie Sasson ("Sasson") [Document No. 8]. For the reasons set forth below, the Court recommends the motion to dismiss the complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(2), Federal Rule of Civil Procedure 12(b)(6), and the doctrine of forum non conveniens be GRANTED in part and DENIED in part.

### I. *FACTUAL AND PROCEDURAL HISTORY*

This matter relates to a series of business transactions between two companies that broker bulk paper internationally. Eagle Paper International, Inc. ("Eagle") is a Virginia corporation with its principal place of business in Virginia Beach, Virginia. Compl. ¶ 2. The company maintains a number of international offices, including an office in Ramat-Gan, Israel. Geron Affidavit, Oct. 1, 2007, ¶¶ 4, 9

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

("Geron Aff."). Eagle's President, Jacob Geron ("Geron"), is a citizen of Israel with residences in both Israel, Mamlin Affidavit, Sept. 17, 2007, ¶ 2 ("Mamlin Aff. 1"), and the Commonwealth of Virginia, Geron Aff. ¶ 2. Expolink is an Israeli company with its principal place of business in Ashkelon, Israel. Compl. ¶ 3. Mamlin is the company's President and sole shareholder, Mamlin Aff. 1 ¶ 2, and Sasson is employed by Expolink as its International Trade Representative, Sasson Affidavit, Sept. 17, 2007, ¶ 2 ("Sasson Aff. 1"), Sasson Affidavit, Oct. 9, 2007, ¶¶ 2, 3 ("Sasson Aff. 2"). Both Mamlin and Sasson are citizens and residents of Israel. Mamlin Aff. 1 ¶ 2, Sasson Aff. 1 ¶ 1.

In late 2003 or early 2004, the parties first discussed the possibility of entering into a business relationship whereby Expolink would serve as Eagle's exclusive agent in a number of Eastern European nations, such as the Ukraine, Estonia, Moldova, and Belarus, procuring sales of Eagle's products in those countries and obtaining paper supplies from manufacturers with production capacity in those countries. Compl. ¶¶ 8-10. The parties' first face to face conversation through their principals Geron and Mamlin took place at Eagle's office in Ramat-Gan. Mamlin Affidavit, Oct. 9, 2007, ¶¶ 3, 4 ("Mamlin Aff. 2"). Shortly after their initial meeting, Eagle and Expolink began transacting business. Compl. ¶ 11.

On or about May 2005, Geron proposed that the parties memorialize the terms of their business relationship in writing. Mamlin Aff. 2 ¶ 5. He then drafted an agreement which the parties met to discuss in Israel on May 26, 2005. Id. On June 8, 2005, Mamlin signed the agreement on behalf of Expolink and faxed it to Eagle's office in Israel. Id. While purportedly still in Israel, Geron signed the agreement on behalf of Eagle on June 18, 2005. Id. ¶ 6. The signed agreement was faxed from Eagle's office in Israel to Expolink's office in Israel on July 26, 2005. Id. ¶ 5. This agreement was later transmitted to Eagle's office in Virginia from outside the United States. Geron Aff. ¶ 14.

During the course of the parties' business transactions, Expolink employee Veronika Korf ("Korf") would place orders for products with Eagle's office in Israel. Korf Affidavit, Oct. 9, 2007, ¶¶ 5-7 ("Korf Aff."). Korf selected products from lists of inventory provided to her by Eagle's Israeli employee "Hagit." Id. ¶ 5. Hagit would confirm Expolink's orders by sending Korf a "Notification of Shipment" and later a "Bill of Lading." Id. ¶¶ 8, 9. While Expolink did not dictate the source of Eagle products, Mamlin Aff. 2 ¶ 14, it often accepted shipments from United States ports, including the Port of Norfolk, Geron Aff. ¶ 19. Eagle shipped all products purchased by Expolink at its own expense. Mamlin Aff. 2 ¶¶ 15, 16. Upon arrival of a shipment and receipt of an invoice from Eagle, Korf would send payment from Expolink's bank in Israel to Eagle's bank in Richmond, Virginia. Korf Aff. ¶ 10, Geron Aff. ¶¶ 6, 15. Concurrently, Eagle, through its employee Hagit, would place similar orders with Korf for products from Expolink's Eastern European suppliers. Mamlin Aff. 2 ¶ 10.

Geron alleges that Mamlin, Sasson, and Korf frequently placed telephone calls and sent electronic mail ("e-mail") messages to Eagle's offices in Virginia Beach to conduct this business. Geron Aff. ¶¶ 16-18, 20-23. Mamlin and Sasson disagree, claiming instead that any telephone calls were placed to Eagle's office in Israel or directly to Geron's phone. Mamlin Aff. 1 ¶ 6, Sasson Aff. 1 ¶ 5. Korf also states that she did not call Eagle's Virginia Beach office. Korf Aff. ¶ 11. Instead, she maintains that all her calls were local and conducted in Hebrew. Id. ¶¶ 6, 11. Korf further claims that any e-mails sent to Virginia Beach employees were in response to technical shipping problems and were sent to e-mail addresses appearing in previous correspondence sent by Eagle. Id. Though the parties did discuss business face to face on a number of occasions, neither Mamlin or Sasson ever traveled to the United States to transact business. Mamlin Aff. 1 ¶ 6, Sasson Aff. 1 ¶ 3.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

On April 3, 2007, Eagle filed its ten-count complaint, against Expolink and Mamlin and Sasson individually, alleging breaches of contract, breaches of fiduciary duty, fraud, tortious interference with business expectancy, prospective economic advantage, and statutory conspiracy [Doc No. 1]. In particular, Eagle claims that Expolink breached its obligations under their agreement by failing to pay for goods of which it took possession, and failing to provide credit for shipments of inferior quality product. Compl.¶¶ 26-28, 35-38. Eagle also contends that Expolink, Mamlin and Sasson-the latter two acting in furtherance of personal pecuniary interests-used Eagle's reputation and purchasing power to establish relationships with paper suppliers in Moldova and Belarus, then diverted these supplies of paper to their own benefit. *Id.* ¶¶ 15-23, 24-34. On September 7, 2007, this Court granted Defendants' motion for an extension of time to file responsive pleadings [Doc No. 7]. And on September 18, 2007, Defendants filed a motion to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), or in the alternative, seeking dismissal under the doctrine of forum non conveniens [Doc. Nos. 8, 9]. The Court addresses each of these motions in turn.

## II. *MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION*

When a defendant files a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the ultimate burden to prove by a preponderance of the evidence that the exercise of personal jurisdiction is proper as to each defendant. *In re Celotex Corp.,* 124 F.3d 619, 628 (4th Cir.1997). However, a plaintiff need only make a prima facie showing of jurisdiction when, as here, the court decides a Rule 12(b)(2) motion without conducting an evidentiary hearing or deferring its ruling until the receipt of evidence at trial.FN1 *Id.* To determine whether the requisite showing has been made, the court must draw all reasonable inferences and resolve all factual disputes in the plaintiff's favor. *Mylan Laboratories, Inc. v. Akzo, N.V.,* 2 F.3d 56, 60-62 (4th

Cir.1993). Moreover, it is not required to look solely to the plaintiff's proof in drawing these inferences. *Id.*

> FN1. Even if a plaintiff makes the requisite showing, the matter is not settled, as the plaintiff must still prove at trial or at an evidentiary hearing that the assertion of personal jurisdiction over the defendant is proper by a preponderance of the evidence. *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.,* 416 F.3d 290, 294 n. 5 (4th Cir.2005).

Whether personal jurisdiction is proper involves a two-prong inquiry. First, the court must consider whether the forum's long-arm statute authorizes the exercise of jurisdiction. *Id.* at 60. Second, if the requirements of the long-arm statute are met, the court must then determine whether the exercise of jurisdiction is consistent with the Due Process Clause of the Fourteenth Amendment. *Id.* Because Virginia's long-arm statute extends personal jurisdiction to the limits of due process, the state law and due process analyses are identical. *Federal Ins. Co. v. Lake Shore, Inc.,* 886 F.2d 654, 657 n. 2 (4th Cir.1989); *see also Christian Broadcasting Network, Inc. v. Busch,* No. 2:05cv558, 2006 U.S. Dist. LEXIS 1868, at *6-7, 2006 WL 51190 (E.D.Va. Jan. 9, 2006). That is, this Court must only determine whether the Defendants' activities in Virginia are such that it may exercise in personam jurisdiction without violating due process. *Id.*

The Due Process Clause of the United States Constitution requires that a defendant have sufficient minimum contacts such that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (internal citations omitted). Depending on the nature of the defendant's contacts with the forum, courts may exercise either general or specific jurisdiction. *See Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984);

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 170506 (E.D.Va.)
(Cite as: 2008 WL 170506 (E.D.Va.))

*ALS Scan, Inc. v. Digital Service Consultants, Inc.,* 293 F.3d 707, 711-12 (4th Cir.2002). General jurisdiction is authorized when a defendant has "continuous and systemic" contacts with the forum. *Helicopteros Nacionales,* 466 U.S. at 414. Because these contacts are extensive, the suit need not "aris[e] out of or relat[e] to the defendant's contacts with the forum." *Id.* at 411 n. 9. If, however, insufficient contacts exist to justify general jurisdiction, specific jurisdiction is permissible where a defendant's contacts with the forum are also the basis for the suit. *Id.* at 411 n. 8. For a court to exercise specific jurisdiction over a defendant, it must consider (1) the extent that the defendant "purposefully availed" himself of the privilege of conducting activities in the State; (2) whether the plaintiff's claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable. *ALS Scan,* 293 F.3d at 712.

Here, Eagle claims Defendants engaged in extensive activity in Virginia over the course of three years including frequent telephone calls and e-mails to Eagle's office in Virginia, orders transmitted to Virginia, acceptance by Defendants of products shipped from Virginia, and hundreds of thousands of dollars' worth of payments made to Eagle in Virginia. Moreover, Eagle argues that the parties' written agreement, which states that Eagle Paper International is located in Virginia Beach, Virginia, demonstrates that Defendants' contacts were purposeful. This Court disagrees, finding instead that contact between Defendants and the Commonwealth of Virginia was not so purposeful as to warrant specific jurisdiction.

Expolink is an Israeli company, organized under the laws of Israel, which maintains no office, employees, or other presence in Virginia. While Expolink did execute a contract with a Virginia corporation, the mere existence of a contract does not establish the necessary contacts for due process. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 478-79, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985);

*Chung v. NANA Dev. Corp.,* 783 F.2d 1124, 1127-28 (4th Cir.1986). Of greater significance is the fact that the contract upon which this suit is based was proposed and written by Plaintiff, and was negotiated in part and signed by the parties in Israel.[FN2] *See e.g., Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners,* 229 F.3d 448, 451 (4th Cir.2000) (finding no personal jurisdiction when the contractual relationship was initiated by the Plaintiffs); *American Online, Inc. v. Huang,* 106 F.Supp.2d 848, 856-57 (E.D.Va.2000) (relying on the circumstances of the contracts' negotiation and execution to conclude that defendant did not purposefully direct its activities to Virginia). The contract did not specify that it would be governed by forum law. What's more, the contract principally contemplated activities by Expolink abroad. *See* Compl. ¶ 10 (The contract included a number of specific business undertakings, including: "(a) Expolink serving as Eagle's exclusive agent *in the Former Soviet Bloc States,* procuring sales for Eagle's products on a commission basis; (b) Expolink procuring for Eagle's sale to Eagle's existing customers paper products produced by a paper mill "Mold Carton" *located in Moldova;* (c) Expolink procuring for Eagle's sale to Eagle's existing customers paper from a mill *located in Belarus* (the "Dobrouch Mill"); (d) Expolink obtaining from a mill *in Russia* (the "Kama Mill") newsprint and other types of paper for sale by Eagle to Eagle's existing customers.") (emphasis added).

> FN2. It is immaterial, in this context, that the contract was later "transmitted" to Eagle's office in Virginia. *See Superfos Invest., Ltd. v. Firstmiss Fertilizer, Inc.,* 774 F.Supp. 393, 398 (E.D.Va.1991) (finding that a contract negotiated and signed outside the forum "and returned to Virginia once signed" did not satisfy minimum contacts).

Although Expolink engaged in some activities in Virginia, the nature of the acts belie Eagle's claim that Expolink deliberately directed its activit-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 170506 (E.D.Va.)
(Cite as: 2008 WL 170506 (E.D.Va.))

ies at the forum. *See Chung,* 783 F.2d at 1127 ("The significant contacts considered [for purposes of personal jurisdiction] are those actually generated by the defendant ."). For instance, Expolink placed orders with Eagle's office in Israel. But, Eagle internally transmitted those orders to its headquarters in Virginia. *See Diamond Healthcare,* 229 F.3d at 452 (recognizing that interactions between plaintiff's headquarters and its employees in the field who were affiliated with nonresident defendant constituted unilateral activity that did not create personal jurisdiction). Expolink accepted products shipped from Virginia. But, Eagle determined the source of the products and shipped them at its own expense.[FN3] Expolink sent payments to Eagle's bank in Richmond, Virginia. But, Eagle generated the invoices which directed how and where payments were to be made. *See id.* (concluding that defendant's monthly payments to Richmond amounted only to "attenuated contact" with Virginia).

> FN3. It is important to note that Eagle does not manufacture its paper products. Instead, it brokers paper from paper mills around the world. Geron Aff. ¶¶ 4, 10. Thus, the source of Eagle's products varies, as does the ports from which its products are shipped. *See, e.g.,* Geron Aff. ¶¶ 26, 27, 36, 37, 54, 65, 66, 71, 77 (acknowledging that Eagle has shipped products to Expolink from a number of ports including Norfolk, Savannah, New Orleans, Charleston, Chicago, Montreal, and Houston). Expolink then cannot be found to have purposefully directed its activities at the forum simply because on occasion Eagle's products traveled through Virginia.

Eagle also places heavy emphasis on the exchange of communications between the parties. However, it is well settled that mere telephone calls and electronic communications in furtherance of a transaction are insufficient to constitute purposeful

activity. *See Superfos Invest., Ltd. v. Firstmiss Fertilizer, Inc.,* 774 F.Supp. 393, 397-98 (E.D.Va.1991) (concluding that letters, telephone calls and facsimile transmissions to Virginia corporation for purposes of transacting business did not constitute sufficient contact for in personam jurisdiction); *Unidyne Corp. v. Aerolineas Argentinas,* 590 F.Supp. 391, 396 (E.D.Va.1984) (finding that telephone calls, telex messages and letters did not form a basis for personal jurisdiction); *Consulting Engineers, Inc. v. Geometric Software Solutions and Structure Works LLC,* No. 1:06cv956, 2007 U.S. Dist. LEXIS 25150, at *15, 2007 WL 1072010 (E.D. Va. April 3, 2007) (holding that defendant's telephone calls and e-mails to plaintiff's Virginia office did not warrant personal jurisdiction).

It is apparent from the facts taken as a whole and viewed in favor of Plaintiff that Expolink did not purposefully avail itself of the privilege of conducting activities in Virginia. The parties' contract was initiated by Plaintiff, negotiated in part and signed in Israel, and primarily required Expolink to perform acts outside the United States. Furthermore, Expolink's contacts with the forum were generated by Plaintiff and ancillary to its role under the contract. Accordingly, the Court finds that it may not exercise in personam jurisdiction over Defendant Expolink.[FN4]

> FN4. Because Eagle failed to satisfy the more lenient standard necessary to prove specific jurisdiction, the more stringent general jurisdiction analysis is not necessary. *ALS Scan,* 293 F.3d at 715 ("The threshold level of minimum contacts sufficient to confer general jurisdiction is significantly higher than for specific jurisdiction.").

However, this is not the end of the matter. For each defendant's contacts with the forum must be assessed individually. *Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). To that end, Defendants Mamlin and Sasson argue that they are not subject to personal jurisdiction in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

their individual capacities solely based upon their contact with the forum in their corporate capacities. But, the relevant inquiry is not whether an individual acted in his corporate capacity or his personal capacity. *See id.* (noting that defendants' "status as employees does not somehow insulate them from jurisdiction."). Rather, "the controlling issue is simply whether the non-resident defendant, whatever role he may have occupied, had such 'minimum contacts.' " *Columbia Briargate Co. v. First Nat'l Bank,* 713 F.2d 1052, 1058 (4th Cir.1983). In this case, Mamlin and Sasson are citizens and residents of Israel. Neither have traveled to Virginia to transact any business with Eagle. Nor do either Mamlin or Sasson own any property here. The only specific contacts asserted by Eagle involve misrepresentations Mamlin and Sasson allegedly made in telephone calls and e-mails to Plaintiff in Virginia. As already discussed, such communications alone do not form a basis for personal jurisdiction.[FN5]

> FN5. Eagle seeks further discovery on the nature of Mamlin and Sasson's contacts with Virginia. However, this court is not persuaded that such discovery would be productive. When a plaintiff, as here, offers only speculation or conclusory assertions about contacts with a forum state, the court is within its discretion in denying jurisdictional discovery. *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.,* 334 F.3d 390, 402 (4th Cir.2003).

Because Plaintiff did not allege constitutionally sufficient contacts with Virginia to subject Defendants Expolink, Mamlin, and Sasson to suit here, the motion to dismiss for lack of personal jurisdiction should be GRANTED.

## III. *MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM*

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move the court to dismiss a cause of action for "failure to state a claim upon which re-

lief can be granted." Fed.R.Civ.P. 12(b)(6). A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint; it " 'does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses.' " *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir.1999) (quoting *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir.1992)). A plaintiff "must sufficiently allege facts to allow the court to infer that all elements of each of his causes of action exist." *Jordan v. Alternative Res. Corp.,* 458 F.3d 332, 344-45 (4th Cir.2006). In ruling on a motion to dismiss, the Court must accept as true well-pleaded allegations and construe them in favor of the non-moving party. *Randall v. United States,* 30 F.3d 518, 522 (4th Cir.1994). Moreover, the Court may only rely upon allegations in the complaint and those documents attached as exhibits. *Anheuser-Busch, Inc. v. Schmoke,* 63 F.3d 1305, 1312 (4th Cir.1995).

In this case, Defendants contend that Eagle did not state a valid cause of action under Virginia law, and instead that Eagle's claims are governed by the law of Israel. Even if true, the applicability of Israeli law would not dictate dismissal of this cause of action.[FN6] For federal courts can properly be called upon to apply the law of a foreign country. *Hodson v. A.H. Robins Co., Inc.,* 528 F.Supp. 809, 823 (E.D.Va.1981). Further, Eagle's failure to give notice of the possible applicability of Israeli law in its pleadings does not necessitate dismissal. Under Federal Rule of Civil Procedure 44.1, a party who intends to raise an issue concerning foreign law must "give notice in his pleadings or other reasonable written notice." Fed.R.Civ.P. 44.1. This notice requirement "falls considerably short of a requirement that in order to survive a Rule 12(b)(6) motion, a plaintiff must allege the identity and substance of the applicable law." *Id.* at 824 (quoting *Grice v. A/S Ludwig Mowinckels,* 477 F.Supp. 365, 376 (S.D.Ala.1979)). In cases such as this, where the applicability of foreign law is not obvious at the outset and is a matter of contention among the parties, notice may come at "any time sufficient to give the court and the defendants adequate notice of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 170506 (E.D.Va.)
**(Cite as: 2008 WL 170506 (E.D.Va.))**

the need to research the foreign rules." *Id.*

> FN6. Though the applicability of Israeli law would weigh in Defendant's favor should the Court decide a motion to dismiss under the doctrine of *forum non conveniens. See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241 n. 6, 102 S.Ct. 252, 70 L.Ed.2d 419 (internal citations omitted).

Defendants Mamlin and Sasson also argue that, under the doctrine of corporate immunity, Eagle failed to state a valid cause of action for tortious interference with its business relationships as well as statutory conspiracy in violation of Virginia Code §§ 18.2-499 and 18.2-500. The doctrine of intercorporate immunity recognizes that a conspiracy between a corporation and its agents, acting within the scope of their employment, is a legal impossibility. *Greenville Pub. Co. v. Daily Reflector Inc.,* 496 F.2d 391, 399 (4th Cir.1974). However, in *Greenville Publishing,* the Fourth Circuit determined that the doctrine may be excepted when an agent of the corporation has an "independent personal stake" in achieving the corporation's impermissible objectives. *Id.* In that case, the court found that the president of the defendant company could conspire with it where he had a financial interest in another company that competed with the plaintiff company and would directly benefit if the plaintiff company was eliminated as a competitor. *See id.* at 400. Similarly, Eagle alleges in its complaint that Mamlin and Sasson collaborated to divert supply from paper mills in Moldova and Belarus to entities other than Expolink, in which Mamlin had an interest. *See* Compl. ¶¶ 21, 33. Thus, Plaintiff has pled sufficient facts to satisfy the personal stake exception.

Because Eagle has set forth facts sufficient to support its cause of action, the motion to dismiss for failure to state a claim should be DENIED.

## IV. *DISMISSAL BASED ON FORUM NON CONVENIENS*

As the Supreme Court recently reaffirmed, "the common-law doctrine of *forum non conveniens* has continuing application in federal courts only in cases where the alternative forum is abroad, and perhaps in the rare instances where a state or territorial court serves litigation convenience best." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,* --- U.S. ----, ----, 127 S.Ct. 1184, 1190, 167 L.Ed.2d 15 (2007) (internal citations omitted). The defendant, however, bears a "heavy burden in opposing the plaintiff's chosen forum." *Id.* at 1191. In assessing whether dismissal based on *forum non conveniens* grounds is appropriate,[FN7] the court must first determine whether that an alternative forum exists. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). If an alternate forum is available and adequate, the court must then weigh the familiar private and public interest factors laid out by the Supreme Court in *Gulf Oil v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947):

> FN7. A court may consider the doctrine of *forum non conveniens* as a basis for dismissal, without first determining whether it has personal jurisdiction over the defendants. *Sinochem,* 127 S.Ct. at 1192.

The factors pertaining to the private interests of the litigants include the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate for the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." The public factors bearing on the question included the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening the citizens in an unrelated

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

forum with jury duty.

*Piper,* 454 U.S. at 241 n. 6 (quoting *Gulf Oil,* 330 U.S. at 508-09). At this stage, the movant continues to bear the burden to "provide enough information to enable the District Court to balance the parties' interests." *Id.* at 258.

In this case, Defendants claim that Israel offers an available and adequate forum for the parties and that the balance of the public and private interests favor dismissal. In fact, it is unclear that an alternate forum exists. While Defendants rely on a translation of an Israeli statue governing venue, it is not apparent from the face of the statute whether *all parties* can come within that forum's jurisdiction. *See* Def. Reply Br. Ex. 4; *see also Fid. Bank PLC v. N. Fox Shipping N.V.,* No. 06-1299, 2007 U.S.App. LEXIS 16793, at * 14, 2007 WL 2046805 (4th Cir. July 13, 2007) (unpublished op.) (citing *In re Air Crash Disaster near New Orleans,* 821 F.2d 1147, 1165 (5th Cir.1987). This Court then is not in a position to rule upon the availability and adequacy of an Israeli forum. In any event, its disposition of Defendants' motion to dismiss for lack of personal jurisdiction removes any need to reach the merits of this issue.

## V. *RECOMMENDATION*

For the foregoing reasons, the Court recommends that Defendants' motion to dismiss for lack of personal jurisdiction be GRANTED and Defendants' motion to dismiss for failure to state a claim be DENIED.

## VI. *REVIEW PROCEDURE*

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(c):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within ten days from the date of mailing of this report to the objecting party, see 28 U.S.C. § 636(b)(1)(c), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three days permitted by Rule

6(e) of said rules. A party may respond to another party's objections within ten days after being served with a copy thereof.

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Carr v. Hutto,* 737 F.2d 433 (4th Cir.1984); *United States v. Schronce,* 727 F.2d 91 (4th Cir.1984).

E.D.Va.,2008.
Eagle Paper Intern., Inc. v. Expolink, Ltd.
Not Reported in F.Supp.2d, 2008 WL 170506 (E.D.Va.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3202274 (W.D.N.C.)
(Cite as: 2012 WL 3202274 (W.D.N.C.))

Only the Westlaw citation is currently available.

United States District Court, W.D. North Carolina,
Charlotte Division.
**NLA DIAGNOSTICS** LLC, Plaintiff,
v.
THETA TECHNOLOGIES LIMITED, and TTL
Holdings Limited, Defendants.

No. 3:12-cv-00087-GCM.
Aug. 3, 2012.

James Carlos Smith, Nexsen Pruet, LLC, Charlotte,
NC, for Plaintiff.

D.J. O'Brien, III, Reid Lloyd Phillips, Brooks,
Pierce, McLendon, Humphrey & Leonard, L.L.P,
Greensboro, NC, for Defendants.

ORDER

GRAHAM C. MULLEN, District Judge.

THIS MATTER is before the Court on Defendants' Motion to Dismiss pursuant to the doctrine of *forum non conveniens.* The matter is fully briefed and ripe for determination. For the reasons set forth below, Defendants' Motion is **GRANTED.**

**I. FACTUAL BACKGROUND**

In 2007, Dr. Peter Robert Armitage ("Armitage") and Geoffrey Pitts ("Pitts") created Defendant Theta Technologies Limited ("Defendant Theta") pursuant to the English Companies Act of 1985 to commercially exploit intellectual property arising out of research developed by Armitage at Exeter University in England. *See* Decl. Of John Greenlaw Fairbairn ¶¶ 5, 8 (hereinafter "Fairbairn Decl."). [FN1] Armitage's research yielded intellectual property relating to the use of non-linear acoustic sound waves to detect stresses, defects, and cracks in construction and manufacturing materials (the "Invention"). *Id* at ¶ 5; Compl. at ¶ 10. The Invention is protected by patent applications, assigned by Exeter University

to Defendant Theta, in Great Britain, the United States, the European Union, China, and Japan. Fairbairn Decl. at ¶ 6. Exeter University retains an exclusive right to use the Invention for noncommercial purposes. *Id* at ¶ 7.

> FN1. When determining a motion to dismiss for *forum non conveniens,* the Court may rely on affidavits submitted by the parties. *Van Cauwenberghe v. Biard,* 486 U.S. 517, 528 (1988); *see Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 258 (1981) ("Requiring extensive investigation would defeat the purpose of [the] motion.").

Armitage initially served as Defendant Theta's technical director, with Pitts serving as managing director. *Id* at ¶ 8. Defendant Theta's principal place of business is Exeter, England. *Id* at ¶ 3. Armitage and Pitts are English citizens. *Id* at ¶¶ 8, 12. Theta is wholly owned by TTL Holdings Limited ("Defendant TTL"), an English company with a principal place of business in Exeter, England. *Id* at ¶ 9. All of the directors of Theta and TTL are English citizens who live and work in Exeter or London, England. *Id.* Neither Defendant has any officers, employees, property, or business in the United States. *Id* at ¶ 29.

Plaintiff **NLA Diagnostics** LLC ("Plaintiff NLAD") was incorporated in 2009, under the laws of the State of North Carolina, to be the intended exploiter of the Invention in North America. *Id* at ¶ 10. Plaintiff NLAD's chief executive is Rick Webster ("Webster"). *Id* at ¶ 13.

On or about July 13, 2009, Defendant Theta and Plaintiff NLAD entered into a Patent Licence Agreement in which Theta granted to NLAD an exclusive license to manufacture and sell the Invention (as protected by U.S. and British patent applications) in the "Territory" (defined as the United States, Canada, and Mexico) for an initial term of 10 years from the date of the Patent Licence Agree-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 3202274 (W.D.N.C.)
(Cite as: 2012 WL 3202274 (W.D.N.C.))

ment and an additional term of 5 years each until the expiration of the last to expire of the Invention's U.S. and British patent applications. *See* Fairbairn Decl. at ¶ 14; Compl., Ex. A. Clause 27 of the Patent Licence Agreement contains a choice-of-law and forum-selection clause that provides in full:

## 27 GOVERNING LAW AND JURISDICTION

27.1 This Agreement and any disputes or claims arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) are governed by and construed in accordance with the laws of England.

27.2 Subject to Clause 17, the parties irrevocably agree that the courts of England have non-exclusive jurisdiction to settle any dispute or claim that arises out of or in connection with this Agreement or its subject matter or formation (including non-contractual disputes or claims).

Compl., Ex. A, cl. 27. Clause 17 of the Patent Licence Agreement obligates the parties to confer in good faith if a dispute regarding the Patent Licence Agreement arises, but does not prevent the parties from initiating legal action. *Id* at cl. 17.

By a written agreement dated October 26, 2009 ("Purported Variation No 1"), Defendant Theta and Plaintiff NLAD purported to vary the Patent Licence Agreement by expanding the licensed use of the Invention to include "wind turbine blades and components." Fairbairn Decl. ¶ 18. By another written agreement dated November 10, 2010 ("Purported Variation No 2" and, together with Purported Variation No 1, sometimes collectively referred to as the "Purported Variations"), Defendant Theta and Plaintiff NLAD purported to vary the Patent Licence Agreement by extending the definition of Territory to "all countries and jurisdictions in the world, without limit" and to adjust the Initial Term to mean ten (10) years from November 10, 2010. *Id* at ¶ 19. Defendant Theta claims that it received nothing in return for the Purported Vari-

ations. *Id* at ¶ 11.

After execution of the Patent Licence Agreement, Defendants conducted all of their business within the United Kingdom, and Plaintiff manufactured and sold in North America its instrument created under licensed patents. *See Id* at ¶ 16; Compl. at ¶ 18. All of the meetings between the directors of Plaintiff NLAD and the directors of Defendant Theta occurred in England. Fairbairn Decl. ¶ 16. A director of Defendant Theta visited the United States on one occasion when Armitage provided technical support to a sales pitch by Plaintiff NLAD in or about July 2011. *Id.*

In August 2011, issues arose between Defendant Theta and Plaintiff NLAD regarding the interpretation of, and performance under, the Patent Licence Agreement. *Id* at ¶ 20. The other directors of Defendant Theta discovered the Purported Variations and terminated Pitts as a director of Theta. *Id* at ¶ 11. The issues between Defendant Theta and Plaintiff NLAD include: the invalidity of the Purported Variations for lack of consideration; the applicable "Royalty Rate" as a percentage of "Adjusted Gross Revenues"; NLAD's obligation to pay a minimum royalty of $100,000 under clause 8.2; the exclusion of overhead or research and development costs from "direct manufacturing costs" in calculating "Adjusted Gross Revenues"; and NLAD's breach of the Patent Licence Agreement for failure to pay royalties to Theta (the "Disputed Issues"). *Id* at ¶ 20.

## II. PROCEDURAL HISTORY

Plaintiff commenced the instant action in this Court on February 9, 2012. On March 12, 2012, Plaintiff served its Complaint on Defendants in their office in Exeter, England. Plaintiff's Complaint seeks a declaratory judgment to determine the validity of the Purported Variations and the proper calculation of royalty payments under the Patent Licence Agreement. *See* Compl. ¶¶ 23-25. Plaintiff's Complaint also alleges that Defendant Theta breached the Patent Licence Agreement by marketing a non-linear acoustic testing system to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

customers in England and elsewhere in Europe (but not in the United States, Canada, or Mexico). *Id* at ¶¶ 20, 27-30.

On March 26, 2012, Defendants filed a Particulars of Claim against Plaintiff in the High Court of Justice, Queen's Bench Division, Bristol Mercantile Court in England, Claim No. 2BS40372 (the "U.K. Litigation"). Fairbairn Decl., Ex. A. The Particulars of Claim seeks declaratory relief and damages pertaining to the Disputed Issues between the parties. *Id.* The Particulars of Claim discloses the pendency of the instant litigation in this Court. *Id.* On March 27, 2012, the Court in the U.K. Litigation issued an Order granting Theta and TTL permission to serve the Particulars of Claim on NLAD at its principal place of business in Charlotte, North Carolina. *Id.,* Ex. B. Theta and TTL caused the Particulars of Claim to be served on NLAD on April 6, 2012. *Id* at ¶ 27. On May 11, 2012, NLAD filed its response to Defendants' U.K. Litigation, objecting to the English Court's jurisdiction to hear this dispute and asking the English Court to stay further proceedings in the U.K. Litigation on the ground that (i) the U.S. Action involving the same claims is the prior pending action, and (ii) the English Court is not a convenient forum. *See* Affidavit of William Richard Webster ("Webster Aff").

On April 23, 2012, Defendants answered the Complaint in the instant litigation and filed compulsory counterclaims pertaining to the Disputed Issues. Defendants' Answer also included a motion to dismiss pursuant to the doctrine of *forum non conveniens.*

### III. LEGAL STANDARD: The Doctrine of *Forum Non Conveniens*

"Dismissal for *forum non conveniens* reflects a court's assessment of a 'range of considerations, most notably the convenience to the parties and the practical difficulties that can attend the adjudication of a dispute in a certain locality.' " *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.,* 549 U.S. 422, 429 (2007) (quoting *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 723 (1996)). "A *forum non*

*conveniens* dismissal must be based on the finding that, when weighed against plaintiff's choice of forum, the relevant public and private interests strongly favor a specific, adequate, and available alternative forum." *Tang v. Syntura Int'l, Inc.,* 656 F.3d 242, 246 (4th Cir.2011). A district court must determine whether the alternative forum is: (1) available; (2) adequate; and (3) more convenient in light of the public and private interests involved. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241 (citing *Koster v. Lumbermens Mut. Cas. Co.,* 330 U.S. 518 (1947)); *Gulf Oil v. Gilbert,* 330 U.S. 501 (1947). The moving party bears the burden of showing that an adequate alternative forum exists. *Galustian v. Peter,* 591 F.3d 724, 731 (4th Cir.2010).

Availability will ordinarily "be satisfied when the defendant is 'amenable to process' in the other jurisdiction." *Piper Aircraft,* 454 U.S. at 255 n. 22 (quoting *Gilbert,* 330 U.S. at 506-507). "A foreign forum is adequate when '(1) all parties can come within that forum's jurisdiction, and (2) the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court.' " *Fid. Bank PLC v. N. Fox Shipping N.V.,* 242 Fed. Appx. 84, 90 (4th Cir.2007) (quoting *Mercier v. Sheraton Int'l, Inc.,* 935 F.2d 419, 424 (1st Cir.1991)). "In rare circumstance, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied." *Piper Aircraft,* 454 U.S. at 254 n. 22.

If the alternative forum is both available and adequate, then the district court must weigh the public and private interest factors. *Tang,* 656 F.3d at 249. The factors pertaining to the private interests of the litigants include the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gilbert*, 330 U.S. at 508. The public factors bearing on the question include the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty. *Piper Aircraft*, 454 U.S. at 241 n. 6 (quoting *Gilbert*, 330 U.S. at 508).

**A. The English Court is an Adequate and Available Forum**

The Court finds that the Defendants, the moving parties, met their burden of showing that the English Court is an adequate and available forum. This issue merits no further discussion in light of the fact that Plaintiff concedes that England offers a forum that is both adequate and available. *See* Pl.'s Resp. at p. 4.

**B. The Private Interest Factors Do Not Strongly Favor Either Party**

The factors pertaining to the private interests of the litigants include the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling witnesses, and the costs of obtaining attendance of willing witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Piper Aircraft*, 454 U.S. at 241 n. 6 (quoting *Gilbert*, 330 U.S. at 508).

The arguments of both parties put the private interest factors at equipoise. Plaintiff claims that its documents are in North Carolina and Defendants claim that their documents are in England. *See* Webster Aff. at ¶ 14; Fairbairn Decl. at ¶ 30. Likewise, Plaintiff argues that some witnesses are residents of the United States and Defendants argue that other witnesses reside in the United Kingdom. *See*

Webster Aff. at ¶ 13; Def.'s Br. at 9. The parties also make counter-balancing arguments regarding the availability of compulsory process for attendance of unwilling witnesses and regarding the costs of obtaining attendance of willing witnesses. *See* Def.'s Br. at 17; Webster Aff. at ¶ 19.

**C. The Public Interest Factors Strongly Favor Dismissal**

The public interest factors to be considered in a *forum non conveniens* analysis include: the "local interest in having localized controversies decided at home"; the avoidance of unnecessary problems in conflict of laws, or the application of a foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty. *Piper Aircraft*, 454 U.S. at 241 n. 6 (quoting *Gilbert*, 330 U.S. at 508).

Here, the factors of public interest weigh strongly in favor of dismissal. First, Defendants rightly observe that North Carolina has little interest in this controversy, which primarily concerns allegations of breach of a contract governed by English law by English companies. Second, the factor of avoiding problems applying foreign law strongly favors dismissal of this action. *See Piper Aircraft*, 454 U.S. at 259-260 . The Patent Licence Agreement at issue in the instant litigation requires the application of English law to the dispute and clearly contemplates the permissive jurisdiction of the English Courts. Thus, in the present forum, the Court would be substantially burdened with attempting to "untangle problems in conflict of laws, and in law foreign to itself," while the same concerns would not be present in England. *Gilbert*, 330 U.S. at 509; *see also Piper Aircraft*, 454 U.S. at 251; *see, e.g., Wolff v. Zip.ca, Inc.*, 2009 WL 1628887, at *3 (M.D.N.C. June 10, 2009) ("Although this does not rule out hearing the case in North Carolina, the court would be applying foreign laws in a dispute involving the financial problems of a Canadian baseball team. This matter is best handled by the courts in Ottawa. Accordingly, the court will recommend dismissal of the action on *forum non conveniens* grounds."). "The *forum non*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*conveniens* doctrine exists largely to avoid such comparative law problems." *Tang,* 656 F.3d at 252 (citing *Piper Aircraft,* 454 U.S. at 251). Finally, the Western District of North Carolina has comparatively less interest in this case, which primarily involves injuries inflicted abroad, and jury duty "ought not be imposed upon the people of a community which has no relation to the litigation." *Gilbert,* 330 U.S. at 508-509 .

Plaintiff's reliance on two cases from the Middle District of North Carolina is accurate, but the cases are easily distinguished from the instant controversy. In *The ' In' Porters, S.A. v. Hanes Printables, Inc.,* 663 F.Supp. 494 (M.D.N.C.1987), the Middle District found that the defendants failed to demonstrate the presence of an adequate alternative forum. *'In' Porters,* 663 F.Supp. at 505. One of the two defendants had its principal place of business in Winston-Salem, NC, and the Court found that it lacked evidence to determine whether French law would govern the dispute. *Id.* Under those facts, the defendants failed to establish a more convenient forum. *Id* at 506. Here, however, both Defendants maintain their principal place of business in England and the Patent Licence Agreement calls for the mandatory application of English law. In *S & D Coffee Inc. v. GEI Autowrappers,* 995 F.Supp. 607 (M.D.N.C.1997) , the plaintiff conceded that English law would govern only some aspects of the case, and the Court noted a need for the jury to view a defective machine that was located in North Carolina. *S & D Coffee,* 995 F.Supp. at 611. Here, again, English law governs the entire dispute and there is no machinery, or other similar item, present in North Carolina that a jury would be required to view.

In sum, Defendants convincingly met their burden of demonstrating that the public interest factors at issue favor the English forum and disfavor litigation in the Western District of North Carolina. The public interest factors tip the scales in favor of dismissal in light of this Court's analysis finding the private interest factors at equipoise.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss on the ground of *forum non conveniens* is **GRANTED.**

W.D.N.C.,2012.
NLA Diagnostics LLC v. Theta Technologies Ltd.
Slip Copy, 2012 WL 3202274 (W.D.N.C.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1628887 (M.D.N.C.)
**(Cite as: 2009 WL 1628887 (M.D.N.C.))**

C
Only the Westlaw citation is currently available.

United States District Court,
M.D. North Carolina.
Miles WOLFF, Plaintiff,
v.
**ZIP.CA**, INC., Defendant.

No. 1:09CV92.
June 10, 2009.

Matthew Hallman Bryan, T. Paul Hendrick, Timothy Nerhood, Hendrick & Bryant, LLP, Winston-Salem, NC, for Plaintiff.

Adam H. Charnes, Daniel R. Taylor, Jr., James J. Hefferan, Jr., Kilpatrick Stockton, L.L.P., Winston-Salem, NC, for Defendant.

## MEMORANDUM OPINION AND RECOMMENDATION
WALLACE W. DIXON, United States Magistrate Judge.

This matter is before the court on a motion to dismiss by Defendant **Zip.ca**, Inc. ("Zip") (docket no. 8). Plaintiff Miles Wolff has responded in opposition to Zip's motion to dismiss and Zip has submitted a reply. In this posture, the matter is ripe for disposition. Since there has been no consent to the jurisdiction of the magistrate judge, the court must address the motion by way of a recommended disposition. For the following reasons, it will be recommended that Defendant's motion be granted.

## I. Background
This case arises out of an investment in a professional baseball team. Plaintiff is a resident of Durham, North Carolina, and Defendant is a Canadian corporation with its principal place of business in Ottawa, Ontario. Until May 2008, Plaintiff was the sole owner of Ottawa Professional Baseball, Inc. ("OPBI"), which leased the right to field a baseball team in Ottawa. Plaintiff is also a director

and the commissioner of the Canadian American Association of Professional Baseball, Ltd. (the "League") in which OPBI is a member. On May 8, 2008, an agreement ("Letter Agreement") was signed, giving the management rights to Defendant and Momentous.ca Corporation, which owns 80 percent of Defendant. Plaintiff retained 51 percent interest in OPBI. In this agreement, Defendant agreed to indemnify Plaintiff for any costs resulting from the personal guarantee that Plaintiff made with the City of Ottawa on January 17, 2008, up to $216,000 (CDN). The city subsequently demanded a payment for annual rent of the city-owned stadium of $108,000 (CDN) ($83,500 U.S.) from Plaintiff, which he paid. Plaintiff then demanded the same amount from Defendant. Defendant refused or failed to pay Plaintiff.

Plaintiff filed his complaint in the Durham County Superior Court to recover $83,500 from Defendant for breach of the indemnification agreement. Defendant removed the matter to this court on February 4, 2008, contending that the dispute should be litigated in federal court based on diversity jurisdiction. 28 U.S.C. § 1332(a)(2).

## II. Discussion
Defendant's motion to dismiss, filed pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, argues both that the court lacks personal jurisdiction over Defendant, and that the doctrine of *forum non conveniens* requires that this case be heard in Ottawa. As a preliminary matter, it is the duty of any federal court to first determine whether it has jurisdiction over the matter before it. The United States Supreme Court has held, however, that a federal court may choose among threshold grounds for dismissing a suit, and need not necessarily decide jurisdictional issues first. *Sinochem Int'l Co., Ltd. v. Malaysia Int'l Shipping Corp.,* 549 U.S. 422, 432 (2007). The Supreme Court suggested that the court should "properly take[ ] the less burdensome course" in deciding which threshold issues or motions to consider. *Id.* at 436; *see Long*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1628887 (M.D.N.C.)
**(Cite as: 2009 WL 1628887 (M.D.N.C.))**

*Term Care Partners, LLC v. United States,* 516 F.3d 225, 233 (4th Cir.2008) ("*Sinochem* counsels us to 'take[ ] the less burdensome course.' "). The Supreme Court limited the scope of its *Sinochem* holding by explaining:

> If, however, a court can readily determine that it lacks jurisdiction over the cause or the defendant, the proper course would be to dismiss on that ground. In the mine run of cases, jurisdiction "will involve no arduous inquiry" and both judicial economy and the consideration ordinarily accorded the plaintiff's choice of forum 'should impel the federal court to dispose of [those] issue[s] first.'

*Sinochem,* 549 U.S. at 436 (quoting *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 587-88 (1999)). Here, the jurisdictional analysis is somewhat unclear and does not appear to be "the less burdensome course." Accordingly, I will consider the motion to dismiss based on *forum non conveniens,* finding it to be the more efficient and reasonable course under the facts presented.

The doctrine of *forum non conveniens* gives the district court the discretion to dismiss a case where it finds that "when weighed against [the] plaintiff's choice of forum, the relevant public and private interests strongly favor a specific, adequate, and available alternative forum." *S & D Coffee, Inc. v. GEI Autowrappers,* 995 F.Supp. 607, 610 (M.D.N.C.1997) (quoting *Kontoulas v. A.H. Robins Co.,* 745 F.2d 312, 315 (4th Cir.1984)). As this court has observed:

> The relevant private interests include: the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining willing, witnesses; possibility of view of the premises if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious, and inexpensive.

> The relevant public interests include: administrat-ive problems resulting from court congestion; the local interest in having localized controversies decided at home; the interest in having trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems and conflicts of law or the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*Id.* at 610-11 (citing *Gulf Oil Co. v. Gilbert,* 330 U.S. 501, 508-09 (1997) (internal citations omitted)).

I first find that the private interests do not tip the balance strongly in either direction. There are witnesses in both Canada and North Carolina, although it is likely that more witnesses are in Canada. The physical evidence would consist entirely of documents that could be examined easily in either location. The public interests, however, argue strongly for this matter to be decided in Ottawa. Here, Plaintiff was acting as both commissioner of the League based in North Carolina and as owner of a team based in Ottawa when he signed the Letter Agreement. The indemnity clause in the Letter Agreement applies to costs Plaintiff might incur in his position as the team's owner in Ottawa, not as the commissioner of the League in North Carolina.

Furthermore, there is an adequate and available alternative forum in Ottawa, where nearly all of the events leading up to this case took place. Defendant currently has litigation against Plaintiff pending in Ontario Superior Court. That suit was filed just over a month after this litigation began. Although Plaintiff lives and works in North Carolina and this state is home to the League's offices, this is a localized dispute that arose in Canada. Defendant is a Canadian corporation that wanted to invest in a Canadian baseball team. The team's management was based in Ottawa, the team played its home games in Ottawa, and the team rented the stadium from the City of Ottawa.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1628887 (M.D.N.C.)
**(Cite as: 2009 WL 1628887 (M.D.N.C.))**

Finally, the Letter Agreement provides that Ontario and Canadian law would govern and that each party would submit to non-exclusive jurisdiction of the courts of Ottawa with respect to any matter arising under the Agreement. By agreeing to this clause, Plaintiff indicated that he was willing to be hailed into Canadian courts even if he was not required to bring suit there. His acceptance of these terms weakens his argument that it would be unfair for him to have to litigate away from his home district. Although this does not rule out hearing the case in North Carolina, the court would be applying foreign law in a dispute involving the financial problems of a Canadian baseball team. This is a matter best handled by the courts in Ottawa. Accordingly, the court will recommend dismissal of the action on *forum non conveniens* grounds.

### III. Conclusion

For the reasons stated herein, **IT IS RECOMMENDED** that the motion of Defendant **Zip.ca**, Inc. to dismiss (docket no. 8) be **GRANTED** on *forum non conveniens* grounds.

M.D.N.C.,2009.
Wolff v. Zip.ca, Inc.
Not Reported in F.Supp.2d, 2009 WL 1628887 (M.D.N.C.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 153542 (E.D.Wis.)
(Cite as: 2008 WL 153542 (E.D.Wis.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Wisconsin.
**STARK TRADING** AND SHEPHERD INVEST-
MENTS INTERNATIONAL, LTD., Plaintiffs,
v.
FALCONBRIDGE LIMITED and Brascan Corpor-
ation, Defendants.

No. 05-C-1167.
Jan. 14, 2008.

Christopher J. Barber, Peter J. Meyer, Richard G.
Agin, Steptoe & Johnson LLP, Chicago, IL, John E.
Murray, Gardner Carton & Douglas LLP, Milwau-
kee, WI, for Plaintiffs.

Amanda L. Kosowsky, Gregory A. Markel, Ronit
Setton, Cadwalader Wickersham & Taft LLP, New
York, NY, Scott W. Hansen, Stephen J. Liccione,
Reinhart Boerner Van Deuren SC, Milwaukee, WI,
for Falconbridge Limited.

Ashley R. Altschuler, John A. Neuwirth, Joseph S.
Allerhand, Weil Gotshal & Manges LLP, New
York, NY, William J. Mulligan, Kathy L. Nusslock,
Davis & Kuelthau SC, Milwaukee, WI, for Brascan
Corporation.

**DECISION AND ORDER GRANTING DE-
FENDANTS' MOTIONS TO DISMISS**

AARON E. GOODSTEIN, United States Magis-
trate Judge.

*1 On November 7, 2005, plaintiffs **Stark
Trading** ("Stark") and Shepherd Investments Inter-
national, Ltd. ("Shepherd") filed suit against the de-
fendants Falconbridge Limited ("Falconbridge")
and Brascan Corporation ("Brascan"). This case
was originally assigned to the Honorable Thomas J.
Curran. On January 17, 2006 both defendants filed
separate motions to dismiss the complaint. The
pleadings on these motions closed on April 18,
2006.

On June 5, 2006, upon Judge Curran's retire-
ment, this case was randomly reassigned to this
court, and all parties have consented to the full jur-
isdiction of a magistrate judge.

**SUMMARY OF FACTS ALLEGED IN COM-
PLAINT**

In February of 2004, Brascan, a Canadian asset
management company based in Toronto, Ontario,
Canada, informed the Board of Directors for Nor-
anda, an international mining company
headquartered in Toronto, Ontario, Canada, that it
wanted to sell its 41% interest in Noranda. (Docket
No. 1 at 2, ¶ 2; 10, ¶ 24; 11, ¶ 35.) This resulted in
various discussions between Brascan and potential
purchasers, but none of these negotiations came to
fruition. (Docket No. 1 at 2-3, ¶ 2.)

In order to facilitate Brascan's desire to cash
out its investment in Noranda, Noranda and Falcon-
bridge, Noranda's publicly traded subsidiary, re-
ferred to here as Old Falconbridge, devised a series
of transactions. (Docket No. 1 at 4 ¶ 4; 14 ¶ 45; 15.)
Noranda owned 59% of Old Falconbridge's stock
and the remaining 41% was widely held. (Docket
No. 1 at 15.)

There was a substantial relationship between
Brascan, Noranda, and Old Falconbridge. (Docket
No. 1 at 15.) Brascan owned 41% of Noranda, and
Noranda owned 59% of Old Falconbridge. (*Id.*) At
all relevant times, these three companies had over-
lapping management and several senior officers
and/or directors of Old Falconbridge who owned
little if any shares of Old Falconbridge stock owned
a substantial number of shares of Brascan and/or
Noranda. (Docket No. 1 at 15, ¶ 53.) Additionally,
a substantial portion of Brascan was owned by an
entity called Partners, Ltd., which was comprised of
35 shareholders, ten of whom were senior officers
and/or directors of Noranda and/or Old Falcon-
bridge. (Docket No. 1 at 15.) Partners, Ltd. owned

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 153542 (E.D.Wis.)
(Cite as: 2008 WL 153542 (E.D.Wis.))

sufficient stock in Brascan to be able to elect a majority of Brascan's directors. (Docket No. 1 at 11 ¶ 34 .) Noranda and Old Falconbridge shared the same office suite for their corporate headquarters, and Brascan's corporate headquarters were in the same building but in a suite one floor above Noranda and Old Falconbridge. (Docket No. 1 at 9, ¶ 24; 11, ¶ 35; 13, ¶ 45.)

On March 9, 2005, Noranda announced an Issuer Bid for 63.4 million shares of its common stock, 21% of Noranda's outstanding shares. (Docket No. 1 at 4 ¶ 5; 28, ¶ 86.) The Issuer Bid commenced on March 24, 2005 and closed on May 5, 2005. (Docket No. 1 at 30, ¶ 93.) As consideration for stockholders tendering its shares, Noranda issued US$1.25 billion in junior preferred shares that had a redemption value of at least US$25.00 per share, plus unpaid dividends. (Docket No. 1 at 4, ¶ 5.) These preferred shares had various "final redemption dates" depending upon series, but were otherwise redeemable at any time. (Docket No. 1 at 28, ¶ 87.) Each tendering common share holder received 0.789 preferred shares per common share tendered. (Docket No. 1 at 29, ¶ 90.) In light of the fixed US$25 value upon each preferred share, each tendering Noranda common shareholder effectively received US$19.72 per common share. (*Id.*) In the three months prior to the Issuer Bid, Noranda shares averaged US$17.29 and in the prior 15 years, had never traded over US$19.00 per share. (Docket No. 1 at 30, ¶ 92.)

*2 Brascan tendered all 122 million of its Noranda common shares into the Issuer Bid, and on June 21, 2005 Brascan redeemed US$500 million worth of the preferred shares it received. (Docket No. 1 at 5, ¶ 8.) This thus reduced Brascan's ownership of Noranda from 41% to 20%, which could be sold more easily because it would not trigger regulatory scrutiny. (*Id.*)

Also on March 9, 2005, the same day that the Issuer Bid was announced, Noranda announced a Tender Offer wherein it offered each of Old Falconbridge's minority shareholders 1.77 shares of Noranda common stock in exchange for each share of Old Falconbridge stock tendered. (Docket No. 1 at 4, ¶ 6.) The Tender Offer commenced on March 24, 2005 and closed May 5, 2005. (Docket No. 1 at 30, ¶ 96.) Old Falconbridge created a Special Committee, comprised of individuals that it represented to be independent, to review Noranda's Tender Offer. Based upon a valuation conducted by a Canadian investment bank hired by the Special Committee, which stated that the offer was fair from a financial point of view, the special committee recommended that shareholders accept Noranda's offer. (Docket No. 1 at 31, ¶¶ 98-99.) In turn, the Old Falconbridge Board of Directors recommended that investors accept the offer. (Docket No. 1 at 31, ¶ 98.) The plaintiffs allege that the documents disseminated with the Issuer Bid and Tender Offer, including the valuation and other relevant documents, contained numerous material omissions and misrepresentations. (Docket No. 1 at 40-61, ¶¶ 124-80.)

Stark is a limited partnership organized under the laws of Wisconsin and Shepherd is a corporation organized under the laws of the British Virgin Islands with its principle place of business in the British Virgin Islands. (Docket No. 1 at 8, ¶¶ 19-20.) Investment decisions for both plaintiffs were made by Stark Offshore Management, LLC in St. Francis, Wisconsin. Between March 17, 2005 and May 5, 2005, Stark purchased 1,373,000 shares and Shepherd purchased 4,119,000 shares of Old Falconbridge stock. (*Id.*) Shortly before the Tender Offer expired, the plaintiffs became aware of some alleged inaccuracies in the offering documents and raised their concerns with Noranda and Old Falconbridge as well as the Ontario Securities Commission. (Docket No. 1 at 68-69, ¶ 205.) Noranda and Old Falconbridge issued a press release wherein they denied the plaintiffs' allegations, and the Ontario Securities Commission allowed the Tender Offer to proceed. (Docket No. 1 at 69, ¶ 205.) The plaintiffs then tendered most of their Old Falconbridge shares out of concern that if they did not, they would be eventually squeezed out while having their capital tied up in the interim. (Docket No.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 153542 (E.D.Wis.)
(Cite as: 2008 WL 153542 (E.D.Wis.))

1 at 69, ¶ 206.)

The plaintiffs allege that the timing of the Issuer Bid and the Tender Offer, as well as other factors, led to the creation of a "when-issued" market in the preferred shares where, if the trading price of Noranda's common shares ever fell below US$19.72 per share during the bid period, arbitrageurs were able to realize an immediate profit prior to the completion of the Issuer Bid by, in part, purchasing Noranda common shares and then electing to exchange these common shares for preferred shares. (Docket No. 1 at 35, ¶ 108.) This "when issued" market artificially inflated Noranda's share price, and thus, upon the announcement of the Issuer Bid, Noranda's common stock share price rose to a 52-week high of US$19.25, during the pendency of the Issuer Bid, Noranda's common stock price climbed to an all-time high of US$20.99, and on the last day of the Issuer Bid, the trading price of Noranda's common stock was US$19.72. (Docket No. 1 at 36, ¶¶ 110-11.) Therefore, the when-issued market had the effect of creating the impression that the consideration offered in Noranda's Tender Offer for Old Falconbridge's outstanding shares was more valuable than it was.

*3 The plaintiffs allege that the defendants' scheme was successful in that Noranda was able to obtain 91% of Old Falconbridge and thus permit it to complete a merger of the two companies by squeezing out non-tendering shareholders. (Docket No. 1 at 5, ¶ 7.) This merger created a single company that retained the Falconbridge name, referred to here as New Falconbridge. (Docket No. 1 at 6, ¶ 9.)

On August 15, 2005, Brascan announced that it had sold a 19.9% interest in New Falconbridge, which was nearly all of its remaining interest, to a Swiss mining company. (Docket No. 1 at 6, ¶ 10.)

On October 11, 2005, New Falconbridge announced a friendly takeover bid from Inco Limited for all of New Falconbridge's common shares at a price of US$28.91 per share. (Docket No. 1 at 6, ¶

11 .) This takeover triggered a change-of-control provision regarding the preferred shares and thus completed Brascan's cash-out of its investment in Noranda. (Docket No. 1 at 6, ¶ 11.)

**MOTION TO DISMISS STANDARD**

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for a plaintiff's "failure to state a claim upon which relief can be granted." Generally, a plaintiff in federal court need only provide sufficient detail in a complaint to satisfy two requirements. First, the complaint must contain sufficient information "to give the defendant "fair notice of what the ... claim is and the grounds upon which it rests.' " *EEOC v. Concentra Health Servs.,* 496 F.3d 773, 776 (7th Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007)). Second, the plaintiff must set forth sufficient facts that "plausibly suggest that the defendant has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court. *Id.* (citing *Bell Atlantic,* 127 S.Ct. at 1965, 1973 n. 14). However, heightened pleading requirements apply to certain claims, such as claims sounding in fraud. *See* Fed.R.Civ.P. 9(b); *Borsellino v. Goldman Sachs Group, Inc.,* 477 F.3d 502, 507 (7th Cir.2007). A complaint alleging fraud must provide "the who, what, when, where, and how." *Borsellino,* 477 F.3d at 507 (quoting *U .S. ex rel. Gross v. AIDS Research Alliance-Chicago,* 415 F.3d 601, 605 (7th Cir.2005)).

In determining whether a plaintiff has satisfied the pleading requirements, the court must read the complaint liberally, accept as true all well-pleaded allegations, and view all reasonable inferences that may be drawn therefrom in the light most favorable to the plaintiff. *Int'l Med. Group, Inc. v. Am. Arbitration Ass'n,* 312 F.3d 833, 841 (7th Cir.2002); *Mosley v. Klincar,* 947 F.2d 1338 (7th Cir.1991). When considering a motion to dismiss under Rule 12(b)(6), the court is limited to considering only the pleadings, including documents referred to in the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

pleadings, and facts that may be judicially noticed. *Menominee Indian Tribe v. Thompson,* 161 F.3d 449, 456 (7th Cir.1998); *Alioto v. Marshall Field's & Co.,* 77 F.3d 934, 936 (7th Cir.1996). If the court considers extrinsic materials, the motion to dismiss must be converted to one for summary judgment under Federal Rule of Civil Procedure 56. Fed.R.Civ.P. 12(c); *Alioto,* 77 F.3d at 936. Ordinarily, a court is required to provide the adversely affected party with notice that it will convert a motion for judgment on the pleadings to one for summary judgment. *Alioto,* 77 F.3d at 936. However, under certain circumstances, such as when the "parties had every reason to know that extraneous material was being considered," explicit notice is not required. *Fleischfresser v. Directors of Sch. Dist. 200,* 15 F.3d 680, 684 (7th Cir.1994).

## FORUM NON CONVENIENS

**\*4** Both defendants argue that the complaint should be dismissed pursuant to the doctrine of forum non conveniens in favor of Canadian courts.

Under the doctrine of forum non conveniens, "a trial court may dismiss a suit over which it would normally have jurisdiction if it best serves the convenience of the parties and the ends of justice." *Kamel v. Hill-Rom Co.,* 108 F.3d 799, 802 (7th Cir.1997) (citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *Koster v. Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 527, 67 S.Ct. 828, 91 L.Ed. 1067 (1947)). Two elements are required for dismissal on the basis of forum non conveniens. First, the question is whether there is an adequate alternative forum available. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255 n. 22, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). "Ordinarily, this requirement will be satisfied when the defendant is 'amenable to process' in the other jurisdiction." *Id.* (citing *Gilbert,* 330 U.S. at 506-07). However, in rare circumstances the alternative forum may nonetheless be inadequate if, for example, the plaintiff's claims are not recognized in the foreign jurisdiction. *See id.* The plaintiffs do not dispute that the Canadian courts provide an ad-

equate forum for their claims. Rather, the plaintiffs' objection focuses upon the second element of the forum non conveniens test.

Once it is determined that the alternative forum is adequate, dismissal on the basis of forum non conveniens is appropriate only if the convenience of the parties and the ends of justice are best served by dismissing the action. When a plaintiff has chosen to file suit in its home forum, the assumption arises that the forum is convenient and deference afforded the plaintiff's decision. *Piper Aircraft,* 454 U.S. at 241, 253, 255. However, if trial in the Eastern District of Wisconsin would be oppressive or vexatious to the defendants out of all proportion to the plaintiff's convenience, then this court may dismiss the plaintiff's claim under the doctrine of forum non conveniens. *American Dredging Co. v. Miller,* 510 U.S. 443, 447, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994) (citing *Piper Aircraft,* 454 U.S. at 241). This element is determined by evaluating numerous factors affecting the private interests of the parties and factors affecting public interests. *See Piper Aircraft,* 454 U.S. at 255.

Defendants provide essentially seven reasons as to why Canadian courts are a more appropriate forum for this case: (1) all witnesses other than the plaintiffs are located in Canada; (2) all relevant events occurred in Canada; (3) all documents are located in Canada; (4) third-party witnesses are located in Canada and beyond the subpoena power of this court; (5) Canada has a strong interest in regulating its own corporations; (6) American interests in this case are minimal; and (7) the only Wisconsin plaintiff is a large hedge fund that chose to invest in Canada.

The reasons cited by the defendants do not lead to the conclusion that the interests of justice would be served by dismissing this present action. Although travel of witnesses is naturally burdensome to some degree, such travel is commonplace in litigation. Travel between Milwaukee and Toronto can be accomplished easily and inexpensively. *See ISI Int'l, Inc. v. Borden Ladner Gervais LLP,* 316

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

F.3d 731, 732 (7th Cir.2003) ("Travel between Ontario and Illinois requires only a short and inexpensive journey."). Moving this matter to Canada would simply transfer the burden of travel to the Milwaukee-based plaintiffs.

*5 The defendants' assertion that all relevant events occurred in Canada is also unpersuasive. The defendants provide no explanation as to how this fact translates into inconvenience for the defendants. The defendants' claim that the transportation of documents shall be burdensome is also unpersuasive. Copying and transporting documents is an inherent part of discovery in any litigation. There are many reliable and inexpensive means by which to transport documents. Additionally, documents may be digitized as easily as documents are copied, and digitized documents may be easily and quickly transferred electronically. The ready-availability of electronic transfer of documents renders distance largely irrelevant.

As for the limitations of this court's subpoena power, most any international litigation will result in some witnesses being outside of the subpoena power of the forum court. The fact that certain witnesses would be beyond the subpoena power of this court would be no less true of the Canadian court. The witnesses that the defendants point to as being beyond this court's subpoena power are best characterized as being peripheral to this litigation. Additionally, the defendants provide no reason as to why many of these witnesses, such as the defendants' own financial or legal advisors, would not appear voluntarily in Milwaukee if requested to do so by the defendants.

The defendants next argue that Canada has a strong interest in regulating its corporations and that the United States' interests in this matter are minimal. In support of its argument, the defendants point to the complaint the plaintiffs filed with the Ontario Securities Commission regarding the conduct that is the focus of this litigation in which the plaintiffs state that this is a matter "of critical importance to the Canadian capital markets." Addi-

tionally, the defendants point out that at no time during the time relevant to this litigation, did Old Falconbridge shares trade on any United States stock exchange.

Certainly, Canadian courts have an interest in addressing allegations of fraud made against its domestic corporations. However, United States courts have a similar interest in addressing alleged frauds perpetrated upon its citizens. The fact that the plaintiffs previously acknowledged that the transactions in question were of critical importance to the Canadian capital markets is not at all determinative. Simply because a matter is of critical concern for the Canadian capital markets does not necessarily mean that the matter is of no concern to other jurisdictions. Finally, the fact that Old Falconbridge stock never traded on any United States exchange is a fact that weighs in favor of the Canadian forum. However, this single factor is mitigated by the fact that the stock of both Noranda and Brascan was traded on the NYSE.

Finally, the defendants argue that a factor weighing in favor of dismissing the complaint on the basis of forum non conveniens is the fact that this case is connected to the Eastern District of Wisconsin simply because an investor happens to be a resident of this district. However, this again is a frequent characteristic of litigation. Often times the venue for litigation is based upon the fortuitous situs of the plaintiff.

*6 Having weighed the public and private interests affecting the appropriate forum for this litigation, the court concludes that litigating this matter in the Eastern District of Wisconsin as opposed to Canada would not be oppressive or vexatious to the defendants out of all proportion to the plaintiffs' convenience. At best, evaluating the forum of the Eastern District of Wisconsin versus the Canadian forum results in a draw. Given the deference that must be afforded to a plaintiffs' choice of forum, this court shall not dismiss the complaint pursuant to the doctrine of forum non conveniens.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 153542 (E.D.Wis.)

**(Cite as: 2008 WL 153542 (E.D.Wis.))**

### FALCONBRIDGE'S MOTION TO DISMISS

### Failure to State a Claim under Section 10(b) of the 1934 Act

New Falconbridge presents seven reasons as to why the plaintiffs have failed to state a claim under § 10(b). New Falconbridge first argues that the complaint does not support the inference of scienter. Second, New Falconbridge argues the complaint does not allege any actionable misrepresentations or omissions. Third, New Falconbridge argues that the plaintiffs' allegations regarding § 10(b) are not pled with requisite particularity. Fourth, New Falconbridge argues that the plaintiffs' allegations are not actionable under § 10(b) because they are simply allegations of corporate mismanagement. Fifth, the plaintiffs are not able to plead that they relied upon allegedly false or misleading statements. Sixth, New Falconbridge argues that the plaintiffs lack standing to bring an action under § 10(b) with respect to statements made by Noranda regarding the Issuer Bid. Finally, New Falconbridge argues that the plaintiffs' § 10(b) claims should be dismissed because the plaintiffs have failed to plead loss causation.

### Scienter

The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that, with respect to each act or omission, the plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.' " *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* ---U.S. ----, ----, 127 S.Ct. 2499, 2507, 168 L.Ed.2d 179 (2007) (quoting *Ernst & Ernst,* 425 U.S., at 193-194, and n. 12 (1976)), or the " 'reckless disregard for the truth of the material asserted,' whether by commission or omission." *Ambrosino v. Rodman & Renshaw, Inc.,* 972 F.2d 776, 790 (7th Cir.1992) (quoting *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1044 (7th

Cir.1977); *see also Tellabs,* 127 S.Ct. at 2507 n. 3 (noting that it was not deciding the issue of whether recklessness satisfies the scienter requirement). With respect to recklessness, the Seventh Circuit held:

reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*\*7 Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977) (quoting *Franke v. Midwestern Oklahoma Development Authority,* CCH Fed. Sec. L. Rep. 95,786 at 90,850 (W.D.Okl.1976)). The court continued by noting that the type of recklessness required must be "equivalent to wilful (sic) fraud." *Id.* (quoting *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 868 (2d Cir.1968) (Friendly, J., concurring) (en banc)). If the plaintiffs fail meet this pleading requirement, the court shall dismiss the complaint. § 78u-4(b)(3)(A).

"Under the PSLRA's heightened pleading instructions, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Id.* at 127 S.Ct. at 2508 (quoting 15 U.S.C. § 78u-4(b)(1); and (2)).

In New Falconbridge's motion to dismiss and the plaintiffs' response to that motion, both parties relied extensively upon *Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 437 F.3d 588 (7th Cir.2006). However, while the present motions were pending, the Supreme Court granted certiorari in *Makor* to resolve a split among the circuits regarding the is-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 153542 (E.D.Wis.)
**(Cite as: 2008 WL 153542 (E.D.Wis.))**

sue with which this court is presented, i.e., what must a plaintiff plead with respect to scienter to survive a motion to dismiss? Following the Supreme Court's decision in *Tellabs,* both parties filed submissions to this court addressing how this decision affected their respective positions.

In *Tellabs,* the Court stated:

It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind. Rather, to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by § 21D(b)(2) must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, ... but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, non-culpable explanations for the defendant's conduct. To qualify as "strong" within the intendment of § 21D(b)(2), we hold, an inference of scienter must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

*Tellabs,* 127 S.Ct. at 2504-05.

In conducting this inquiry, a court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 2509 (emphasis in original). Further, when determining whether an inference is "strong," the court must undertake a comparative inquiry, and

*8 must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences." ... [T]he inference of scienter must be

more than merely "reasonable" or "permissible"-it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Id.* at 2510 (internal citations omitted).

Specifically, the Court held, "the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 2511.

In their response to New Falconbridge's motion to dismiss, the plaintiffs point to numerous allegations in the complaint, which they argue support a strong inference of scienter. (Docket No. 33 at 47-49.) The plaintiffs specifically point to their allegations that (1) documents contained misrepresentations and omissions relating to Noranda and Old Falconbridge's "respective assets and leverage," which was information critical to Noranda's and Old Falconbridge's core operations; (2) the dollar value of these errors was large; (3) the defendants were informed of errors in the valuation prior to the expiry of the Tender Offer and rather than correcting the errors, it issued a press release stating that the valuation complied with the law and the deal was attractive to Old Falconbridge shareholders; (4) the defendants stated publicly that a merger would not create any material synergies and thus knew there was no basis for marking up the value of the Noranda shares based upon resulting synergies; (5) because Noranda would continue as the surviving company following the merger, the defendants knew that the valuation should not have included an undisclosed takeover premium; (6) the Special Committee represented that they supervised the preparation of the valuation but Old Falconbridge's CEO was involved in the preparation of the valuation and reviewed its methodologies; (7) Noranda manipulated its stock price to increase the value of its consideration; (8) contrary to the de-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

fendants' representations, the Special Committee was not independent nor acting in the shareholders' best interests because members of the Special Committee were affiliated with the defendants; (9) Noranda represented that its stock was worth $19, whereas it had never traded that high; and (10) Brascan sold its interests in Noranda at a substantial premium over what it stood to make in its earlier unsuccessful effort to sell its interest. (Docket No. 33 at 47-49.)

New Falconbridge argues in its initial supporting brief and its reply that the plaintiffs fail to present sufficient facts to support their conclusory allegations. (Docket No. 43 at 9-10.)

**\*9** Although plaintiffs' inferences of fraud are in many instances reasonable, the inference of fraud is not "cogent and compelling" or "strong in light of other explanations even when all the plaintiffs' allegations are reviewed together;" therefore the court will grant the defendant New Falconbridge's motion to dismiss the plaintiffs' § 10(b) claims. *See Tellabs,* 127 S.Ct. at 2510.

Many of the plaintiffs' allegations relate to alleged errors in the valuation. New Falconbridge argues that there were no errors in the valuation and thus the plaintiffs' allegations could hardly be evidence of scienter. (Docket No. 23 at 41-43; Docket No. 43 at 10 n. 12.) As with any factual allegation in a complaint, the court shall accept the plaintiffs' allegations regarding the existence of inaccuracies in the valuation as true. *See Tellabs,* 127 S.Ct. at 2509. Even accepting as true that the plaintiffs' subsequent expert analysis has uncovered errors in the valuation, such hindsight analysis is insufficient to support the inference of scienter.

The valuation was conducted by TD, an independent Canadian investment bank. (Docket No. 41 at 23.) Although the plaintiffs take issue with certain of TD's assumptions and methodologies, the plaintiffs' allegations do not support the conclusion that the defendants' intent was to defraud. The assumptions and methodologies were TD's and were

not under the direct control of the defendants. Although the Special Committee represented that it supervised the preparation of the valuation, the Special Committee, although related to the defendants, was independent of the defendants. Therefore, the fact that the Special Committee was in a position to learn of any alleged error in the valuation does not support a strong inference that any errors in the valuation persisted because of the defendants' fraudulent intent.

The fact that the valuation was independently conducted and independently supervised would not automatically immunize an entity for misrepresentations contained in a valuation or prevent errors in the valuation from supporting a strong inference of scienter; however, under the attendant circumstances, the fact that the valuation was conducted by TD and supervised by the independent Special Committee weighs heavily on the side supporting the conclusion that the persistence of the errors in the valuation were not the result of the defendants' fraudulent intent.

Although the plaintiffs allege that the significant dollar amount of these resulting errors supports a strong inference of scienter, this court finds most persuasive the principle set forth by the Sixth Circuit in *Fidel v. Farley,* 392 F.3d 220, 231 (6th Cir.2004), when it stated, "Allowing an inference of scienter based on the magnitude of fraud 'would eviscerate the principle that accounting errors alone cannot justify a finding of scienter.' " *Id.* at 231 (quoting *In re SCB Computer Tech., Inc. Sec. Litig.*, 149 F.Supp.2d 334, 359 (W.D.Tenn.2001)). Based upon the relevant factors presented in this case, most notably that the valuation was prepared by an independent and competent investment bank, the court is unable to say that, based upon the dollar amount of the alleged error or any other specific error, that the defendants' failure to correct any alleged error in the valuation was reckless.

**\*10** It is additionally notable that the valuation was provided to the plaintiffs. (Docket No. 1 at 42, ¶ 128, 58, ¶ 172.) It is clear that the plaintiffs care-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 153542 (E.D.Wis.)
**(Cite as: 2008 WL 153542 (E.D.Wis.))**

fully reviewed the valuation, even going so far as to alert the defendants of their concerns, prior to tendering their shares. In response to the plaintiffs' concerns, rather then making any correction, the defendants issued a press release affirming that the valuation complied with the law. The plaintiffs argue that the issuance of the press release affirming the appropriateness of the valuation supports a strong inference of scienter. The court disagrees.

"A subject of a Tender Offer or merger bid has no duty to issue a press release, but if it chooses to speak it must tell the truth about material issues." *Ackerman v. Schwartz,* 947 F.2d 841, 848 (7th Cir.1991) (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 232-36, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ). Based upon the circumstances, the court believes that the stronger inference drawn from the issuance of the press release is not that the defendants acted with fraudulent intent in devising and executing the complained of transactions, but rather that they honestly believed that there were no errors in the valuation. If the defendants possessed a fraudulent intent and arguably were aware of any errors, since there was no indication that the transaction was on the brink of failure, the most reasonable response from the defendants would have been silence. Certainly, the defendants were aware that any continued fraudulent representation, particularly in the highly-public form of a press release, would simply further expand their potential liability.

As for the plaintiffs' allegation that the defendants falsely represented that the Special Committee was independent and acting in the shareholders' best interests because members of the Special Committee had certain affiliations with the defendants, the fact that an affiliation existed is insufficient to create a strong inference of scienter. One might reasonably expect some degree of affiliation, as opposed to choosing only complete strangers to serve in such a critical capacity. However, the existence of an affiliation does not necessarily undermine independence. The plaintiffs' allegations, at most, demonstrate that members of the Special Commit-

tee were affiliated with related entities; the plaintiffs fail to plead sufficient facts to demonstrate that these individual affiliations were sufficient to undermine the represented independence of the Special Committee, and thus the plaintiffs fail to demonstrate that an alleged lack of independence on the part of the Special Committee supports a strong inference of scienter. As for the plaintiffs' allegations that the Special Committee was not acting in the best interests of shareholders, the court regards this as merely a conclusory allegation, insufficient to support a strong inference of scienter.

As for the fact that the complained of conduct resulted in a substantial benefit to Brascan, this too is insufficient to support a strong inference of scienter. Although courts have said, "The incentive to complete the lucrative sale of a business, and the personal pecuniary benefits associated therewith, can create a strong motive to engage in fraud and, logically, can raise an inference of scienter sufficient to support allegations of fraud," *Danis v. USN Communs., Inc.,* 73 F.Supp.2d 923, 940 (N.D.Ill.1999) (quoting *Zuckerman v. Fox Meyer Health Corp.,* 4 F.Supp.2d 618 (N.D.Tex.1998) (citing *Trecker v. Scag,* 679 F.2d 703 (7th Cir.1982))), this court does not find that pecuniary gain is sufficient to support an inference of scienter in light of the Supreme Court's holding in *Tellabs.*

*11 Admittedly, pecuniary benefit is perhaps the most frequent motive for fraud. However, in addition to being a motive underlying fraud, pecuniary benefit is the underlying motive in most every action undertaken by a capitalistic business. When the same conduct may support both an inference of fraudulent or innocent motivation, it is only if the innocent inference is stronger that the court will conclude that the plaintiffs have failed in their burden of pleading scienter. *Tellabs,* 127 S.Ct. at 2510. Under the circumstances presented, it is the conclusion of this court that the stronger inference is that the defendants were motivated by innocent and ordinary capitalistic motives rather then fraud. The plaintiffs are essentially asking the court to infer

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

that every time an entity undertakes an action for pecuniary benefit, the inference of fraud is at least as strong as any innocent profit-seeking motive. Such a pessimistic outlook on human nature is unreasonable; accepting the premise that fraud is equally as likely as any innocent motive, simply because the motivation was pecuniary benefit, would not bode well for our society. Rather, it is the conclusion of this court that simply because the end result was a gain for the defendants does not create a strong inference of scienter. *See Schleicher v. Wendt,* 2007 U.S. Dist. LEXIS 67924, 2007 WL 4580035 (S.D.Ind.2007) (citing *Cutsforth v. Renschler,* 235 F.Supp.2d 1216, 1250 (M.D.Fla.2002) (allegation that defendants fraudulently inflated the stock price to benefit the company "has no force since it would seem to apply to just about every case.")). As the court noted in *Davis v. SPSS, Inc.,* 385 F.Supp.2d 697, 714 (N.D.Ill.2005):

> The desire to increase the value of a company and attain the benefits that result, such as meeting analyst expectations and reaping higher compensation, are basic motivations not only of fraud, but of running a successful corporation. Were courts to accept these motives as sufficient to establish scienter, most corporate executives would be subject to such allegations, and the heightened pleading requirements for these claims would be meaningless. Thus, courts have repeatedly rejected plaintiff's allegations as sufficient to establish scienter.

*Id.* (citing cases). If pecuniary motive was to be equated with a strong inference that an entity acted with a fraudulent intent, then Congress' intent in establishing heightened pleading requirements under § 10(b) and Rule 10b-5, *see Tellabs,* 127 S.Ct. at 2508, would be effectively vitiated for, as stated previously, it is the desire of pecuniary gain that underlies most every business transaction.

Finally, the plaintiffs allege that the defendants' scheme to inflate the value of its stock to create the false impression that the consideration in the Tender Offer was more valuable than it was, and Noranda's allegedly false representation that its stock was worth at least $19 per share, support a strong inference of scienter. Such tautology is insufficient to support a strong inference of scienter; the plaintiffs, in effect, contend that the conclusory allegation that the defendants engaged in fraud is strong evidence that the defendants intended to engage in fraud.

**\*12** The specific actions that the plaintiffs point to as allegedly forming the basis for the purported fraud were publicly disclosed and either known or readily knowable to the plaintiffs at the time they tendered their Old Falconbridge shares. Under the circumstances of this case, the fact that much of the complained of conduct was publicly disclosed more strongly supports the conclusion that it was with innocent rather than fraudulent intent that the defendants acted. The plaintiffs' argument is largely one of "fraud by hindsight," *see Tellabs,* 168 S.Ct. at 2508 (quoting *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978)), and thus having evaluated the plaintiffs' complaint as a whole, the court must conclude that the plaintiffs have failed to plead scienter with the specificity required by the Supreme Court in *Tellabs.* Therefore, this court will grant the defendant New Falconbridge's motion to dismiss the plaintiffs' § 10(b) claim (Count II). The preceding analysis applies equally to the plaintiffs' claim against New Falconbridge for violations of Section 14(e) of the 1934 Act (Count I), and therefore New Falconbridge's motion to dismiss these claims shall be similarly granted.

**Reliance**

With respect to the plaintiffs' § 10(b) and 14(e) claims, New Falconbridge argues that the plaintiffs' claims must fail because they are unable to adequately plead that they relied upon any allegedly misleading or false statements. Specifically, New Falconbridge points out that the complaint states that the plaintiffs learned of the alleged problems in the Issuer Bid shortly before the expiration of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 153542 (E.D.Wis.)
**(Cite as: 2008 WL 153542 (E.D.Wis.))**

Tender Offer. The plaintiffs' knowledge is evidenced in their April 29, 2005 letter to the Ontario Securities Commission ("OSC") made before the expiration of the Tender Offer, wherein the plaintiffs set forth many of the same alleged inaccuracies that form the basis for their present complaint. (Docket No. 23 at 51-52.)

The plaintiffs respond by arguing that they have adequately pled reliance, and alternatively, individual reliance is not an indispensable element of their claims. (Docket No. 33 at 52-54.) Specifically, the plaintiffs argue that all that must be shown is that the defendants' fraud induced the requisite number of shareholders to approve the proposed action that resulted in the complained of injury. (Docket No. 33 at 53.)

In reply, the defendants cite *Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 437 F.3d 588, 595 (7th Cir.2006), rev'd on other grounds, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* --- U.S. ----, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007), wherein the Seventh Circuit explicitly held that plaintiff's justified reliance upon the defendant's false statements is an element of a claim under § 10(b) of the Securities Exchange Act and Rule 10b-5. *Id.* at 595 (citing *Caremark, Inc. v. Coram Healthcare Corp.,* 113 F.3d 645, 648 (7th Cir.1997)).

The Seventh Circuit has made it clear that individual reliance is an element of a plaintiffs' claim under § 10(b) of the Securities Exchange Act and Rule 10b-5. For the same reasons that individual reliance is an element of a § 10(b) or Rule 10b-b claim, the court finds that individual reliance is an element of a claim under § 14(e).

**\*13** However, the court recognizes that there may be circumstances where an investor's knowledge of fraud will not prevent his injury. This may occur, for example, in instances where a nontendering shareholder is forced out following a transaction wherein a sufficient number of other shareholders are deceived into tendering their shares. *See, e.g., Plaine v. McCabe,* 797 F.2d 713,

717 (9th Cir.1986) (discussing an alleged violation of § 14(e)).

Based upon the facts alleged in the complaint, this is not what occurred in the present case. Rather than exercising their dissenters' rights, the plaintiffs allegedly chose to tender their shares out of fear that they would later be forced out. In light of the plaintiffs' letter to the OSC, in tendering their shares, the plaintiffs were knowingly succumbing to what they now claim was a fraud. It is simply illogical to permit the laws that were designed to protect investors deceived by sophisticated companies engaged in fraudulent schemes to similarly be wielded as a sword by sophisticated investors who, for whatever reason, knowingly accepted the risk of entering into transactions they suspect were fraudulent.

The fact that it eventually turned out that regardless of the plaintiffs tendering their shares, sufficient other shareholders also tendered their shares so as to achieve the result desired by the defendants is irrelevant. At the time they tendered their shares, the plaintiffs had no way of knowing that the Tender Offer would be successful; for all they knew, the shares the plaintiffs tendered could have meant the difference in enabling the defendants to accomplish their alleged scheme. Although the plaintiffs allege that they believed the success of the Issuer Bid and subsequent merger to be inevitable, permitting shareholder plaintiffs to proceed with § 10(b) and § 14(e) claims after they tendered their shares based upon a belief that objection to suspected fraud would be futile, would run contrary to public policy. Public policy favors shareholders suspicious of fraud speaking up.

A person who is aware of the alleged fraud before tendering his shares but nonetheless did so out of the belief that objecting would be futile will be barred from bringing a § 10(b) or § 14(e) claim based on an inability to plead the element of reliance. Any other result would run contrary to public policy in that it would not encourage the strong public policy in favor of preventing frauds before

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

they occur. A shareholder believing that the Tender Offer is founded in fraud must choose a single consistent path-either object and do not tender his shares, or tender his shares and accept what may come. In the view of this court, § 10(b) and § 14(e) are available only for those who were unknowingly deceived and tendered their shares, or non-tendering shareholders who suffered an injury as a result of a sufficient number of other shareholders tendering shares as a result of the defendant's fraudulent statements. Neither instance allegedly occurred here, and thus the plaintiffs have failed to plead reliance. This defect in the pleadings constitutes another reason as to why the plaintiffs' § 10(b) and § 14(e) claims must be dismissed.

*14 Although New Falconbridge presents numerous alternative reasons as to why the plaintiffs' § 10(b) and § 14(e) claims should be dismissed, having granted New Falconbridge's motion to dismiss these claims for the plaintiffs' failure to adequately plead scienter and reliance, it is not necessary to address New Falconbridge's alternative arguments.

**Failure to State a Claim under Section 9(a)(2) and 9(a)(4) of the 1934 Act**

In Count III, the plaintiffs allege that New Falconbridge violated § 9(a)(2) of the Exchange Act, and in Count IV, the plaintiffs allege that New Falconbridge violated § 9(a)(4) of the Exchange Act.

Section 9 of the 1934 Act states, in relevant part:

(a) Transactions relating to purchase or sale of security. It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange-

* * *

(2) To effect, alone or with one or more other

persons, a series of transactions in any security registered on a national securities exchange or in connection with any security-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act) with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

* * *

(4) If a dealer or broker, or the person selling or offering for sale or purchasing or offering to purchase the security or a security-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act) with respect to such security, to make, regarding any security registered on a national securities exchange or any security-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act) with respect to such security, for the purpose of inducing the purchase or sale of such security or such security-based swap agreement, any statement which was at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, and which he knew or had reasonable ground to believe was so false or misleading.

* * *

(e) Persons liable; suits at law or in equity. Any person who willfully participates in any act or transaction in violation of subsection (a), (b), or (c) of this section, shall be liable to any person who shall purchase or sell any security at a price which was affected by such act or transaction, and the person so injured may sue in law or in equity in any court of competent jurisdiction to recover the damages sustained as a result of any such act or transaction.

15 U.S.C. § 78i

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Section 9(a)(2) functions to preserve the reliability of reported trading activity as an index of the value of a security. "The central purpose of section 9(a) is not to prohibit market transactions which may raise or lower the price of securities, but to keep an open and free market where the natural forces of supply and demand determine a security's price." *Trane Co. v. O'Connor Sec.,* 561 F.Supp. 301, 304 (S.D.N.Y.1983) (quoting *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 383 (2d Cir.1973). By enacting § 9(a), Congress "sought to protect the small investor by maintaining a market controlled by natural forces rather than by intervention of artificial manipulative devices...." *Id.* at 305.

*15 The elements of a violation of § 9(a)(2) in a private action brought under § 9(e) were determined [by the Second Circuit] in *Crane Co. v. Westinghouse Air Brake,* 419 F.2d 787 (2d Cir.1969), rev'd on other grounds, 490 F.2d 332 (1973). In conformity with *Crane,* the Fifth Circuit explicated the five elements that a plaintiff must plead and prove in order to establish a violation of § 9(a)(2), as follows:

> (1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter (3) for the purpose of inducing the security's sale or purchase by others, (4) was relied on by the plaintiff, (5) and affected plaintiff's purchase or selling price.

*Chemetron Corp. v. Business Funds, Inc.,* 682 F.2d 1149, 1164 (5th Cir.1982), vacated on other grounds, 460 U.S. 1007, 103 S.Ct. 1245, 75 L.Ed.2d 476 (1983).

*UBaum v. Phillips, Appel & Walden, Inc.,* 648 F.Supp. 1518, 1529-30 (S.D.N.Y.1986); *see also, Perry v. Eastman Kodak Co.,* 1991 U.S. Dist. LEXIS 20914, 17-18, 1991 WL 629728 (S.D.Ind.1991) (adopting the five *Chemetron* elements) aff'd, 1992 U.S.App. LEXIS 11753.

New Falconbridge argues that the plaintiffs have failed to sufficiently plead scienter and to comply with Federal Rule of Civil Procedure 9(b). (Docket No. 23 at 56.) Specifically, New Falconbridge argues that the plaintiffs' allegations are conclusory, and they have failed to provide any factual allegations to support the proposition that the defendants willfully made material misstatements with the intent to deceive Old Falconbridge shareholders. (Docket No. 23 at 56.) Further, New Falconbridge argues that the plaintiffs' claims should be dismissed because, like with their § 10(b) claims, they have failed to adequately plead reliance. (Docket No. 23 at 57.)

The plaintiffs respond that the complaint is sufficient because it alleges that Noranda had a direct and pecuniary motive to ensure the success of the Tender Offer, which in turn depended upon convincing Old Falconbridge's shareholders that each Noranda share was more valuable than it actually was. (Docket No. 33 at 57.) Second, the plaintiffs argue that evidence that Noranda violated SEC Regulation M supports the inference that Noranda was willfully manipulating its stock price. (Docket No. 33 at 58.) Finally, the plaintiffs argue that Noranda's dissemination of an Offering Circular and SEC Registration Statement that contained materially false and misleading statements support the inference that Noranda's acts were willful. (Docket No. 33 at 58 (citing Docket No. 1 at 43-51, 56-59, ¶¶ 131-152, 164-173).)

The court finds that the plaintiffs' § 9(a) claims must fail for many of the same reasons the plaintiffs' § 10(b) claims must fail. First, the plaintiffs have failed to adequately plead scienter. Section 9(a) does not prohibit transactions simply because they raise or lower a security's sale price. *See, e.g., Spicer v. Chicago Bd. Options Exchange, Inc.,* 1990 U.S. Dist. LEXIS 14469, 7-8, 1990 WL 16983 (N.D.Ill.1990); *Trane Co. v. O'Connor Sec.,* 561 F.Supp. 301, 304 (S.D.N.Y.1983) (citing *Chris-Craft v. Piper Aircraft,* 480 F.2d 341, 383 (2d Cir.1973)). As discussed above, a pecuniary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 153542 (E.D.Wis.)
**(Cite as: 2008 WL 153542 (E.D.Wis.))**

motive cannot, by itself, act as strong evidence of scienter because, in addition to being a frequent motive for fraud, it is also nearly universally the primary motivation underlying any business transaction. Holding that pecuniary motive alone was sufficient would effectively eviscerate the safeguard against harassing lawsuits that the scienter requirement is intended to represent. Thus, the fact that the defendants' had a pecuniary motive does not support an inference of scienter because it does not present a cogent and compelling inference of fraud that is strong in light of other explanations.

*16 Even when the defendants' pecuniary motive is evaluated in conjunction with the plaintiffs' other allegations presented to support the inference of scienter, the court finds the complaint insufficient to state of claim for a violation of § 9(a). The inference of fraud is not cogent and compelling based upon the defendants' alleged violation of SEC Regulation M. The defendants' conduct, including their alleged violation of SEC Regulation M, was publicly apparent and known or readily knowable to the plaintiffs. Thus, the court finds that an innocent explanation for the defendants' alleged conduct is a stronger inference than an inference of fraud.

Finally, although the plaintiffs devote numerous pages of their complaint to detailing alleged inaccuracies in the Offering Circular and SEC Registration Statement, (see Docket No. 1 at 43-51, 56-59, ¶¶ 131-152, 164-173), for the reasons set forth above with respect to the plaintiffs' § 10(b) claims, the court finds the plaintiffs' allegations insufficient to support the strong inference of scienter with respect to their § 9(a) claims. Nearly all of the inaccuracies alleged by the plaintiffs relate to the valuation. However, the court finds that the alleged inaccuracies in this valuation cannot support the inference that the defendants acted with the requisite scienter because the valuation was not prepared by the defendants but rather was prepared by an independent investment bank. Because it was TD rather than the defendants who prepared the valuation, the

facts relied upon and the methodology utilized indicate little, if anything, as to the defendants' states of mind, and thus the plaintiffs' allegations, when viewed alone or in combination with the plaintiffs' other allegations, cannot support a strong inference of scienter.

Additionally and alternatively, the court finds that New Falconbridge's motion to dismiss the plaintiffs' § 9(a) claims must be granted because the plaintiffs fail to adequately plead reliance. Like the plaintiffs' § 10(b) and § 14(e) claims, reliance is an element of the plaintiffs' § 9(a) claims. *Perry,* 1991 U.S. Dist. LEXIS 20914, 17-18, 1991 WL 629728. As discussed above, it would be contrary to the strong public policy in favor of preventing fraud before it occurs to permit a plaintiff who believes a fraud may be occurring and has a remedy available to prevent the fraud from occurring to nonetheless permit the fraud to occur, and then attempt to seek redress under § 9(a), § 10(b), or § 14(e). Therefore, for the same reasons the plaintiffs' § 10(b) and § 14(e) claims fail the plaintiffs' failure to plead reliance, so too must the plaintiffs' § 9(a) claims. *See id.*

### Failure to State a Claim Under Section 11 of the 1933 Act

The defendants argue that the plaintiffs' claim under § 11 of the 1933 Act must be dismissed because: (1) the plaintiffs have failed to allege that the registration statement for the Tender Offer contained any actionable misstatement or omission; (2) the plaintiffs have failed to comply with the heightened pleading requirements of Rule 9(b); and (3) the plaintiffs have not suffered any recoverable damages.

*17 The plaintiffs respond by arguing that the complaint does sufficiently allege actionable misstatements or omissions; § 11 claims need not conform with Rule 9(b), or if the heightened pleading standard applies, the plaintiffs have met the standard; and the plaintiffs have suffered damages and the defendants misinterpret 15 U.S.C. § 77k(e).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 153542 (E.D.Wis.)
**(Cite as: 2008 WL 153542 (E.D.Wis.))**

The defendants argue that the plaintiffs have suffered no damages because the price of the securities in question on the dates that the complaint was filed and amended were greater than the initial purchase price. Under § 11, damages are measured by the difference between the price paid for the security and the price of the security at the time it was sold or when the lawsuit was filed. 15 U.S.C. § 77k(e).

15 U.S.C. § 77k(e) states in relevant part:

Measure of damages; undertaking for payment of costs. The suit authorized under subsection (a) may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought: Provided, That if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.

The plaintiffs respond that the defendants improperly utilize the market price of Noranda's common shares when calculating the "amount paid." Rather, the plaintiffs argue that the "amount paid" is appropriately the value of their Old Falconbridge shares.

The defendants reply by pointing out that even if the court were to accept the plaintiffs' arguments, nonetheless, the plaintiffs fail to show damages. Specifically, the trading price of one share of Old Falconbridge on May 5, 2005, the date the Tender Offer expired, was Cdn. $39.59. In exchange for each Old Falconbridge share tendered, the plaintiffs received 1.77 shares of Noranda stock. Noranda subsequently became New Falconbridge and on November 7, 2005, the date this lawsuit was filed, a share of New Falconbridge was trading at Cdn. $34.43, thus making the 1.77 shares that the plaintiffs received in exchange for each share of Old Falconbridge worth Cdn. $60.94. Therefore, if the plaintiffs had sold their New Falconbridge shares on the date they filed this lawsuit, they would have earned Cdn. $21.35 per Old Falconbridge share, and thus the plaintiffs cannot prove damages under § 77k(e).

**\*18** With respect to their § 11 claims, the complaint is devoid of any allegation of damages other than to say, "By virtue of the foregoing, **Stark Trading** and Shepherd are entitled to damages under Section 11, as measured by the provisions of Section 11(e), from New Falconbridge." (Docket No. 1 at 80, ¶ 260.) Absent a claim that the relevant security, in this case the New Falconbridge shares, dropped in value relevant to the exchanged security, in this case the Old Falconbridge shares, the plaintiffs' § 11 claims are legally insufficient and must be dismissed. *See Grossman v. Waste Management, Inc.,* 589 F.Supp. 395, 415 n. 10 (N.D.Ill.1984).

The plaintiffs' argument presented in response to the defendants' motions to dismiss that they were nonetheless damaged because their consideration for the Noranda shares, i.e. the Old Falconbridge shares, were undervalued, is an argument the court finds insufficient to state a claim under § 11, if the plaintiffs had included this allegation in their complaint. The "amount paid" for 1.77 shares of Noranda stock was 1 share of Old Falconbridge stock. The value of one share of Old Falconbridge, at the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 153542 (E.D.Wis.)
(Cite as: 2008 WL 153542 (E.D.Wis.))

time the Tender Offer expired, was Cdn. $39.59. Under the circumstances, this market price is a fair determination of the stock's value. *See id.* at 416 (citing *Mills v. Electric Auto-Lite Co.,* 552 F.2d 1239, 1247 (7th Cir.1977). The plaintiffs do not allege in their complaint that the defendants deflated the value of Old Falconbridge or did anything to directly manipulate the market price of Old Falconbridge stock. Rather, the plaintiffs allege that the defendants inflated the value of the Noranda shares. When an investor purchases a security at an allegedly inflated price but the security nonetheless increases in value, § 11 does not provide that investor with a remedy because the investor is unable to prove damages under § 77k(e).

Because the court finds that the plaintiffs have failed to adequately plead damages so as to state a claim under § 11, the court shall not address the defendants' other challenges to the sufficiency of the plaintiffs' § 11 claim.

### Court Declines to Exercise Supplemental Jurisdiction Over Wisconsin Law Claims

The plaintiffs' claims regarding New Falconbridge's alleged violations of Wisconsin's statutory and common law, (*see* Docket No. 1, Counts VIII, IX, and X), are in federal court pursuant to the doctrine of supplemental jurisdiction, because these claims are directly related to the plaintiffs' federal law claims. *See* 28 U.S.C. § 1367. In dismissing all claims over which this court possesses original jurisdiction, this court may decline to exercise its supplemental jurisdiction over the remaining non-federal claims. § 1367(c)(3). Although not required to do so, ordinarily a district court will decline to exercise its supplemental jurisdiction when all federal claims have been dismissed. *Croplife Am., Inc. v. City of Madison,* 432 F.3d 732, 734 (7th Cir.2005); *Van Harken v. City of Chicago,* 103 F.3d 1346, 1354 (7th Cir.1997); *Boyce v. Fernandes,* 77 F.3d 946 (7th Cir.1996). Having dismissed all claims over which this court has primary jurisdiction, the court declines to exercise its supplemental jurisdiction over the plaintiffs' state law claims and

shall dismiss these claims without prejudice.

### BRASCAN'S MOTION TO DISMISS

**\*19** In their complaint, the plaintiffs allege that Brascan is liable for New Falconbridge's alleged violations of the Securities Exchange Act of 1934 pursuant to § 20(a) of the Act, 15 U.S.C. § 78t(a), (Docket No. 1, Count V, at 78-79), and for New Falconbridge's alleged violation of § 11 of the Securities Exchange Act of 1933 pursuant to § 15 of the Act, 15 U.S.C. § 77o, (Docket No. 1, Count VII, at 80-81), as a "control person" of Noranda and Old Falconbridge. In view of this court's determination that the plaintiffs have failed to set forth any legally sufficient claim under either the 1933 or 1934 Acts, the plaintiffs are effectively precluded from pursuing a claim against Brascan as a control person. Therefore, the court shall grant Brascan's motion to dismiss.

**IT IS THEREFORE ORDERED** that the defendants' motions to dismiss, (Docket Nos. 8, 13), are granted. Counts I through VII are dismissed with prejudice. *See, e.g., Waypoint Aviation Servs. v. Sandel Avionics, Inc.,* 469 F.3d 1071, 1074 (7th Cir.2006). Counts VIII through X are dismissed without prejudice. The clerk shall enter judgment accordingly.

E.D.Wis.,2008.
Stark Trading and Shepherd Inv. Intern., Ltd. v. Falconbridge Ltd.
Not Reported in F.Supp.2d, 2008 WL 153542 (E.D.Wis.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.